Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEW MEXICO

IN RE:

PLATINUM OIL PROPERTIES,

       Debtor.                    No. 09-10832 m11

BE IT REMEMBERED that this matter came on for

a Meeting of Creditors before LEONARD MARTINEZ-METZGAR,

Trustee/Coordinator on April 16, 2009, in Albuquerque,

New Mexico.

A P P E A R A N C E S

For the Debtor:              Roger Jones, Esq.
                             Jennie Deden Behles, Esq.

For Creditor:                Joi Thomas, Esq.

For JAYCO:                   Nancy Cusack, Esq.

Page 2

```
 1                          I N D E X

 2      EXAMINATION

 3        By The Trustee                              3

 4        By Ms. Thomas                              20

 5        By Ms. Cusack                              25

 6        By the Trustee                             26

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Proceedings          IN RE: Platinum Oil Properties, Debtor.
Held on April 16, 2009

Page 3

1    (CD 1 of 1)

2

3              THE TRUSTEE:  We're on record now in the

4    case of Platinum Oil Properties, Case No. 09-10832-m11.

5    My name is Leonard Martinez-Metzgar, and I'm with the

6    U.S. Trustee's Office.  Today's date is April the 16th,

7    and it's approximately 2:09 in the afternoon.  The

8    petition in this particular Chapter 11 was filed on

9    March the 2nd, 2009.  It's been continued a couple of

10   times, and that's why we have it set for today.  Notice

11   of this meeting has been mailed.

12            Appearing on behalf of the debtor is Mr. Roger

13   Jones and also Jennie Behles, who is local counsel.

14   Both have filed employment applications, and they're

15   waiting on orders of employment.

16            I've sent around a sign-up sheet for people

17   who wanted to get notice, should we have to send notice

18   out again on this thing and get everybody together

19   again.  I doubt seriously if that's going to happen, but

20   let me just read the names of the people who are here.

21   There's George Laredo, Sr.; George Tetrot from BIA;

22   Daryl Paiz from the Jicarilla Apache Nation; Raymond

23   Lucero, Jicarilla Revenue and Tax; Sharon Paiz,

24   Jicarilla Revenue and Tax; Kurt Sandoval, Jicarilla Oil

25   and Gas Administration; Steve McCue from Holland &

1    Knight; Joi Thomas, also from Holland & Knight; Joseph

2    Sanchez from J.S. Trucking, Inc.; Paul Barnes from Elm

3    Ridge Exploration; Nancy Cusack from JAYCO.

4          And also appearing on behalf of the debtor is

5    Dave Lionetti, who is going to be testifying on behalf

6    of the debtor this afternoon.

7          Mr. Lionetti, let me ask you to please stand

8    and raise your right hand and let me swear you in.

9                         DAVE LIONETTI

10        having been duly sworn, testified as follows:

11                          EXAMINATION

12   BY THE TRUSTEE:

13        Q    In general, just tell me what is Platinum Oil

14   Properties, LLC?

15        A    Platinum Oil Properties, LLC, is an entity

16   that holds the operating rights to operate on two

17   leases, oil and gas leases known as the 71 lease and the

18   363 lease, which are located on the Jicarilla Apache

19   Reservation.

20        Q    And does Platinum Oil Properties at this time

21   have any operations?

22        A    No.

23        Q    And other than the lease, the two leases, does

24   Platinum Oil Properties have any other assets?

25        A    It has a bank account and approximately

1    $24,000 in the account.

2        Q    Is that a debtor in possession bank account?

3        A    It --

4            MR. JONES:  We are waiting for approval

5    from your office.  We spoke to them about that

6    yesterday, and they need to check whether Vector Bank --

7    your office is checking whether Vector Bank will be

8    approved or whether we have to move that account.

9        Q    (By The Trustee) Between March 2nd of '09

10   and today, has there been money going in and out of

11   that bank account?

12       A    Up till today?  Today there was -- $10,000 was

13   used to pay a retainer, Jennie's firm.

14       Q    Okay.

15       A    And there was a bank fee.  I think the bank

16   took a fee.

17       Q    Is that the only disbursement that's been made

18   out of that account --

19       A    Yes, sir.

20       Q    -- since the filing?

21       A    Yes, sir.

22            THE TRUSTEE:  And, Mr. Jones, when did

23   you say that new debtor in possession bank account would

24   be open?  Do you have any idea?

25            MR. JONES:  No, this account, the Vector

1    Bank account, we would treat that as a debtor in

2    possession account if your office is comfortable with

3    Vector Bank being the bank.

4              MS. BEHLES:  But the question was,

5    Ms. Lombard yesterday asked us to inquire of you whether

6    you knew whether or not Vector Bank in Colorado was on

7    the list of recognized depositories so that we could

8    make that, keep that, whatever the word is, the DIP

9    account.  That was a new account opened for this entity

10   for this case.  And she had some question because she

11   only had a New Mexico list.

12             THE TRUSTEE:  Yeah.

13             MS. BEHLES:  Whether that was an approved

14   depository.  It certainly has FDIC insurance and we

15   don't have money in it over the level, so I'm not too

16   worried about it, but --

17             THE TRUSTEE:  Yeah.

18             MS. BEHLES:  -- she thought you had some

19   way to check that, it being a Colorado bank.  I have no

20   idea if you do or not, but there you go.

21             THE WITNESS:  I believe Vector is also

22   owned by a more significant bank above it, but I don't

23   know who.

24             MS. BEHLES:  Yeah.

25             MR. JONES:  There have been no other

Transcript of Proceedings                    IN RE: Platinum Oil Properties, Debtor.
Held on April 16, 2009

Page 7

1     monies in that account and no other disbursements from

2     that account.

3                    THE TRUSTEE:  Okay.  I guess that's the

4     important thing now.  But technically, I guess, we need

5     to somehow, whether it be this bank or one that is

6     approved, we've got to get that set up pretty quickly,

7     okay?

8                    MR. JONES:  Right.  And if you approve

9     Vector, we'll immediately do that.

10                    THE TRUSTEE:  All right.  We may need to

11     call up to --

12                    MS. BEHLES:  I was going to say, you

13     know, we can check with the UST's office in Denver.

14                    THE TRUSTEE:  Yeah.

15                    MS. BEHLES:  Do you just want me to do

16     that and get a copy of their list?

17                    THE TRUSTEE:  Yeah, or even we can get

18     Michelle to do that.

19                    MS. BEHLES:  Well, we can pass it around,

20     I guess.

21                    THE TRUSTEE:  Yeah.

22        Q    (By The Trustee) Mr. Lionetti, tell me --

23     I know there's a history behind these leases and

24     some of the assignments.  Can you go through that

25     from the time that the -- I guess they're referred

1    to as JAR, the Jicarilla Apache Reservation, first

2    leased the oil wells to the Golden Oil Company?

3         A    I probably can't take you back that far.  I

4    can take you back to the Golden bankruptcy; and in the

5    Golden bankruptcy, as part of a resolution to that

6    bankruptcy, the operating rights under those leases were

7    assigned to Platinum Oil, and those were approved by all

8    the parties concerned.

9         Q    And it was approved by the Bankruptcy Court in

10   Texas?

11        A    Yes, in Houston.  I think it was out of

12   Houston.  And also the Jicarilla --

13              MR. JONES:  Also the Secretary of

14   Interior --

15        A    Yeah, Secretary of Interior.

16              MR. JONES:  -- signed off on that in

17   connection with the bankruptcy.

18        A    And there were no objections to it by the

19   Jicarilla Apache Nation either.

20        Q    (By The Trustee) Okay.

21        A    So the operating rights, if you will, sat

22   within Platinum.

23        Q    All right.

24        A    Later on -- I want to say it was 2005 or 2006,

25   I think it was 2006 -- Platinum struck a deal with an

1    entity called Star Acquisitions 7 and assigned their

2    rights to the leases to Start Acquisitions 7.  Those --

3        Q    Let me ask you about that.

4        A    Sure.

5        Q    When that assignment happened, under the lease

6    agreement, was there any requirement that the Bankruptcy

7    Court approve that?

8        A    My understanding of the legalities are that

9    the Department of Interior and the Jicarilla Nation

10   would have had to approve of that assignment.

11       Q    And did they?

12       A    No, not to my knowledge.

13       Q    Okay.

14       A    Or I've been told that they did not; let me

15   put it that way.

16            MR. JONES:  The Golden Oil bankruptcy

17   case had -- their plan was confirmed in late 2004, early

18   2005, those leases were assigned to Platinum.  So that

19   bankruptcy case was, in effect, over.

20            THE TRUSTEE:  It had a final decree and

21   it closed?

22            MR. JONES:  That's right, at the time of

23   the assignment from Platinum to Star Acquisition 7.

24            THE TRUSTEE:  It was closed at that time?

25            MR. JONES:  I don't know if the final

Transcript of Proceedings      IN RE: Platinum Oil Properties, Debtor.
Held on April 16, 2009

Page 10

1  decree had been entered, but the confirmation order, I

2  believe, was in late 2004.

3         THE TRUSTEE:  Okay.  As far as you know,

4  Mr. Jones, did the Bankruptcy Court in Houston have any

5  authority to approve or disapprove the assignment of the

6  leases from Platinum to Star Acquisition?

7         MR. JONES:  It did not.

8         THE TRUSTEE:  Okay.

9         MR. JONES:  No authority or jurisdiction.

10         THE TRUSTEE:  All right.

11         MR. JONES:  The approval -- the Secretary

12  of Interior approval was required.  The Jicarilla Apache

13  Nation takes the position that their approval was

14  required.  We would dispute that, but the Secretary of

15  Interior approval was, indeed, required; and it was not

16  obtained.

17         THE TRUSTEE:  All right.  And those --

18  the requirement of the Secretary of Interior to approve

19  it was part of the assignment or part of the original

20  lease or what?

21         MR. JONES:  It's by statute.

22         THE TRUSTEE:  Okay.

23         MR. JONES:  The lease is between -- the

24  lease is with the Jicarilla, but the Secretary of

25  Interior has certain authority with respect to those

1    leases and there is a statutory and a regulatory

2    requirement for approval of the assignment of those

3    leases.

4                    THE TRUSTEE:  Okay.

5        Q    (By The Trustee) What happened after the

6    assignment to Star Acquisition, Mr. Lionetti?

7        A    Madison Capital Company, which is located in

8    Denver, entered into a -- essentially a banking or

9    financing arrangement with Star Acquisition 7, and they

10    were providing capital or did provide capital that was

11    to be used for acquisition of these interests from

12    Platinum and to develop the field, putting Cap X and

13    those kinds of things.  For that, Madison received an

14    overriding royalty interest in the fields and it also

15    received the right to increase its interest and if there

16    were certain defaults under the agreement [inaudible]

17    phrased as defaults, but certain triggers, that it could

18    take over operations from Star.

19               Suffice it to say that Star Acquisition did

20    not meet its obligations under this agreement, Madison

21    filed a litigation against Star, litigation ensued.  At

22    the end of the day in June of 2008, there was both a

23    stipulated order from the court in La Plata County,

24    Colorado, and also a conveyance of all the assets and

25    interest held by Star 7 to Madison or its designee.

1    It's designee at the time was Sagebrush Holdings.  And

2    so the assets and interests were transferred into

3    Sagebrush.

4        Q    Now, why did this happen?

5        A    Because -- a number of reasons, but suffice it

6    to say that Star and its -- Tom Stover, who was the -- I

7    don't know if he's the managing member, but he was

8    certainly the kingpin behind it, did not hit production

9    targets; they took capital expenditure monies and spent

10   it personally, personal things; there were other

11   defaults under the agreement that allowed us

12   contractually to take over operations of the field and

13   to increase our interest from 60 percent to 100 percent.

14       Q    When you say "our," who are you talking about?

15       A    Madison -- at the time, it was Madison Cap.

16           MS. BEHLES:  And there was a suit,

17   Mr. Martinez-Metzgar, whereby they filed suit and the

18   court entered a decree that said this is how it would

19   come out of there.

20           MR. JONES:  There was a document evidence

21   in the financing that Madison provided that provided

22   upon certain events, either Star had to purchase

23   Madison's interest or Madison had the right to receive

24   all of Star's interest.  Madison's litigation was to

25   specifically enforce that obligation on the part of Star

1    to convey those assets.  The Court granted us summary

2    judgment on specific performance, ordered Star 7 to

3    convey those assets to Madison or its designee.  That

4    order was entered on June 3, 2008.  It was treated as a

5    final order; and on June 10, 2008, Star Acquisition 7

6    conveyed whatever rights it had to Sagebrush.

7              THE TRUSTEE:  And that was pursuant to

8    this order?

9              MR. JONES:  It was pursuant to the order

10   granting specific performance, directing Star 7 to make

11   that conveyance, yes.

12             THE TRUSTEE:  Okay.  Now, all this that

13   happened in the court, was the Department of Interior

14   involved in that?

15             MR. JONES:  Not at all.

16             THE TRUSTEE:  Did they have to be, or

17   should they have been?

18             MR. JONES:  Should they have been a

19   party?  Not required to be a party, but --

20             THE TRUSTEE:  Should they have been --

21             MR. JONES:  -- but their assignments do

22   -- the assignments do require their approval, which we

23   do not have.

24             THE TRUSTEE:  Okay.  So the extent of

25   their involvement should just be with regard to the

1    approval of any assignments?

2                    MR. JONES:  That is their -- that is

3    their involvement.

4                    THE TRUSTEE:  Okay.

5                    MR. JONES:  The background, Madison

6    discovered the fields were in horrible condition, sought

7    the injunctive relief in the La Plata County District

8    Court on an expedited basis to take control of the

9    wells.  The same -- a lot of the issues that Madison had

10   with the operation are also the issues that the

11   Jicarilla Apache Nation had in closing those wells

12   around the same time.  So we act -- Madison acted as

13   quickly as possible to get control of the wells, then

14   sought to -- approval from the Jicarilla Apache Nation,

15   tried to reach a resolution as a predicate to seeking

16   Secretary of Interior approval, but was never able to

17   reach any agreement with the Jicarilla to recognize the

18   assignments from Platinum to Star, and in turn, from

19   Star to Sagebrush.

20       Q    (By The Trustee) So why did y'all file

21   bankruptcy if you need the Jicarilla Nation to

22   approve these assignments?

23       A    Well, because --

24       Q    I mean, is it -- are you going to try to get

25   their approval through Bankruptcy Court?

1        A    We're not --

2                MR. JONES:  We're not asking the approval

3    of the assignments.

4        A    Yeah.

5                MR. JONES:  The assignments have not been

6    approved, and so these leases sit in Platinum, the

7    debtor.  The purpose of the filing is to assume those

8    leases and cure the defaults under those leases.

9                MS. BEHLES:  And to deal with other debts

10   to the extent that they need to be dealt with.  There's

11   lien claims and other things arising from the operations

12   of Star 7 which have attached to these wells, or

13   claimedly have attached to these wells.

14               THE TRUSTEE:  Yeah, the mechanic's liens.

15               MS. BEHLES:  Yeah.

16               MR. JONES:  That's correct.

17               THE TRUSTEE:  Yeah.

18       Q    (By The Trustee) Mr. Lionetti, let me ask

19   you this.  Let's assume that a bankruptcy judge in

20   New Mexico allows the debtor to assume these leases.

21   What's the next step?

22       A    We obviously pay any cure costs that would be

23   associated with that order.

24       Q    Where are you going to get the money to do

25   that?

1      A    Right now we have a proposed -- we filed a

2  motion for a DIP facility be provided by Sagebrush to

3  Platinum.  And then we would move to obviously cure the

4  cure costs -- or pay the cure costs on the leases.  And

5  then our plan is to get the fields opened up, restarted,

6  reworked and produce oil and gas.  Pay royalties to the

7  Tribe and taxes to both the Tribe and the authorities

8  that are due.

9         THE TRUSTEE:  Mr. Jones, back to you,

10  assuming the judge approves the assumption of lease, at

11  this time is it your position that in order for the

12  judge to do that, you're going to have to get approval

13  from DOI or the Jicarilla Apache Reservation in addition

14  -- I mean, before the judge can do --

15         MR. JONES:  Well, let me take those one

16  at a time.  With respect to the Jicarilla, they are in

17  effect the lessor, no different from any other lessor.

18  We filed our motion to assume, they objected to it, we

19  say there are no defaults, they say there are some.  So

20  that's no different than any other 365 motion that you

21  would deal with.

22      We are not seeking to assign these leases to

23  another party.  If we were, then the Secretary of

24  Interior would have a role to play; but we are not

25  seeking to assign the leases.  We're only seeking to

Joe Jameson Court Reporters
201 Third Street NW, Suite 1180  Albuquerque, New Mexico 87102      (505) 242-2809 or 1-800-532-2809
Case 09-10832-j11   Doc 44   Filed 05/11/09   Entered 05/11/09 19:44:34 Page 16 of 36

1    assume.

2              I believe if you look at the objection filed

3    by the Jicarilla, they acknowledge that we are not

4    seeking to assign the leases, and the Department of

5    Interior approval would only be required only if we

6    were.

7                   THE TRUSTEE:  Okay.

8                   MR. JONES:  And we are not.

9                   THE TRUSTEE:  So, in other words, that

10   assignment from Platinum Oil, LLC, to Star 7 is void?

11   Is that what you're saying, that it never happened or

12   it's --

13                  MR. JONES:  In the absence of Secretary

14   of Interior approval, the laws are quite clear and has

15   been for a long time, that those assignments are void.

16                  THE TRUSTEE:  Okay.  Let me --

17                  MS. BEHLES:  It's probably important to

18   point out that those operations, though, that did occur

19   when those were being operated by Star 7 were permitted

20   operations, were they not?

21                  MR. JONES:  They were.

22                  MS. BEHLES:  Yeah.

23                  MR. JONES:  The Jicarilla Apache Nation

24   did permit operations, even though the assignments

25   hadn't been approved.  They can prove an operator

Transcript of Proceedings                    IN RE: Platinum Oil Properties, Debtor.
Held on April 16, 2009

Page 18

1    without approving the transfer of the lease itself.

2                    THE TRUSTEE:  Uh-huh.

3                    MR. JONES:  They did approve Star 7 as an

4    operator, and so at least -- and Platinum was approved

5    [inaudible] Star 7.  Because Platinum was the record

6    holder lessee under the leases, Platinum and Star

7    operate on a pass-through basis because Platinum is

8    still holding the leases.  There has been no approval of

9    them signed.

10                    THE TRUSTEE:  According to the Statement

11   of Financial Affairs, it says Sagebrush holdings is the

12   100 percent membership -- or has 100 percent membership

13   interest.  Is that true?

14                    MR. JONES:  That is true.  If you would

15   like some history there, I'm happy to provide it.

16                    THE TRUSTEE:  Yes.  Yes.

17                    MR. JONES:  The Golden Oil bankruptcy

18   case was a case that sought to resolve in many ways

19   dispute ownership claims going back many, many years, to

20   these leases.  And the way it did that under a plan was

21   that it said that this group -- and it was referred to

22   in the plan as the "MLG Group" -- these were sort of the

23   group of claimants claiming an interest in these

24   properties.  And as part of the plan and under a

25   settlement that was enforced pursuant to the plan, that

1    the leases would be transferred to this entity called

2    Platinum Oil, which the MLG Group formed.

3           At the time of the transfer from Platinum to

4    Star 7, those owners were still the owners of Platinum,

5    that original MLG Group.  There were about 30 different

6    interest holders in Platinum Oil.

7           Sagebrush, again, negotiations with the owners

8    of Platinum late last year after it could no longer --

9    after it had reached an impasse with the Jicarilla

10   Apache Nation, it acquire all those ownership interests

11   in Platinum.

12               THE TRUSTEE:  Sagebrush did?

13               MR. JONES:  Yes.  That's why it's today a

14   hundred percent owner of Platinum.

15               THE TRUSTEE:  Okay.  So the MLG Group is

16   kind of out of the picture now?

17               MR. JONES:  They are.

18               THE TRUSTEE:  Well, tell me who's Mr.

19   Pfizer and how -- and Mr. Domenici and Lotspeesh, how

20   are they connected?

21               MR. JONES:  They were -- they're not

22   connected now, but your questions go back for two years,

23   so they were connected before Sagebrush acquired their

24   ownership interest in Platinum.

25               THE TRUSTEE:  Were they part of this MLG

Page 20

1    Group?

2             MR. JONES:  They were.

3             THE TRUSTEE:  Okay.

4             MR. JONES:  They were the largest part of

5    the MLG Group.

6             THE TRUSTEE:  All right.  I'm going to

7    stop there, just so we have enough time for people to

8    ask questions.  Mr. McCue or Ms. Thomas, do you want to

9    start?

10            MS. THOMAS:  I just had --

11            THE TRUSTEE:  Come on up so we can get

12   you --

13            MS. BEHLES:  So we can hear.

14            THE TRUSTEE:  That air conditioner drowns

15   everybody's voice out.

16                      EXAMINATION

17   BY MS. THOMAS:

18       Q    Just a couple of clarifications, questions

19   just so I can make sure I have my notes right; and I

20   won't take that much time.

21            So just to be clear, when we're -- when U.S.

22   Trustee asked what was the purpose of filing the

23   Chapter 11 case, it was to be able to assume the lease

24   because according to your client starting back from

25   Golden, you -- Platinum still holds operating rights,

1 correct?

2 MR. JONES: And according to your client

3 having not recognized any of the assignments

4 [inaudible].

5 MS. THOMAS: Okay.

6 MR. JONES: That's correct.

7 MS. THOMAS: And on top of that, you're

8 saying it's also to deal with other debt as well?

9 MR. JONES: That's correct. There are

10 approximately $600,000, as I recall, give or take, of

11 mechanic's and materialman's liens that have been filed

12 against the property.

13 MS. THOMAS: Uh-huh. And by going --

14 using Chapter 11 to assume the leases, you're able to do

15 so -- are you able to do so without going in Chapter 11?

16 MR. JONES: Are we able to --

17 THE TRUSTEE: Are you able to assume --

18 are you able to act upon the leases now without going to

19 Chapter 11?

20 MR. JONES: I apologize, but I don't

21 understand the question about --

22 MS. THOMAS: Is Platinum today, without

23 filing a Chapter 11, are they able to act upon the

24 leases?

25 MR. JONES: Perform on the leases?

1            MS. THOMAS:  Perform on the leases, I'm

2      sorry.

3            MR. JONES:  Well, when you say, "Without

4      filing Chapter 11, are we able to perform on the

5      leases," we're certainly -- Platinum is certainly able

6      to perform on the leases if the Jicarilla Apache Nation

7      would permit it to do so.  The reason for the filing of

8      the Chapter 11 is that the Jicarilla Apache Nation will

9      not permit us to -- permit Platinum to perform under the

10     leases.  So that's the purpose of the filing is to be

11     permitted to operate.  As you know, Platinum has filed

12     for an operating permit, has attempted to determine what

13     defaults the Jicarilla allege exist under the leases,

14     but we have not gotten that information.  So the purpose

15     of the filing is to assume the leases, to determine

16     those defaults and operate.

17            MS. THOMAS:  Okay.  And going back to

18     another point that you made previously about having Star

19     gain a permit from the Nation in order to operate,

20     correct?

21            MR. JONES:  We did not --

22            THE TRUSTEE:  That's why I just wanted to

23     clarify.

24            MR. JONES:  Star obtained --

25            MS. BEHLES:  Star --

1            MR. JONES:  Start obtained a permit to

2    operate from the Nation?

3         A    Star -- yeah.

4            MS. THOMAS:  Okay.

5         A    That permit -- Star's permit expired November

6    of 2007, if I recall correctly.

7            MS. THOMAS:  Okay.

8         A    And the field was shut in in October of 2007.

9            MS. THOMAS:  And as far as after the

10   assumption, if the Court were to allow the assumption to

11   go forward, financially who would be responsible for

12   supplying Platinum with funds in order to operate the

13   wells and bring them up to par, to function?

14            MR. JONES:  We have -- as you know, we

15   have filed an application to approve $950,000 of good

16   financing.  That $950,000 is intended to permit Platinum

17   to pay cure costs, to plan the Chapter 11 plan to

18   reorganization and address to the extent their valid,

19   the M and M liens against the property, address those

20   things and plan.

21            The DIP facility matures -- does not require

22   any interest payments by Platinum, and it matures at the

23   end of November, which is intended to afford Platinum an

24   opportunity to do just those things, to assume the

25   leases, cure the defaults.

Transcript of Proceedings       IN RE: Platinum Oil Properties, Debtor.
Held on April 16, 2009

Page 24

1       We are operating at somewhat of a deficit in

2  terms of [inaudible] tell you exactly what our plan

3  would be for recommencing operations of the wells

4  because they have been closed now since October -- late

5  October of 2007.  As you know, we've requested from the

6  Jicarilla Apache Nation a right to inspect the wells so

7  we can put together a plan and a budget for recommencing

8  operations; but we can't do that without an inspection

9  of the wells because it's been -- we don't know the

10  condition of the wells, we don't know which ones we can

11  bring back online first, second, all of that.

12    A   Or what it would take to bring that well or

13  wells back online.

14       MR. JONES:  If we had access to the

15  wells, we could do that.  We could tell you a plan in

16  about --

17       MS. THOMAS:  I just have one more last

18  question, just to understand the structure here.  So

19  going back from Golden, Madison was at the top as far as

20  the line; but now we're dealing with Sagebrush.  And in

21  the structure, is Madison still at all in the picture as

22  far as the corporate structure?

23       MR. JONES:  Madison -- Madison Capital

24  has an ownership interest in two entities that own 100

25  percent of Sagebrush, which in turn owns 100 percent of

Joe Jameson Court Reporters
201 Third Street NW, Suite 1180  Albuquerque, New Mexico 87102    (505) 242-2809 or 1-800-532-2809
Case 09-10832-j11   Doc 44   Filed 05/11/09   Entered 05/11/09 19:44:34 Page 24 of 36

1    Platinum.

2              MS. THOMAS:  Okay.

3              MR. JONES:  Your office asked me to get

4    you the names of those intervening entities.  I will do

5    that.  I do not have those with me, but we will provide

6    that.  I'm happy to provide that.

7              MS. THOMAS:  Okay.  That's it.  Thank you

8    very much.

9              THE TRUSTEE:  Nancy, do you have any

10   questions?

11                      EXAMINATION

12   BY MS. CUSACK:

13      Q    Just a couple of questions.  Just so that I'm

14   clear, is Sagebrush the 100 percent -- who has 100

15   percent membership interest in Platinum, are they

16   providing them the DIP financing?

17             MR. JONES:  That's correct.

18             MS. CUSACK:  Okay.  Thank you.  The other

19   thing is, it's your position, then, that Platinum has

20   remained as lessee of these leases and that they then

21   assigned the operating rights to Star --

22             MR. JONES:  No.

23             MS. CUSACK:  I'm sorry.  Could you

24   explain to me what that --

25             MR. JONES:  No.  Our position is that

Page 26

1  these rights under the leases have remained in Platinum

2  because the Secretary of Interior has never approved an

3  assignment any farther downstream.

4          MS. CUSACK:  Is that none of the rights?

5          MR. JONES:  That's correct.

6          MS. CUSACK:  Including the operating

7  rights?

8          MR. JONES:  They are the operating

9  rights.

10         MS. CUSACK:  Okay.  And that's -- okay.

11    A    Platinum holds the operating rights.

12         MS. BEHLES:  Just Star 7 was granted an

13  operating permit by the Jicarilla.

14         MR. JONES:  But no assignment of any of

15  the rights under the leases was ever approved.

16         MS. CUSACK:  Okay.  Thank you.

17         THE TRUSTEE:  Anybody else have any

18  questions?  I've got a couple more.

19         THE WITNESS:  Sure.

20            FURTHER EXAMINATION

21  BY THE TRUSTEE:

22    Q    When you talk about curing defaults with this

23  DIP financing, what does that mean?  What defaults are

24  you talking about?

25         MR. JONES:  We don't know.  And the fact

Page 27

1    is, we don't know.  If you look at the response filed by

2    the Jicarilla Apache Nation to our motion to assume, all

3    they say is that at some point in time Star 7 indicated

4    it owed some past-due royalties, so we think those are

5    probably owed.

6                    THE TRUSTEE:  To whom?

7                    MR. JONES:  To the Jicarilla Apache

8    Nation.

9                    THE TRUSTEE:  Okay.

10                    MR. JONES:  But they provided no

11   information or detail or what periods were involved or

12   any of that.  And there is reference to breach of

13   environmental obligations under those leases, but not

14   defined.  There's no more information in the response

15   than that.  We don't know what the defaults are.  Again,

16   it's a motion to assume, and we're asking the Court to

17   determine what the defaults are and permit us to cure

18   those, if there are defaults.

19        A    And we did take an independent analysis on our

20   own to try and --

21        Q    (By The Trustee) Environmental analysis?

22        A    No, a royalty and tax analysis, just to try

23   and see if we could -- we couldn't find any.

24                    THE TRUSTEE:  Has Platinum Oil ever

25   operated these oil wells?

1          MR. JONES:  Yes, prior to the time that

2   Star was --

3          THE TRUSTEE:  Involved?

4          MR. JONES:  It's a period of time from

5   the Golden Oil confirmation to the Star --

6       A    Star was the operator for them.  I mean, Tom

7   Stover was --

8          MR. JONES:  Tom Stover worked for them.

9       A    -- worked for them as the operator on those

10  wells.

11         MR. JONES:  Right.

12      Q    (By The Trustee) Okay.  And were any

13  royalties paid to the Jicarilla Apache Reservation

14  during the time that Star was operating for

15  Platinum?

16         MR. JONES:  Yes.

17      A    Yes.

18         MR. JONES:  Yes.  Our analysis indicates

19  that all the royalties due under the leases were paid,

20  but we have a dispute with the Jicarilla with respect to

21  that, at least I think.

22      Q    (By The Trustee) And when did operations

23  completely shut down?

24      A    It was towards the end of October of 2007.

25      Q    So it's coming up on two years?

Page 29

```
1        A     Correct.

2        Q     And these mechanic's liens that are listed in

3    Schedule D, what do they have a secured claim against?

4              MR. JONES:  Their assertion is that they

5    have a secured claim against the leases themselves, the

6    interest in the -- that it's an interest in real estate

7    in which they have a claim against.

8        A     These are results of debts of Star

9    Acquisitions, not of us.

10             MS. BEHLES:  And the assertion letter

11   would be that the oil and gas at least constitutes real

12   property in the liens and therefore filed against.

13             THE TRUSTEE:  Okay.  And the reason

14   you've filed a motion to set a bar date is so that these

15   mechanic's liens can file claims against this estate if

16   you want to; then you object to them and say they belong

17   in Star?

18             MR. JONES:  The -- no.

19             THE TRUSTEE:  Okay.

20             MR. JONES:  The bar date is unrelated to

21   the mechanic's and materialman's liens.  We know what

22   those are.

23             THE TRUSTEE:  Okay.

24             MR. JONES:  We -- they've been filed,

25   they're of record, we know what they are we listed them,
```

Page 30

1    we have copies of them.  So it's not that.  It is we

2    would like to move toward a confirmation as quickly as

3    possible, and we would want to make sure there aren't

4    any claims out there that we're not aware of.  That's

5    really the -- we think we know what all the claims are.

6                        THE TRUSTEE:  Okay.

7                        MR. JONES:  But we want to be sure.  But

8    we're -- it's not to deal with the M and M claims.  The

9    M and M claims, to the extent that they have valid liens

10   against the property, we have to deal with those.  And

11   so that's not why we asked for --

12                       THE TRUSTEE:  Okay.

13                       MS. BEHLES:  Even though they're not a

14   personal liability of the debtor, if they're a valid

15   claim against the lease, then they have to be dealt

16   with.

17                       THE TRUSTEE:  Yeah.

18                       MR. JONES:  And they would be converted

19   into recourse under 11-11, and so we would have to deal

20   with those and we understand that.

21                       THE TRUSTEE:  You're asking for $900,000

22   in the DIP financing?

23                       MR. JONES:  950.

24        A    950.

25                       THE TRUSTEE:  950?  Do you have a budget

1    attached to the motion for what you want to spend that

2    on?

3                    MR. JONES:  We don't.

4                    THE TRUSTEE:  Where did you come up with

5    950?

6                    MR. JONES:  Well, we are -- if you think

7    about the claims that we have to address in the

8    bankruptcy case, we have to address the claims of the

9    Jicarilla, if we're permitted to assume the leases and

10   we have to address the claims of the mechanic's and

11   materialman's lienholders and we have to pay

12   administrative expenses.  We picked a high number.  Our

13   purpose was to try to show that we have the capacity to

14   assume the leases and we have the capacity to operate

15   and we have the capacity to deal with any valid liens

16   that we have to deal with, because that's one of the

17   objections is that Platinum does not have the capacity

18   to do that and we made enough -- tried to get enough

19   financing to show that we can do all of those things.

20                    THE TRUSTEE:  Okay.

21                    MR. JONES:  We would like to have a

22   budget; and, again, we can't tell you what that budget

23   would be unless we can inspect those fields.  If we

24   could inspect those fields, we could put together a

25   budget for recommencing operations and we could tell you

1   what that money is going to be spent on other than just

2   dealing with claims.

3           Now, we hope that we're going to have some

4   progress with the Jicarilla to conduct that inspection,

5   and we'd be -- we'd love to put that budget together.

6   We just don't have the ability, having not seen the

7   wells in, as you said, coming up on two years.  If we

8   can get that inspection done -- and we're going to be

9   asking the Court to permit us to do the inspection, if

10  the Jicarilla do not permit it, so we can do just what

11  you said.

12          THE TRUSTEE:  Well, if you're able to do

13  the inspection -- let's -- do you need the assumption of

14  the leases before you can do the inspection?

15          UNIDENTIFIED SPEAKER:  No.

16          MR. JONES:  No.

17          THE TRUSTEE:  No?  Okay.

18          MR. JONES:  No -- and we need to do that.

19  We need to do that in advance.  Obviously we know

20  something about these wells and we think we know or we

21  have some guesses about the investment it will take to

22  get these back up and running; but until we get out

23  there and see the wells, we're not 100 percent sure.

24          THE TRUSTEE:  Okay.

25          MR. JONES:  So we're going to try to get

1   that done before a hearing on the motion to assume so

2   that we will have for you and for the Court a plan as to

3   how we're going to operate those wells.

4                THE TRUSTEE:  Okay.  And what I'm trying

5   to figure out is what -- number one -- and I think you

6   answered this.  The reason you picked 950,000, a couple

7   of reasons, is, one, to show that you can accumulate

8   that kind of money if you have to; and also to -- is it

9   just going to be stored in the DIP account until --

10               MR. JONES:  It wouldn't be -- it wouldn't

11  be drawn unless it's needed.  It's made available to it.

12  If you think about the claims so far that I've seen

13  asserted, I've seen $600,000 in M and M claims; I've

14  seen $122,000 from the Jicarilla in their pleading.

15  That's the only number I've ever seen.

16               THE TRUSTEE:  Okay.

17               MR. JONES:  That's $722,000.  I've got

18  some costs in restarting the wells that I know about,

19  and I've got administrative expenses.  So you can sort

20  of see how I came up with the number.

21               MS. BEHLES:  But if you look at the loan

22  agreement, it's not a single advance note.  It's a draw

23  --

24               MR. JONES:  No, it's a line of credit.

25               MS. BEHLES:  -- line.  It's a line.

1          MR. JONES:  It wouldn't be drawn.

2          MS. BEHLES:  So it wouldn't be drawn, so

3    interest wouldn't accrue on it, it would not sit in the

4    DIP account.  It would simply be available to be drawn

5    upon as required.

6          THE TRUSTEE:  Okay.  Based upon my

7    questions, does anybody have any other questions they

8    want to ask?  Okay.  Is the plan going to be dependent

9    on the judge entering an order allowing you to assume

10   the lease?

11         MR. JONES:  Yes.

12         THE WITNESS:  Yes.

13         THE TRUSTEE:  It is?  So that's got to be

14   resolved before you do the plan?

15         MS. BEHLES:  Or as a part of the plan.

16         MR. JONES:  Or as part of the plan.  But,

17   yes, it does.

18         MS. BEHLES:  You know, assumption can be

19   dealt with that way.

20         MR. JONES:  It is dependent.  It's

21   dependent for everyone.  It's dependent for lienholders,

22   as well.  If there are not valid interest in these

23   properties, those liens may attach to air.  So it's not

24   only --

25         A    It affects all involved.

1           MR. JONES:  -- critical to Platinum, it's

2    also critical to the lienholders, as well.

3           THE TRUSTEE:  Okay.  I don't have any

4    other questions of the debtor.  Yes, go ahead, Mr. --

5           UNIDENTIFIED SPEAKER:  I just wanted to

6    make sure I understood your question.  Were you asking

7    about the DIP financing, or were you asking about the

8    plan?  I just wanted to make sure I -- when you said,

9    "the judge has to approve the assignment before," and I

10   wasn't quite sure if I heard you say, you know, the plan

11   or the DIP financing.

12          THE TRUSTEE:  I think I said --

13          MR. JONES:  You said, "the plan."

14          MS. BEHLES:  You said, "the plan."

15          THE TRUSTEE:  Yeah, I think I said does

16   -- "the plan."

17          UNIDENTIFIED SPEAKER:  Okay.  That's what

18   I --

19          MS. BEHLES:  And actually you should have

20   meant the plan.

21          MR. JONES:  That is correct.

22          THE TRUSTEE:  Yeah, right.

23          UNIDENTIFIED SPEAKER:  I just wanted to

24   make sure.

25          THE TRUSTEE:  All right.  So we'll go

1    ahead and conclude the meeting if nobody else has any

2    other questions.  Good luck to you and the debtor,

3    Mr. Lionetti.

4              THE WITNESS:  Thank you, sir.

5              MR. JONES:  Thank you.

6          (End of recording.)

7

8

9

10         I certify that the foregoing is a correct

11   transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15         Joe Jameson

16         New Mexico CCR #67

17         Expires 12/31/09

18

19

20

21

22

23

24

25