# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   PLATINUM OIL PROPERTIES, LLC,                    11-09-10832 JA

Debtor.

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on cross-motions for partial summary judgment filed by

The Jicarilla Apache Nation (the "Nation") and by the Debtor Platinum Oil Properties, LLC

("Platinum").[1]  Platinum claims that it owns certain operating rights and working interests in and

under two oil and gas leases:  a) Jicarilla Oil and Gas Lease No. 71 covering certain real property

described in Exhibit A to the Stipulation in Connection with Cross-Motion of Platinum Oil

Properties, LLC for Summary Judgment on Threshold Issues (the "Stipulation); and b) Jicarilla

Oil and Gas Lease No. 363 covering other real property described in Exhibit A to the Stipulation.

The Nation claims that Platinum has no operating rights or working interests in and under the

two leases.  (The operating rights and working interests at issue in the cross motions for

summary judgment will be referred to herein as "Operating Rights and Working Interests").[2]

---

[1] *See* The Nation's Motion for Summary Judgment (Docket No. 103); the Nation's Memorandum in Support of Nation's Motion for Summary Judgment and supporting papers, including a statement of 43 paragraphs of uncontested facts and 15 exhibits (Docket No. 104); Platinum's Response to the Nation's Statement of Uncontested Facts (Docket No. 107); Platinum's Motion for Summary Judgment and supporting papers (the supporting papers consist of more than 2000 pages and 103 exhibits (Docket No. 194); Platinum's Memorandum of Law in support of its motion for summary judgment and in opposition to the Nation's Motion for Summary Judgment (Docket No. 195); Platinum's Statement of Uncontested Facts containing 42 paragraphs of facts (Docket No. 196); Platinum's Statement in response to the Nations Statement of Uncontested Facts (Docket No. 197); Responses by BP America to the Nation's Motion for Summary Judgment and its Statement of Undisputed Facts (Docket Nos. 198 and 199) ; the Nations' s Reply in support of its motion for summary judgment and in opposition to Platinum's motion for summary judgment (Docket No. 209); the Nation's Memorandum of Law in support of its reply in support of its motion for summary judgment and in opposition to Platinum's motion for summary judgment and supporting exhibits (Docket No. 210); the Nation's Response to Platinum's statement of uncontested facts and 25 supporting exhibits (Docket No. 211); Stipulation between Platinum and BP America Production Company in connection with the cross motions for summary judgment (Docket No. 217); Advisory Brief filed by the United States Department of Interior (Docket No. 223) and Platinum reply thereto (Docket No. 228); Supplemental Memorandum of Law filed by Platinum (Docket No. 224) corrected by a filing on June 16, 2010 (Docket No. 225) and Platinum reply thereto (Docket No. 227).

[2] A Stipulation in Connection With Cross-Motion of Platinum Oil Properties, LL for Summary Judgment on Threshold Issues filed May 20, 2010 (Docket No. 217) contains a stipulation between Platinum and BP America

The United States Department of Interior ("DOI") supports the Nation's position but has not participated in the contested matters commenced by the filing of the cross motions for summary judgment except for the filing of an *amicus* brief on one issue. BP America Production Company takes no position on the issue before the Court based on the Stipulation under which the only rights or interests at issue are the Operating Rights and Working Interests.

## PROCEDURAL HISTORY

Platinum commenced its chapter 11 bankruptcy case on March 2, 2009. On March 6, 2009, Platinum filed a Motion for an Order Authorizing Assumption of Leases. *See* Docket No. 10. On April 10, 2009, Platinum filed a Motion for Order Authorizing Secured and Super-Priority Financing. *See* Docket No. 27. On May 11, 2009, the Nation filed a Motion to Dismiss Chapter 11 Case. *See* Docket No. 43. The Nation objected to the two motions filed by Platinum. *See* Docket Nos. 18 and 38. Platinum objected to the Nation's motion to dismiss. *See* Docket No. 29. On June 30, 2009, Platinum filed a plan and disclosure statement. *See* Docket Nos. 55, 56 and 90. The Nation, the DOI and Enervest Energy Ltd. objected to the disclosure statement. *See* Docket Nos. 72 and 77. A threshold issue necessary for the determination of all three motions, and to the consideration of Platinum's disclosure statement and confirmation of its plan is whether Platinum owns the Operating Rights and Working Interests.

On June 15, 2009, the Nation filed a complaint to commence Adversary Proceeding No. 09-10832 naming Platinum as the sole defendant. The Nation asserted in the complaint, among other things, that Platinum has no rights or interests in or under Leases Nos. 71 or 363. On

---

Production Company that the only issue to be decided on Platinum's cross motion for summary judgment is whether Platinum is the owner of the Operating Rights and Leasehold Interest. The Stipulation is consistent with the Brief the Nation filed on April 19, 2010 in support of its motion for summary judgment and in opposition to Platinum's motion. (Docket No. 210). Accordingly, that is the only issue the Court is deciding in this opinion.

-2-

August 21, 2009, the Nation filed a motion for summary judgment in Adversary Proceeding No. 09-10832. *See* Adversary No. 09-10832, Docket No. 8.

The Court held a Status Conference in the bankruptcy case on August 31, 2009. At the Status Conference the parties who appeared, including Platinum, the Nation and the DOI, agreed that the Court should determine as a threshold matter issues relating to Platinum's ownership of the Operating Rights and Working Interests before deciding other issues raised by Platinum's motion to assume leases and motion for post-petition financing, and the Nation's motion to dismiss. *See* Order, Docket No. 120. The Court, with the concurrence of the parties, directed the Nation to file its motion for summary judgment in the bankruptcy case so the threshold issue would be determined in a contested matter affording any party interest with an opportunity to participate. *Id.* The Court also ruled that parties could take discovery relating to the Motion for Summary Judgment and fixed a deadline for responses to the Nation's motion for summary judgment after the end of the discovery period. *Id.* The DOI elected not to respond to the Nation's motion for summary judgment.

On September 15, 2009, the DOI filed a motion to withdraw the reference to the United States District Court for the District of New Mexico so the District Court would decide the issues relating to Platinum's ownership of the Operating Rights and Working Interests. *See* Docket No. 111. The Nation joined in the motion. Docket No. 134. Platinum and BP America Production Company objected to the motion. *See* Docket Nos. 131 and 132. On April 7, 2010, the District Court entered a Memorandum Opinion and Order denying the motion to withdraw the reference. *See* Case No. 09-CV-00922; Docket No. 18. On May 25, 2010 this Court held oral argument on the Nation's and Platinum's cross motions for summary judgment, and set a schedule for supplemental briefs. *See* Order, Docket No. 220.

## SUMMARY JUDGMENT STANDARDS

The Court should grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056. In considering a motion for summary judgment, the Court must "'examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Wolf v. Prudential Inc. Co. of America,* 50 F.3d 793, 796 (10th Cir. 1995)(quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990)). Cross motions for summary judgment raise an inference that summary judgment may be appropriate. *Crossingham Trust v. Baines (In re Baines),* 337 B.R. 392 , 396 (Bankr.D.N.M. 2006). Nevertheless, before a Court may grant summary judgment, the Court must satisfy itself that the requesting party has independently satisfied the requirements of Rule 56(c). *See Harris v. Beneficial Oklahoma, Inc., (In re Harris),* 209 B.R. 990, 998 (10th Cir. BAP 1997); *see also, Renfro v. City of Emporia,* 948 F.2d 1529, 1534 (10th Cir. 1991)(stating that a cross motion for summary judgment does not relieve the court of its obligation to determine if a genuine issue of material fact exists). "[A] party opposing a properly supported motion for summary judgment 'may not rest on mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial'" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Rule 56(e), Fed.R.Civ.P.).

## FACTS NOT IN GENUINE DISPUTE

The Court finds that the following facts are not in genuine dispute:

-4-

1.      On March 2, 2009, Platinum filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Court for the District of New Mexico. *See* Docket No. 1.

2.      The Nation is a federally recognized Indian Tribe organized under the Indian Reorganization Act of 1934 located on a reservation in northwestern New Mexico.

3.      On March 19, 1992, Chace Oil Company, Inc. ("Chace") and Golden Oil Company, a Delaware corporation ("Golden Oil"), among others, executed an Assignment, Bill of Sale and Conveyance under which Chace purported to assign and convey to Golden Oil, all of Chace's operating rights, leasehold interests and other ownership interests in certain leases under which the Nation was the lessor (the "Jicarilla Leases"), including but not limited to leases commonly known as Jicarilla Lease No. 71 and Jicarilla Lease No. 363 (individually, Jicarilla Lease No. 71 and Jicarilla Lease No. 363; and together Jicarilla Lease Nos. 71 and 363).  *See* Myore Deposition at pp. 42-44; Sandoval Deposition at pp. 130 and Exhibit 24 thereto); *see also* The Nation's Objection to Motion to Assume (Platinum Oil Docket No. 18), ¶¶ 4 and 5.

4.      A defect in the transfer of title by Chace to Golden Oil of Chace's interest in Jicarilla Lease Nos. 71 and 363 resulted in a failure to complete and perfect the transfer.  *See* Settlement Agreement between Golden Oil Company and McKay-Lotspeich Group, ¶ 16; Third Amended and Restated Joint Plan, ¶7.2.

5.      Jicarilla Lease Nos. 71 and 363 contain no express provision requiring approval by the Nation of a transfer of Jicarilla Lease Nos. 71 and 363 or any interest in those leases. *See* Jicarilla Lease No. 71, including ¶ 3(h) of the Lease – Deposition of Kurt Sandoval ("Sandoval Deposition"), Exhibit 20; and Jicarilla Lease No. 363, including ¶ 3(h) thereto - Sandoval Deposition, Exhibit 19.  Jicarilla Lease Nos. 71 and 363 do not by their express terms incorporate existing and future regulations of the DOI and do not incorporate existing or future laws or regulations of the Nation. *See* Jicarilla Lease No. 71, including ¶ 3(g) of the Lease - Sandoval Deposition, Exhibit 20; and Jicarilla Lease No. 363, including ¶ 3(g) thereto - Sandoval Deposition, Exhibit 19.

7.      On May 12, 2003, Golden Oil filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Case No. 03-36974 (the "Golden Bankruptcy Case").  *See* Golden Oil Bankruptcy Docket (Notice of Filing, Exhibit 1); Sandoval Deposition, Exhibit 31.

8.      On October 22, 2003, the DOI, through the Bureau of Indian Affairs, filed a Proof of Claim in the Golden Bankruptcy Case (the "DOI Proof of Claim").  *See* Notice of Filing, Exhibit 22.  The DOI Proof of Claim stated, in part, that to the extent it is determined that plugging and abandonment liabilities of Golden Oil under Jicarilla Lease Nos. 71 and 363 are "claims" in the Golden Bankruptcy Case, claims for such plugging and abandonment liabilities were made.  *See* Golden Oil Bankruptcy Case, Claim No. 62 (Notice of Filing, Exhibit 22). The DOI Proof of Claim further stated, in part, that "[t]he Debtor [referring to Golden Oil] is a lessee and the Jicarilla Apache Nation (Nation) is the lessor of the oil and gas leases listed about [which include Jicarilla Lease Nos. 71 and 363] which were all approved by the BIA pursuant to 25 U.S.C. § 396a, *et seq.* (the Indian Mineral Leasing Act)." *Id.*

9.     A Second Amended and Restated Joint Disclosure Statement was filed in the Golden Oil Bankruptcy on March 22, 2004.  *See* Golden Oil Bankruptcy, Docket No. 203 (Notice of Filing, Exhibits 1 and 3).

10.     The DOI filed an objection in the Golden Oil Bankruptcy Case to the Second Amended and Restated Joint Disclosure Statement (the "DOI Disclosure Statement Objection"). *See* Golden Oil Bankruptcy, Docket No. 216 (Notice of Filing, Exhibit 4). In the DOI Disclosure Statement Objection, the DOI stated:

> Debtor [referring to Golden Oil] is the owner of operating rights and is the operator of oil and gas wells on eight oil and gas leases issued by the Secretary of Interior for the Jicarilla Apache Nation ("Nation") in the 1950s. See Exhibit 1 (Original Lease Tract No. 95); Disclosure Statement at § 3.2.1.

*Id*. at p. 1. The eight leases in question include Jicarilla Lease Nos. 71 and 363. See Golden Oil Bankruptcy, Docket No. 203, § 3.2.1 and Exhibit 3.4.3.2 (Notice of Filing, Exhibit 3).

11.     Golden Oil entered into a Settlement Agreement dated March 17, 2004 (the "Settlement Agreement"), with a group of thirty-six (36) individuals or entities referred to in the Settlement Agreement as the "McKay-Lotspeich-Group" (herein, "MLG").  *See* Golden Oil Bankruptcy, Docket No. 311; Exhibit B (Notice of Filing, Exhibit 11); Sandoval Deposition, Exhibit 30; Nation's Memorandum of Law (Platinum Oil Docket No. 104), Exhibit C; Exhibit A to Debtor's Motion to Approve Compromise filed in the Golden Oil Case, Exhibit 11.

12.     The Settlement Agreement describes the members of MLG as a "group of limited partners and working interest owners." *See* Settlement Agreement, second recital.  The Settlement Agreement also describes the members of MLG as "including individuals, corporations, partners and other interest owners represented by the law firm of Dolan & Domenici, PC …, both individually and in any other capacities, including as former or current officers, directors, joint venturers, shareholders or control person … of Chace Oil Company, Ltd., Golden Oil Company …." *See* Settlement Agreement, ¶ 1.

13.     The Settlement Agreement provided the liabilities MLG would assume as transferee of assets that included the Operating Rights and Working Interests would be limited to royalties and taxes in specified dollar amounts and plug and abandonment liabilities.  Settlement Agreement ¶¶ 3a and 11.

14.     The Settlement Agreement provided, among other things, for the assignment of the operating rights and other interests Jicarilla Lease Nos. 71 and 363 by Golden Oil to MLG. *See* attachment to Motion to Approve Compromise, Exhibit 11.  The Settlement Agreement further provided for the termination of certain unspecified partnerships "to fully effectuate the separation and divorce of ownership interest and operations as intended under this Agreement …." Settlement Agreement, ¶ 7(b).

-6-

15.     The Nation and certain agencies of the United States were given notice of the motion to approve the Settlement Agreement in the Golden Bankruptcy Case. See Certificate of Service attached to Debtor's Motion to Approve Compromise, Exhibit 11.

16.     On July 10, 2004, the Bankruptcy Court entered an order approving the Settlement Agreement in the Golden Oil Bankruptcy Case (the "Order Approving Settlement Agreement"). See Exhibit 13 and Exhibit 1, Docket No. 361.

17.     Notice of the Order Approving Settlement Agreement was given to the Nation and to the United States of America/Bureau of Indian Affairs. *See* Exhibit 14, Certificate of Service.

18.     On March 30, 2004, Platinum was organized as a New Mexico limited liability company. *See* Nation's Statement of Uncontested Fact (Platinum Oil Docket No. 104) at ¶ 9.

19.     MLG formed Platinum to own and operate certain rights under certain Jicarilla Leases, including Jicarilla Lease Nos. 71 and 363. *See* Motion to Enforce Compromise and Amended Stipulated Order on MLG's Motion to Enforce Compromise filed in the Golden Bankruptcy Case (Notice of Filing, Exhibits 17 and 20); Letter from Pete V. Domenici Jr. (then counsel for MLG and Platinum) to Naomi Barnes (then counsel for the Nation), dated August 24, 2004; Golden Oil Bankruptcy Docket Nos. 466, 501, and 543 (Notice of Filing, Exhibits 17, 18 and 20); Sandoval Deposition, Exhibit 34; Deposition of David Lionette ("Lionette Deposition") at p. 23.

20.     Sagebrush Holdings/O&G, LLC ("Sagebrush") now owns one hundred percent of Platinum's capital stock. See the Nation's Statement of Uncontested Facts (Platinum Oil Docket No. 104) ¶11.

21.     Sagebrush is owned by FRI Holding, which is a collection of investment funds solely managed by Madison Capital Company, LLC. *See* Lionette Deposition at p. 131 (Notice of Filing, Exhibit 25).

22.     A Third Amended and Restated Joint Disclosure Statement (the "Golden Oil Disclosure Statement") was filed in the Golden Bankruptcy case on April 22, 2004. (Notice of Filing, Exhibit 1, Golden Oil Docket No. 223 and Exhibit 5). On April 23, 2004 an order was entered approving the Golden Oil Disclosure Statement. (Notice of Filing, Exhibit 1, Golden Oil Docket No. 226). A copy of the order approving the Golden Oil Disclosure Statement was served on the Nation on April 26, 2004. *See* Certificate of Service attached to Exhibit 8.

23.     In the Golden Oil Disclosure Statement, there is a disclosure that Golden Oil and the other plan proponents, on the one hand, and the Bureau of Indian Affairs and the Nation, on the other, dispute whether the transfers contemplated by the plan require the approval of the Bureau of Indian Affairs and the Nation. *See* Golden Oil Disclosure Statement, ¶ 10.5.2, Exhibit 3.

24.     The Golden Oil Disclosure Statement further provides, in part:

The Debtor or Reorganized Debtor may sign the documents necessary to effectuate the transfer of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist. This was a contentious issue that had been the subject of significant litigation. The Debtor and Reorganized Debtor shall incur no liability for signing these required forms, or actions taken in reliance thereof. The forms are required by the Jicarilla Apache Nation, the Bureau of Indian Affairs, and have little or no effect, other than to change the official status of the lessee on the leases formerly operated by Chace. The United States of America, Department of the Interior, Bureau of Indian Affairs has objected to this procedure because they believe that the Jicarilla Apache Nation may require a specific individual to make representations notwithstanding the decree of a Federal Court. The Jicarilla Apache Nation has not specifically appeared in this case. The Debtor's position is that the lease transfer document is a mere formality and does not create substantive rights not otherwise existing under applicable law (including tribal law).

Golden Oil Disclosure Statement § 10.5.3.

25.     The Third Amended Plan ("Golden Oil Plan") was filed in the Golden Bankruptcy Case on April 23, 2004.  *See* Golden Oil Bankruptcy Case Docket No. 224, Exhibit 1.

26.     The Golden Oil Plan provides, in part:

        (a)     "MLG is defined to mean and include certain persons, including individuals, corporations, partners and other interest owners, represented by the law firm of Doan & Domenici PC as detailed in a certain letter."  *See* ¶¶ 1.30., 5.5.1.[3]

        (b)     "Settlement Agreement refers to the Settlement Agreement described n paragraph 11 [of the plan]."  ¶ 1.43.

        (c)     "MLG shall receive the benefit of the Settlement Agreement, the respective interest in the 71 and 363 leases described therein, and the liabilities associated therewith."  ¶ 5.5.1.

        (d)     "**Compromise Terms**.  The Debtor's compromise with MLG is approved upon entry of the final order confirming the Plan.  The compromise h MLG is complex, however its general terms are that the Debtor will convey both the assets and the limited liabilities (set

---

[3]  Exhibit A to the Debtor's Motion to Approve Compromise with MLG filed in the Golden Bankruptcy is a list of the members of MLG.  Exhibit B to Exhibit 11. The members of MLG on the list consist of 35 individuals and one trust. Id.  Platinum asserts that the individuals included in MLG were limited partners of limited partnerships of which Golden Oil was the general partner and individuals that owned working interest in Jicarilla leases, including Lease Nos. 71 and 363.  Platinum Brief at 7, Docket No. 195.

-8-

forth below) relating to working interests in all wells on the 71 and 363 leases (except for five wells on the 71 lease being worked-over)…. MLG shall obtain the Section 71 Lease subject only to prepetition royalty payments of $95,958, prepetition state taxes of $27,815, and plug and abandonment liabilities…. MLG shall obtain the Section 363 Lease subject only to prepetition royalty payments of $-0-, prepetition state taxes of $-0-, and plug and abandonment liabilities…." Golden Oil Plan, ¶7.1.

(e) "**Authority to Sign Title Transfer Documents on Behalf of Chace**. On the date the Confirmation Order is entered, the Debtor or Reorganized Debtor may sign the documents necessary to effectuate the transfer of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist. The Debtor and Reorganized Debtor shall incur no liability for signing these required forms, or actions taken in reliance thereof." Golden Oil Plan, ¶ 7.2

(f) "**Additional Releases**. On the Effective Date, McElvenny, the Debtor and MLG shall be forever released and discharged from [certain described liabilities], except for obligations maintained between the Debtor and MLG by the Settlement. Any liability to MLG from GOCO [referring to Golden Oil] or any third party is limited to prepetition royalty payments and prepetition state taxes as set further above. These claims shall be non-recourse to MLG except as against right, title and interest to post June 30, 2004 revenues associated with the operation of rights, title and interest in Section 71 and Section 363 Leases…." Golden Oil Plan, ¶ 7.3.

(g) "**Relation to other Creditors**. MLG and GOCO shall cooperate to obtain a lease assignment and approval of MLG as operator of the Section 71 and 363 Leases for the Jicarilla's, and to reduce any and all claims on behalf of MMS, Jicarilla and other governmental agencies against GOCO. NO [sic] claims of MMS, Jicarilla and other governmental agencies shall survive against MLG or the MLG interests described in Section 10.5 except as set forth herein." Golden Oil Plan, ¶ 7.4.

(h) "**MMS; New Mexico Energy, Minerals, and Natural Resources, and BIA Claims**. The Debtor does not intend to pay the protective claims filed by the New Mexico Oil Conservation Division (#65, 66), the MMS (Claim #22m 63) and the BIA. These claims are mostly for estimated future plugging costs and will specifically except them from discharge if needed. Likewise the MMS claim is based upon alleged royalties owed in 1984-1995, not assessed on the amounts actually paid for hydrocarbons, but by some other formula. The MMS claim is also barred by limitations…." Golden Oil Plan, ¶ 10.5.

(i) "**Jicarilla Release**. The Jicarilla Indian Nation has previously assessed clean-up costs for non-hazardous waste removal to clean up waste buried by Chace Oil, the previous lessee. The Debtor does not own the wells, it merely operates them or has a farmout agreement. Accordingly, the Debtor and its affiliates do not believe they have an obligation for similar cleanups. Accordingly, the Debtor and its Affiliates and Insiders are released and discharged for any liability to the Jicarilla Indian Nation remove buried waste at the wells operated by the Debtor, unless placed there by the Debtor." Golden Oil Plan, ¶ 14.3.

27. The DOI filed an objection in the Golden Oil Bankruptcy Case to the Golden Oil Plan (the "DOI Original Plan Objection"). Exhibit 9. In the objection, the DOI asserted, among other things:

(a) "Under 25 C.F.R. § 211.53(a), (b) (2003) a lease or any interest in Indian land may be assigned or transferred only with the approval of the Secretary of the Interior, that the consent of the Indian mineral owner is required prior to the assignment or transfer of a lease or any lease interest, and that the Secretary cannot compel the Nation to approve the assignments contemplated by the settlement and plan." DOI Original Plan Objection, ¶ 2.

(b) "The assignee of lease interests from Chace to Golden oil, and the subsequent assignment of Golden Oil's interests to MLG, are rendered ineffectual by the failure to obtain the approval of the Secretary of the Interior." *Id.* at ¶ 4.

(c) "The completed discharge in the plan of Golden Oil's and MLG's liability for clean-up costs for non-hazardous waste removal buried by previous lessees violates the provisions of 25 C.F.R. § 211.53(c)." Id at ¶ 5.

28. The DOI subsequently filed an Amended Objection to the Golden Oil Plan (the "DOI Amended Plan Objection"). Exhibit 10. The DOI Amended Plan Objection states, in part: "The United States (BIA) previously filed an objection to confirmation. After discussions with the plan proponents, the United States has resolved all issues regarding approval of the Indian mineral owner, bonding and submission documents required by federal regulations." DOI Amended Plan Objection, ¶ 1. "The United States only remaining objection is to the Release of unknown liabilities of the Debtor for removal of non-hazardous waste buried by the previous lessee on the lands of the Jicarilla Apache Nation." *Id.* at ¶ 2.

29. A proposed order confirming the Golden Oil Plan was submitted to the Bankruptcy Court in the Golden Oil Case approved by, among others, counsel for the Bureau of Indian Affairs (the "Proposed Golden Confirmation Order"). Exhibit 12.

30. An order confirming the Golden Oil Plan ("Golden Confirmation Order") was entered in the Golden Bankruptcy Case on October 6, 2004. *See* Golden Oil Bankruptcy Case Docket No. 399, Exhibit 1.

31. The Proposed Confirmation Order was substantially similar to the Golden Confirmation Order entered October 6, 2004 in the Golden Oil Case confirming the Golden Oil Plan. Compare Exhibits 12 and 15. Both the Proposed Golden Confirmation Order and the entered Golden Confirmation Order contained the following provisions, among others:

(a) "Doc. #250 filed by the United States of America on behalf of the Bureau of Indian Affairs ("BIA") The objection has been resolved and the claim for plugging and abandonment filed by the BIA will be withdrawn in view of the following: (i) the Debtor has a bond; (ii) the Debtor agrees to comply with the provisions of 25 C.F.R. § 211.23; (iii) the Debtor's agreement to escrow funds for plugging and abandonment costs as provided for in the

-10-

Plan Modifications; (iv) the Debtor's acknowledgement as set forth in paragraph 40 of this Order that environmental liabilities are being excluded from discharge; and (v) the Debtor does not seek discharge of liabilities for plugging and abandonment of wells it operates." ¶ 13.b

(b)     "The Court finds that the Debtor is the owner and operator of the wells contained on the lands of the Jicarilla Apache Nation located in the State of New Mexico which are the subject of agreements being assumed pursuant to the terms of the Plan." ¶ 15.

(c)     "Any liability to MLG from GOCO or any third party is limited to prepetition royalty payments and prepetition state taxes as set forth above as well as in the Plan and the settlement. These claims shall be non-recourse to MLG except as against right, title and interest to post June 30, 2004 revenues associated with the operation of rights, title and interest in Section 71 and Section 363 Leases." ¶ 30.

(d)     "MLG shall be allowed to request assistance of this Court to finalize, effectuate or obtain approval of any assignments or transfers required by the Plan or settlement. Approval of assignment or transfer shall not be unreasonably withheld by any Creditor or third party. On the later of the Effective Date or June 30, 2004, all rights, title and interest in the Section 71 and Section 363 leases (except for five wells on the 71 lease being worked-over, which will be transferred after collection of allowable charges for work over), shall be transferred to MLG. If the transfer cannot legally take place on the later of the Effective Date or June 30, 2004, then MLG shall be entitled to a transfer of all equitable interest in and to the Section 71 and Section 363 Leases (except for five wells … ). This equitable transfer shall mean that MLG shall have the rights to all income produced form said Leases net of any current royalties and taxes and the proportionate share of past due royalties payable under this Plan as well as Lease operating expense, equal to direct will expenses paid to third parties and a $300 per operating well operational fee." ¶ 30.

(e)     "The Debtor is authorized to execute all documents under the confirmed Plan as may be necessary, required or appropriate to carry out the provisions of the confirmed Plan including the documents necessary to effectuate the transfer of legal title of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, and the costs necessary to transfer assets to the MLG group in accordance with Article 7 of the plan." ¶ 34

32.     Notice of the entered Golden Confirmation Order was given to the Nation and to the United States of America/Bureau of Indian Affairs. *See* the Certificate of Service that is part of Exhibit 16.

33.     MLG informed the Nation by a letter from Pete V. Domenici Jr. (then counsel for MLG and Platinum) to Naomi Barnes (then counsel for the Nation), dated August 24, 2004, that MLG and Platinum contemplated a transfer of the rights under Jicarilla Lease Nos. 71 and 363 to Platinum pursuant to the Settlement Agreement and Golden Oil Plan. Sandoval Deposition, Exhibit 34.

34.     Neither the Settlement Agreement, Golden Oil Disclosure Statement, Golden Oil Plan, nor the Golden Confirmation Order mentions or refers to Platinum, expressly approves the transfer of any assets to MLG's designee, or indicates that MLG intends to form an entity to take title to any assets.  *See* Exhibits 5, 6, 11 and 15.

35.     On January 4, 2005, the Nation granted Platinum an Oil & Gas Operating Permit on the Jicarilla Apache Reservation for a term of one year.  Sandoval Deposition, Exhibit 18. Platinum provided the Nation with a certificate of liability insurance. *Id.*

36.     Golden Oil, Platinum and MLG executed and recorded a Quitclaim Assignment and Bill of Sale, effective April 1, 2005, that included the conveyance of the Operating Rights and Working Interests from Golden Oil to Platinum.  Sandoval Deposition Exhibit 22.

37.     On February 3, 2005, MLG filed a motion in the Golden Oil Bankruptcy Case to compel compliance with the terms of the Settlement Agreement (the "Motion to Enforce").  *See* Golden Oil Bankruptcy Docket No. 466, Exhibit 1; and Exhibit 17).  The Motion to Enforce recites that MLG formed Platinum to hold all of its interests.  *Id.*

38.     Neither the DOI nor the Nation filed an objection to the Motion to Enforce.  *See* Golden Oil Docket, Exhibit 1.

39.     The Court in the Golden Bankruptcy Case entered an amended stipulated order resulting from the Motion to Enforce, approved by Golden Oil and by MLG and Platinum, by their respective counsel.  Exhibit 20.  The findings contained in the order regarding the interests of Platinum in the Jicarilla Lease Nos. 71 and 363 are findings regarding the agreement of the parties approving the order and not findings regarding MLG's and Platinum's actual interests in the Jicarilla Lease Nos. 71 and 363.  *Id.*  The order further provides, in part:  "This order affects only the relationship between the parties [to the stipulated order] and does not otherwise modify any previous order by the court."  *Id.*

40.     By a letter dated August 13, 2007 from counsel for the Nation to counsel for Golden Oil, with a copy to counsel for Platinum and MLG, the Nation required Golden Oil to execute certain assignment documents to complete the earlier purported assignment from Chace to Golden Oil, and required Golden Oil and Platinum to execute certain documents to effectuate the assignments from Golden Oil to Platinum of, among other things, interests in Jicarilla Lease Nos. 71 and 363.  See Sandoval Deposition, Exhibit 36.  The letter states that the transfers will be made pursuant to the Settlement Agreement between the MLG Group and Golden Oil, and refers to the Golden Oil Bankruptcy Case.  *Id.*

41.     The documents included with the August 13, 2007 letter from counsel for the Nation, prepared for execution by Platinum, designated Platinum as assignee of certain working interests in Jicarilla Lease Nos. 71 and 363, among other interests.  The documents contained an Acceptance and Assumption by Assignee that included the following language:

-12-

Assignee hereby assumes full liability under the lease from its inception as to the assigned interest and assumes all obligations of Assignor related to the assigned interest in such lease, rules and regulations and agrees to pay to the Jicarilla apache Nation all rental, royalty, other lease payments and/or taxes due the nation for any oil or gas produced under said lease from the interest assigned herein, accruing prior to or subsequent to the date of approval of this assignment.

Sandoval Deposition, Exhibit 36.

42.    MLG and Platinum, as seller, and Star Acquisition VII LLC ("Star"), as buyer, entered into a Purchase and Sale Agreement (the "Purchase and Sale Agreement") dated June 20, 2005.  In connection with the Purchase and Sale Agreement, MLG and Platinum, as assignor, and Star, as assignee, executed an Assignment and Bill of Sale dated June 23, 2005, and a Corrective Assignment and Bill of Sale dated July 7, 2005.  *See* Exhibits A, B, and C to Lionette Affidavit – Exhibit 32;  Lionette Deposition, Exhibit 67;  Nation's Statement of Uncontested Facts, ¶ 38, Docket No. 104-1.

43.    The assets to be transferred by Platinum and MLG to Star under the Purchase and Sale Agreement included "the oil and gas leasehold interests and working interests in the oil and gas leases described on Exhibit A [to the Purchase and Sale Agreement]" which included all oil and leasehold interests and working interests in Jicarilla Lease Nos. 71 and 363.  *See* Purchase and Sale Agreement, Article I, Definition of Properties and ¶ 2.1.

44.    The Corrective Bill of Sale incorporated by reference the terms of the Purchase and Sale Agreement, and provided that if there is conflict between the terms of the Purchase and Sale Agreement and the Corrective Bill of Sale, the provisions of the Purchase and Sale Agreement would control.  Corrective Bill of Sale, ¶4.

45.    The Purchase and Sale Agreement includes the following provisions:

(a)    "Seller is not required to make any filing with or obtain any authorization, consent or approval of any government or governmental agency or Third Party in order for the parties to consummate the transactions contemplated by this Agreement."  ¶9.5.

(b)    "Unless waived by the buyer, it is a condition of the obligation of the buyer to close that all representations of seller contained in the Agreement "shall be true and correct in all material respects at and as of Closing…."  ¶ 12.2a.

(c)    "Unless waived, it is a condition to the obligation of either party to close that "all material consents and approvals, if any, whether required contractually or by applicable federal, state, local or tribal Law, or otherwise necessary for the execution, delivery and performance of this agreement by a party … shall have been obtained and delivered to the other party by the Closing and shall not have been withdrawn or revoked."  ¶ 12.3b.

(d)    "It is understood that at Closing, Seller may not have record title to all of the Properties, and may not have all necessary approvals (including tribal approvals and

-13-

approvals of the Bureau of Indian Affairs (BIA) for its title in and to the Properties. Seller covenants with buyer that upon Closing, Seller will use its best efforts and diligence, at Seller's expense, to cause title to the Properties to be fully vested in Buyer, with all necessary tribal and BIA approvals, together with any approvals required by the Bankruptcy Court in connection with the Bankruptcy Case. From time to time, Seller shall execute and deliver all instruments necessary or desirable to vest Buyer in complete title to the Properties." ¶ 14.4a.

(e)    "Until Seller has caused complete title to the Properties to be vested in Buyer, with all necessary approvals, the parties agree that Seller shall remain the designated "operator" of the Properties, and Buyer will cause the actual operations thereof as a subcontractor operator to Seller. From and after Closing, as between Sellers and Buyer, Buyer shall have the exclusive authority and control of all operations of the Properties." ¶ 14.4b.

(f)    "Concurrently with the delivery by Seller to Buyer of all executed instruments necessary or desirable to vest Buyer in complete title to the Properties . . .

46.    The Nation did not approve the assignment of property or interests in Jicarilla Lease Nos. 71 and 363 by Platinum and MLG to Star under the Purchase and Sale Agreement. Sandoval Deposition at pp. 86-88; Nation's Statement of Uncontested Facts, ¶ 42, Docket No. 104-1; Deposition of Manuel Myore ("Myore Deposition") at p. 16.

47.    The DOI did not approve the assignment of property or interests in Jicarilla Lease Nos. 71 and 363 by Platinum and MLG to Star under the Purchase and Sale Agreement Nation's Statement of Uncontested Facts, ¶ 42, Docket No. 104-1.

48.    Mr. Sandoval, the Nation's Rule 30(b)(6) witness, testified at his deposition that it was his understanding that since the Nation and BIA did not approve the assignment from Platinum to Star the assignment was ineffective to transfer ownership. Sandoval Deposition at pp. 86-87.

49.    Mr. Myore, a realty officer for the Bureau of Indian Affairs, testified that if the BIA does not approve an assignment of operating rights under an oil and gas lease the assignment is not effective. Myore Deposition at p. 16.

50. Tract Notes on the Nation's Lease Data Sheets for Jicarilla Lease Nos. 71 and 363 state in part:

Star Acquisition was assigned the Operating Rights held by MLG and Platinum. This Assignment has not been presented or approved by the JAN and the BIA.

Unapproved Assignment of 100% Operating Rights from Chace into Golden Oil Company. Subsequently Golden Oil Company and McKay, Lotspeich (successor to Chace Oil Company) entered into a Settlement Agreement 3/17/2005, affirmed by the Bankruptcy Court that "from and after the effective date" gives MLG and their SUCCESSOR Platinum Oil LLC the right to Operate and the ownership of any interests that were obtained by Golden Oil Company (including the wells on

-14-

these leases).  There has never been an approval of the interest from Chace to Golden…. Chace Oil Company, Inc. remains that last entity approved as having Operating Rights on this lease.  An assignment of interest in this lease is unnecessary and no such Assignment from Golden to Chace or a successor entity since the time of the Agreement providing for the ownership and operation on this lease.  Under the terms of the bankruptcy Platinum's interest was also confirmed by the Bankruptcy Court.  This Assignment of Operating Rights has not been submitted or approved by the JAN or BIA.

Sandoval Deposition Exhibit 5.

51.    On June 24, 2008, the Nation's Legislative Council passed a resolution reflecting the transfer as a result of the Golden Oil Bankruptcy Case of the Leasehold Interests from Chace Oil Company to Golden Oil, From Golden Oil to MLG and from MLG to Platinum.  Sandoval Deposition, Exhibit 40; Jones Affidavit, Exhibit A.

52.    On December 17, 2007, the Mining Minerals Service issued an Order to Report to Golden Oil ordering Golden Oil to submit certain Oil and Gas Operations Reports ("OGORs") for Lease Nos. 71 and 363.  Margaret Louise Williams Deposition Exhibit 1.  Golden Oil filed an appeal of the MMS Order to Report. Margaret Louise Williams Deposition Exhibit 2. The MMS issued a decision in the appeal that the "OGOR reporting requirement for the wells on Jicarilla 71 and 363 were the responsibly of Platinum Oil Properties, LLC for the production months [in question], and that "MMS agrees that Platinum Oil Properties, LLC is the responsible operator to report the OGORs."  Docket No. 194-95, page 15 of 16.

## DISCUSSION

A.    The Golden Plan is binding on the Nation and DOI and has *res judicata* effect; consequently, any provision of the Indian Mineral Leasing Act or the Nation's Code that requires the Nation to approve the transfer of the Operating Rights and Working Interests pursuant to the plan is not implicated.

The Nation argues that a confirmed chapter 11 plan cannot supersede the Indian Mineral Leasing Act or the Nation's laws, and argues further that because the transfer of Operating Rights and Working Interests to Platinum pursuant to the confirmed Golden Oil Plan would violate the Indian Mineral Leasing Act and the Nation's laws the transfer may not be effectuated. Without deciding whether the transfer would violate the Indian Mineral Leasing Act and the Nation's laws, the Court concludes that the confirmed Golden Oil Plan is binding on the DOI and the Nation even if it arguably violates those laws.  The Nation also asserts that 11 U.S.C.

-15-

§106(a), which abrogates the sovereign immunity of governmental units with respect to 11 U.S.C. §1141, does not abrogate the Nation's sovereign immunity such that 11 U.S.C. §1141 has no application to the Nation. For the reasons set forth in Section B of this opinion, the Court disagrees.

A confirmed Chapter 11 plan is binding on all parties described in 11 U.S.C. §1141(a) who received proper notice. *See* 11 U.S.C. §1141(a) (as to the binding effect of a confirmed plan).[4] In fact, confirmation binds creditors and other parties in interest even if those parties have not accepted the plan.[5] Consequently, a creditor who received proper notice is bound by the terms of a confirmed plan "even if it had a different understanding of their meaning or did not realize their effect." *In re K.D. Co., Inc.,* 254 B.R. 480, 491 (10th Cir. BAP 2000).[6] A confirmation order is treated as a final order that has *res judicata* effect.[7]

The confirmed Golden Oil Plan provided for the vesting of good title to the Operating Rights and Working Interests held by Golden Oil, and the transfer of those rights under the terms of the plan without further approval by the DOI or the Nation (other than as may be required under the plan terms). The confirmed Golden Oil Plan limited the liabilities to be assumed by the designated transferee of the Operating Rights and Working Interests to certain pre-petition royalties and taxes and to plugging and abandonment liabilities. *See* Plan § 7.1; Settlement Agreement, ¶¶ 3a and 11. Both DOI and the Nation are bound by these terms.

---

[4] *See also In re Burton Securities, S.A.,* 202 B.R. 411, (S.D.Tex. 1996), *aff'd,* 129 F.3d 607 (5th Cir. 1997)(stating that "[i]t is well-settled that a confirmed chapter 11 plan has a binding effect on both debtors and claimants under the plan, and functions as a judgment with regard to the parties bound by the plan.")(citing 11 U.S.C. § 1141(a); *In re Laing,* 31 F.3d 1050, 1051 (10th Cir. 1994) and *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1051 (5th Cir. 1987)).

[5] *See In re Ruti-Sweetwater, Inc.,* 836 F.2d 1263, 1266-67 (10th Cir. 1998)(finding that a creditor's failure to object to a chapter 11 plan constitutes deemed acceptance of the plan).

[6] *See also, United States Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.),* 150 F.3d 1233, 1239 (10th Cir. 1998)(stating that "once confirmed, a plan is enforceable as a court order against parties who did not even agree to its terms.")(citing 11 U.S.C. § 1141(a)).

[7] *See In re Varat Enterprises, Inc.,* 81 F.3d 1310, 1315 (4th Cir. 1996)(stating that "[a] bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect.")(citing *Stoll v. Gottlieb,* 305 U.S. 165, 170-71, 59 S.Ct. 134, 136-37, 83 L.Ed. 104 (1938)(remaining citations omitted)).

-16-

The Nation's and DOI's[8] arguments that the confirmed Golden Oil Plan cannot supersede the Indian Mineral Leasing Act or the Nation's Code are unavailing because of the *res judicata* effect of the confirmed Golden Oil Plan. Even if the confirmed Golden Oil Plan contains terms that are contrary to the Indian Mineral Leasing Act or the Nation's Code, the confirmed plan controls.

> [T]he binding effect of a confirmed plan of reorganization is such that res judicata applies even when the plan contains provisions which are arguably contrary to applicable law. Consequently, challenges to a confirmed plan of reorganization which allege that the plan is contrary to applicable law, either bankruptcy or otherwise, are bound to be unsuccessful.
> *Bowen v. United States (In re Bowen),* 174 B.R. 840, 847 (S.D. Ga. 1994).[9]

Under 11 U.S.C. § 1123(a)(5), "notwithstanding any otherwise applicable nonbankruptcy law," a chapter 11 plan must "provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Under this section, otherwise applicable nonbankruptcy laws that would interfere with a debtor's means for implementing a plan can be preempted.[10] The scope of this section,

---

[8] The DOI, with permission of the Court, filed an amicus brief on the issue of the interplay between the Indian Mineral Leasing Act and the confirmed Golden Oil Plan. *See* Docket No. 223.

[9] *See also, A.H. Robins Co., Inc. v. Dalkon Shield Claimants Trust,* 216 B.R. 175, 179 (E.D.Va. 1997), *aff'd,* 163 F.3d 598 (4th Cir. 1998)("The plan is *res judicata* as to all questions that could have been raised relating to it, even if it contains provisions arguably contrary to applicable law.")(citing *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938) and *In re Varat Enterprises, Inc.,* 81 F.3d 1310 (4th Cir. 1996)(remaining citations omitted); *K.D.Co., Inc.,* 254 B.R. at 489 (finding that even where the provisions of a confirmed chapter 11 plan were inconsistent with 11 U.S.C. § 726, such provisions were "nonetheless binding on the parties."); *Karathansis v. THCR/LP Corp.,* 2007 WL 1234975 (D.N.J. 2007)(unreported), *aff'd,* 298 Fed.Appx. 120 (3rd Cir. 2008)(stating that "[a] confirmation order also bars parties from relitigating provisions of a plan that violate non-bankruptcy law.")(citing *Bowen,* 174 B.R. at 847 and *In re Howe,* 913 F.2d 1138, 1143 (5th Cir. 1990)). *Cf., In re Brawders,* 325 B.R. 405, 410 (9th Cir. BAP 2005), *aff'd,* 503 F.3d 856 (9th Cir. 2007)(stating in the context of a Chapter 13 case that "[i]t is well established that principles of res judicata and finality . . . can make even 'illegal' provisions of a Chapter 13 plan binding.")(citation omitted).

[10] *See In re FCX, Inc.,* 853 F.2d 1149, 1155 (4th Cir. 1988)(stating that "§1123(a)(5) is empowering statute . . . [that] does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate."); *Montgomery County, MD v. Barwood, Inc.,* 422 B.R. 40, 44 (D.Md. 2009)(stating that "[t]he 'notwithstanding' clause [contained in 11 U.S.C. § 1123(a)] is consistent with other sections of the Bankruptcy Code indicating Congress's intent that 'otherwise applicable nonbankruptcy laws' should be preempted.")(citing *PG & E Co. v. California,* 350 F.3d 932, 946 (9th Cir. 2003)).

and whether it preempts *all* otherwise applicable nonbankruptcy law is not entirely settled.[11]

However, whether the Golden Oil Plan contained provisions that failed to comply with the

provisions of the Indian Mineral Leasing Act, or whether Golden Oil could rely on 11 U.S.C. §

1123(a)(5) to supersede any requirements under the Indian Mineral Leasing Act that would

impair its ability to effectuate the transfers contemplated under its plan, are issues that the DOI

and the Nation were required to raise in connection with the Golden Oil confirmation

proceedings or by a direct appeal. [12]   The Golden Oil plan is now *res judicata* as to this issue.

Having failed to object to the Golden Oil Plan on the ground that it violated the Indian Mineral

Leasing Act and the Nation's laws or to appeal from the Golden Confirmation Order, the DOI

and the Nation remain bound the terms of the Golden Oil Plan and Golden Confirmation Order.[13]

The DOI originally objected to the Golden Oil Plan on grounds that the Golden Oil Plan

did not require the DOI or the Nation to consent to the transfer to MLG as required by the Indian

Mineral Leasing Act; and, therefore, the transfer is rendered ineffectual.  The DOI later amended

its objection to the Golden Oil Plan.  In its amended objection, the DOI stated that all of it

objections were resolved except for an objection to a release of certain unknown liabilities.  The

DOI subsequently approved an order confirming the Golden Oil Plan that provided for the

transfer of the oil and gas interests to MLG without further approval of the DOI.  The

confirmation order entered by the Golden Oil Court was substantially in the form the DOI

---

[11] *Barwood,* 422 B.R. at 47 (holding that "§1123(a) does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety and welfare.").

[12] *See Varat Enterprises,* 81 F.3d at 1315 (noting that "parties may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so.")(citing *Turshen v. Chapman,* 823 F.2d 836, 839 (4th Cir. 1987)); *K.D. Co.,* 254 B.R. at 490 (a confirmed plan may not be attacked other than by filing a timely appeal)(citing *Stoll v. Gottlieb,* 305 U.S. at 170-72)(remaining citation omitted).  *See also United Student Aid Funds, Inc. v. Espinosa,* 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010)(holding that a confirmed chapter 13 plan that did not comply with the requirements under the Bankruptcy Code regarding dischargeability of student loans upon a finding of undue hardship through an adversary proceeding was not void).

[13] *Varat Enterprises,* 81 F.3d at 1315 (stating that "federal courts have consistently applied *res judicata* principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order.")(citing *Dep't of Air Force v. Carolina Parachute Corp.,* 907 F.2d 1469, 1473-74 (4th Cir. 1990)(remaining citation omitted).

approved. The DOI did not take an appeal from the Golden Confirmation Order. Having approved a confirmation order in substantially the form entered by the Golden Oil Court, the DOI is bound by the terms of the confirmed Golden Oil Plan.

Likewise, the Nation is bound by the terms of the confirmed Golden Oil Plan. The Nation did not participate in the confirmation proceedings in the Golden Oil bankruptcy case, but did receive notice in the case, including notices of the plan and disclosure statement filed in the case and the Golden Confirmation Order. "Questions of the propriety or legality of the bankruptcy court confirmation order are . . . properly addressable on direct appeal." *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1050 (5th Cir. 1987). Having failed to object to confirmation of the plan in the Golden Oil bankruptcy case, and having failed to timely appeal the Golden Confirmation Order, any attempt to alter its terms constitutes an impermissible collateral attack. The Nation is now foreclosed from asserting that the confirmed Golden Oil Plan is contrary to applicable law.

The Nation also argues that because the confirmed Golden Oil Plan as well as the Nation's laws required the transferee to execute the Nation's forms, by the terms of the confirmed plan the transferee was required to accept transfer documents in a form required by the Nation's Code. The documents the Nation prepared for transfer of the Operating Rights and Working Interests included assumption of liabilities as a condition to transfer that exceeded the scope of the limited liabilities the transferees of the Operating Rights and Working Interests were to assume as provided under the terms of the confirmed Golden Oil Plan.

Because the Golden Oil Plan expressly limited the liabilities that MLG, as transferee of the Operating Rights and Working Interests, would assume to certain pre-petition royalties and

taxes and plugging and abandonment liabilities, and because the Nation is bound by the terms of the confirmed Golden Oil Plan, the Nation's argument fails.

As to the transfer of Operating Rights and Working Interests by Chace to Golden Oil, Section 7.2 of the confirmed Golden Oil Plan authorizes Golden Oil to sign documents on behalf of Chace necessary to effectuate the transfer of assets from Chace to Golden Oil under a 1991 asset purchase agreement, "specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist." However, Section 7.2 further provides that the "Debtor and Reorganized Debtor [referring to Golden Oil] shall incur no liability for signings these required forms, or actions taken in reliance thereof." Accordingly, under the confirmed Golden Oil Plan, the Nation is not permitted to require Golden Oil to assume any liabilities in connection with a transfer of the Operating Rights and Working Interests by Chace to Golden Oil regardless of what is required by the Nation's Code as a condition of transfer or what assumption of liability provisions are contained in the Nation's transfer forms. "Any preconfirmation rights of creditors survive only to the extent allowed in the reorganization plan." *Robins,* 216 B.R. at 179 (citing *In re Circle K Corp.,* 198 B.R. 784 (Bankr.D.Ariz. 1996) and *In re Poplar Run Five Ltd. P'ship,* 192 B.R. 848 (Bankr.E.D.Va. 1995)(remaining citations omitted).

Similarly, as to the transfer of Operating Rights and Working Interests by Golden Oil to MLG, the confirmed Golden Oil Plan and the Settlement Agreement approved by the Plan limited the liabilities to be assumed by MLG to certain royalty payments and state taxes and to plug and abandonment liabilities. Under the confirmed Golden Oil Plan, the Nation is not permitted to require MLG to assume any liabilities in connection with a transfer of the Operating Rights and Working Interests by Golden Oil to MLG beyond those specified in the confirmed

Golden Oil Plan and the Settlement Agreement regardless of what is required by the Nation's Code as a condition of transfer or what assumption of liability provisions are contained in the Nation's transfer forms.

B.     The Nation does not enjoy sovereign immunity from operation of the binding effect of the Golden Oil Plan.

The Nation asserts that its sovereign immunity shields it from the effects of 11 U.S.C. § 1141(d), which makes a confirmed chapter 11 plan binding on parties receiving proper notice regardless of whether they actively participated in the bankruptcy case. The Nation received proper notice in the Golden Oil bankruptcy case, and chose not to participate. The Nation argues that because there is no clear expression of Congressional intent for the Bankruptcy Code to preempt or supplant the regulatory scheme imposed under the Indian Mineral Leasing Act, the Nation's rights under the Indian Mineral Leasing Act and the Nation's Code have not been abrogated under the Bankruptcy Code. In other words, under the doctrine of sovereign immunity, the Nation asserts that it is not bound by the terms of the confirmed Golden Oil Plan. This Court disagrees.

The Nation's independent sovereignty to regulate oil and gas leasing activity conducted on the Nation's tribal land as contemplated under the Indian Mineral Leasing Act is not being questioned. It is not, therefore, necessary for the Court to consider whether Congress expressed a clear intent in the Bankruptcy Code to abrogate the Nation's sovereignty under the Indian Mineral Leasing Act. As discussed above, any provision contained in the confirmed Golden Oil Plan that is arguably contrary to otherwise applicable laws enacted by an exercise of the Nation's sovereign power is nevertheless binding because of the *res judicata* effect of the confirmed Golden Oil Plan irrespective of the operation of the Indian Mineral Leasing Act and the Nation's laws.

To the extent the Nation asserts that sovereign immunity would otherwise insulate it from the binding effect of a confirmed chapter 11 plan under 11 U.S.C. § 1141(a), the Court finds that 11 U.S.C. § 106 abrogates sovereign immunity of Indian tribes. Indian tribes, including the Nation, generally enjoy sovereign immunity from suit.[14] Tribal sovereign immunity is not absolute, however, and can be abrogated by Congress.[15] Congressional abrogation of tribal sovereign immunity must be explicit; abrogation may not be implied.[16] Abrogation of tribal sovereign immunity by Congress will only be found where Congress has clearly and unequivocally expressed its intent to abrogate the immunity pursuant to a valid exercise of its congressional power.[17]

Section 106(a)(1) of the Bankruptcy Code provides, in relevant part:

Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
    (1) Sections 106, . . . 1141 . . . of this title.

11 U.S.C. § 106(a)(1).

---

[14] *See Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1988)(stating that "[a]n Indian Tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.")(citations omitted); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)("Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.")(citing *Turner v. United States,* 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919)(remaining citations omitted); *Krystal Energy Co. v. Navajo Nation,* 357 F.3d 1055, 1056 (9th Cir. 2004)(observing that "[i]mmunity from suit has been recognized by the courts of this country as integral to the sovereignty and self-governance of Indian tribes.")(citations omitted).

[15] *Krystal Energy,* 357 F.3d at 1056 ("Tribal sovereign immunity is not absolute, however. Congress may abrogate it and thereby authorize suit against Indian tribes.")(citing *Santa Clara Pueblo,* 436 U.S. at 58, 989 S.Ct. 1670)(citing *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). *See also, United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)(superseded in other respects by 25 U.S.C. §§ 1301-1303)("The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance.").

An Indian tribe can also waive its sovereign immunity by participating in a suit. *See, e.g., In re White,* 139 F.3d 1268, 1271 (9th Cir. 1998)(agency that administrated lending of tribal trust monies to members of Indian tribes waived its tribal sovereign immunity by participating in claims adjudication process and by actively participating in the debtor's Chapter 11 proceedings). The Nation did not participate in the Golden Oil bankruptcy case. For purposes of this Memorandum Opinion the Court finds that the Nation did not waive its sovereign immunity in the Golden Oil bankruptcy case.

[16] *Krystal Energy,* 357 F.3d at 1056 (citing *Martinez,* 436 U.S. at 58, 98 S.Ct. 1670)(citing *Testan,* 424 U.S. at 399, 96 S.Ct. 948)).

[17] *See Kiowa Tribe,* 523 U.S. at 754 and 759, 118 S.Ct. 1700 (observing that Congress, subject to constitutional limitations, can alter the limits of tribal sovereign immunity through explicit legislation); *Martinez,* 436 U.S. at 58-59, 98 S.Ct. 1670.

-22-

This section embodies a clear, and unequivocal intent to abrogate the sovereign immunity of governmental units. The Bankruptcy Code defines "governmental unit" as follows:

> United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title); a State, a Commonwealth, a District, a territory, a municipality, or a foreign state; or other foreign or domestic government.

> 11 U.S.C. § 101(27).

The language "or other foreign or domestic government" found in 11 U.S.C. § 101(27) includes Indian tribes, such that 11 U.S.C. § 106 together with 11 U.S.C. § 101(27) embodies Congress' clear and unequivocal abrogation of tribal sovereign immunity.[18] This Court agrees with those courts that hold that 11 U.S.C. § 106(a) abrogates tribal sovereign immunity.[19] The Nation is not shielded from the binding effect of the confirmed Golden Oil Plan under 11 U.S.C. § 1141 by its sovereign immunity. Bankruptcy Code § 106(a), 11 U.S.C. § 106(a), expressly abrogated its sovereign immunity with respect to that section of the Bankruptcy Code.

---

[18] *See, e.g. Krystal Energy Co.,* 357 F.3d at 1057 and 1058 (stating that "Indian tribes are certainly governments, whether considered foreign or domestic" and reasoning further that "[i]t is clear from the face of §§ 106 and 101(27) that Congress did intend to abrogate the sovereign immunity of *all* 'foreign and domestic governments.'" Because "Congress explicitly abrogated the immunity of *any* 'foreign or domestic government[ ]," and because "Indian tribes are domestic governments . . . . Congress expressly abrogated the immunity of Indian tribes.")(citations omitted); *Russell v. Fort McDowell Yavapai Nation (In re Russell),* 293 B.R. 34, 44 (Bankr.D.Ariz. 2003)(holding that "[t]he term 'other foreign or domestic government' in § 101(27) unequivocally, and without implication, includes Indian tribes as 'governmental units[ ]" such that "Section 106(a) unequivocally, and without implication abrogates sovereign immunity as to governmental units, including Indian tribes, with respect to application of the enumerated sections of the Bankruptcy Code"). *See also, In re Mayes,* 294 B.R. 146, 157-60 (10ᵗʰ Cir. 2003)(McFeeley, J., dissenting)(arguing that 11 U.S.C. § 106(a) abrogates tribal sovereign immunity, reasoning, in part, that "if the phrase [in § 101(27)] following the semicolon is not read as referring to Indian tribes and other indigenous peoples, the phrase becomes meaningless [because] [t]here are no other forms of domestic government that have not already been specified[,]" and finding further that "[t]he fact that Indian tribes have been referred to as 'domestic dependent nations' incorporates them into 11 U.S.C. § 106.").

[19] The Court is well aware that abrogation of tribal sovereign immunity by operation of 11 U.S.C. § 106(a) is not the universal view. *See, e.g., Confederated Tribes of the Colville Reservation Tribal Credit v. White (In re White),* 1996 WL 33407856 (E.D.Wash. 1996), *aff'd,* 139 F.3d 1268 (9ᵗʰ Cir. 1998)(finding that 11 U.S.C. § 106 does not abrogate tribal sovereign immunity because it is not an express and unequivocal expression of Congressional intent to abrogate tribal immunity; the statute does not expressly mention Indian tribes); *Mayes,* 294 B.R. at 148 n.10 (commenting, but not holding, that "§ 106(a) likely could not abrogate [the tribe's] immunity . . .").

C.     Neither Platinum nor MLG Divested Themselves of the Operating Rights Under a Purchase and Sale Agreement Between Them and Star Acquisition VII LLC.

Platinum and MLG, as sellers, and Star Acquisition VII LLC ("Star"), as buyer, entered into a Purchase and Sale Agreement dated June 29, 2005 ("Sale Agreement") for the transfer of certain interests, including the Operating Rights and Working Interests. The Nation argues that Platinum has no interest in the Operating Rights and Working Interests because Platinum and MLG divested themselves of any interest in the Operating Rights and Working Interests under the Sale Agreement, regardless of whether any interest in the Operating Rights and Working Interests vested in Star as a result of the Sale Agreement. The Court disagrees.

The property interest to be transferred by Platinum and MLG to Star under the Sale Agreement included not only the Operating Rights and Working Interests, but also leasehold interests in Jicarilla Lease Nos. 71 and 363.[20] In paragraph 14.4 of the Sale Agreement, the parties expressly acknowledged that at closing the seller (Platinum and MLG) "may not have record title to all of the Properties, and may not have all necessary approvals (including tribal approvals and approvals of the Bureau of Indian Affairs (BIA)) for its title in and to the Properties." Paragraph 14.4a required Platinum and MLG to use their best efforts and diligence to cause title to the Properties to be fully vested in Star, with all necessary tribal and BIA approvals and any approvals required by the Bankruptcy Court in the Golden Oil Bankruptcy Case. Specifically, Paragraph 14.4b provides, in part:

> Until Seller has caused complete title to the Properties to be vested in Buyer, with all necessary approvals, the parties agree that Seller shall remain as the designated

---

[20]The Sale Agreement provided that Platinum and MLG would sell and assign certain properties to Star, upon the terms and conditions set forth in the Sale Agreement. *See* Sale Agreement, ¶ 2.1. The Sale Agreement defines "Properties" to include "the oil and gas leasehold interests and working interests in the oil and gas leases described on Exhibit A [to the Sale Agreement]," including without limitation mineral interests, wells, personal property and equipment located on the Leases, operating and farmout agreements, and surface rights incident to the Leases. *See* Sale Agreement, Article I, Definition of Properties. Exhibit A to the Purchase and Sale Agreement lists Jicarilla Lease Nos. 71 and 363 by lease number and tracts, various wells located on tracts covered by the Leases, and various working interests in specified wells located on the tracts.

"operator" of the Properties, and Buyer will cause the actual operations thereof as a subcontractor operator to Seller. From and after Closing, as between Sellers and Buyer, Buyer shall have the exclusive authority and control of all operations of the Properties.

A Corrective Bill of Sale, executed and delivered to effectuate the conveyance of title to the Properties under the Sale Agreement, incorporated by reference all terms of the Sale Agreement, including paragraph 14. Corrective Bill of Sale, ¶4.

Neither the DOI nor the Nation has expressly approved any of the transfers contemplated by the Sale Agreement. Because the Sale Agreement provided for the transfer of title to leasehold interests in Jicarilla Lease Nos. 71 and 363, DOI approval of the transfer was required. *See* 25 C.F.R. § 211.53. The required DOI approvals were never given; therefore, complete title to the Properties to be transferred under the Sale Agreement was not vested in Star. *Id.* Under the express terms of the Sale Agreement, Platinum and MLG retained whatever ownership interests they had in, under or with respect to the Properties to be transferred under the Sale Agreement, including leasehold interests, operating rights and working interests, and Star's interest was limited to that of a subcontractor operator for Platinum and MLG. The Nation's argument that under the Sale Agreement Platinum and MLG divested themselves of the Operating Rights and Working Interests fails because the Sale Agreement expressly contemplates that Platinum and MLG may not have record title to the Properties to be transferred under the Sale Agreement and outlines the parties' rights and obligations pending the complete vesting of title to the Properties in Star.

D.   The Settlement Agreement, Golden Oil Plan and Golden Confirmation Order are unambiguous; consequently parol evidence is not admissible to establish that Platinum, rather than MLG, was the intended transferee.

The Nation argues that even if this Court were to find that the Golden Oil Plan binds the DOI and the Nation to a transfer by Golden Oil of the Operating Rights and Working Interests

without further approval of the DOI or the Nation, the Golden Oil Plan only authorized Golden Oil to transfer the Operating Rights and Working Interests to MLG, not to Platinum. The Nation therefore urges the Court to conclude that Golden Oil's purported transfer of the Operating Rights and Working Interests to Platinum is ineffective.

Platinum counters with the following arguments in support of its contention that Platinum is the transferee designated in the confirmed Golden Oil Plan: 1) because MLG is comprised of thirty-six individuals, a transfer to MLG is unworkable as a practical matter; consequently it was clear that the "Lease Interests" would be assigned to an entity to be formed by MLG,[21] 2) both the DOI and Nation were aware and understood that the "Lease Interests" (Platinum's terminology) would be assigned to Platinum, not to MLG; 3) a motion to compel enforcement of the Settlement Agreement filed in the Golden Oil bankruptcy case referred to MLG having formed Platinum to take title to the "Lease Interests", neither the DOI nor the Nation objected to the motion, and the stipulated order resolving the motion to compel recognized that MLG had formed Platinum to take title to the "Lease Interests;" and 4) the Nation made several admissions in its own documents and other communications that the "Lease Interests" were to be transferred to Platinum.[22]

---

[21] *See* Platinum's Brief filed February 26, 2010, pp 10, 17.

[22] Among the admissions upon which Platinum relies is a statement in the Nation's objection to Platinum's motion to assume filed in the Platinum bankruptcy case that the Nation appeared in the Golden Oil case but did not object to the assumption by Golden Oil of its assignment of the well interest in Leases 71 and 363 to Platinum. Except for this statement, the Nation has consistently maintained in the Platinum bankruptcy case that the approved transferee of the Operating Rights and Working Interests in the Golden Oil bankruptcy case was MLG not Platinum. Further, the Nation relies on the Docket in the Golden bankruptcy case to demonstrate that the Nation did not in fact enter an appearance in that case. Platinum contends the Nation's statement in the objection to the motion to assume constitutes a judicial admission binding on the Nation. The Nation argues that it should not be bound by a perfunctory statement made in error when it has otherwise consistently maintained a contrary position before the Court. The Court agrees with the Nation that it is not appropriate to bind the Nation to the statement in question. "Judicial admissions are formal, deliberate admissions of fact that are conclusive in the litigation in which the admissions are made." *Lopez v. Lopez (In re Lopez),* 2009 WL 3754204, *2 (Bankr.D.N.M. Nov. 5, 2009)(citing *U.S. Energy Corp. v. Nukem, Inc.,* 400 F.3d 822, 833 n.4 (10th Cir. 2005)). Admissions of legal conclusions or of propositions of law are not subject to the doctrine of judicial admissions. *Id.* (citing *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9,* 10 F.3d 700, 716 (10th Cir. 1993)(remaining citations omitted). The Nation's statement in

<u>The Timeline for the Relevant Documents in the Golden Oil Bankruptcy</u>

Until Golden Oil filed a motion to enforce the Settlement Agreement on February 3, 2005, all documents (that are in evidence before this Court) filed or entered in the Golden Oil Bankruptcy Case describe a transfer of the Operating Rights and Working Interests by Golden to MLG. The Settlement Agreement, the Golden Oil Plan, the disclosure statement approved in connection with confirmation of the Golden Oil Plan, and the Golden Confirmation Order all refer to a transfer of the Operating Rights and Working Interests to MLG subject to specified liabilities. No reference is contained in those documents to a transfer of the Operating Rights and Working Interests to an entity to be formed by MLG, to MLG's designee or to Platinum.

The Settlement Agreement, dated March 17, 2004, provides for a transfer of the Operating Rights and Working Interests to MLG. It defines MLG as the parties described on an attached Exhibit A,[23] refers to MLG as a group of thirty-six (36) individuals or entities, and describes the members of MLG as a "group of limited partners and working interest owners." *See* Settlement Agreement, p. 1. The Settlement Agreement does not expressly refer to Platinum, which had not yet been formed when the Settlement Agreement was made, and does not indicate that the transferee will be MLG's designee or an entity to be formed by MLG. MLG formed Platinum on March 30, 2004, thirteen days after the date of the Settlement Agreement, to take title to the assets to be transferred by Golden Oil to MLG.

The Golden Oil Plan was filed April 23, 2004, after MLG formed Platinum. The Golden Oil Plan provides for a transfer of the Operating Rights and Working Interests to MLG. The

---

question was not a sufficiently formal, deliberate statement of fact that it should be deemed a judicial admission in the absence of reliance by the Court. The Court has not relied on the statement in question, and therefore declines to bind the Nation to the statement as a judicial admission. *See Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993)(finding that an admission was not sufficiently deliberate that counsel should be bound by it in the absence of reliance).

[23]Exhibit A to the Settlement Agreement is not in evidence before this Court. The copies of the Settlement Agreement proffered by the Nation and by Platinum to do not have Exhibit A attached.

Golden Oil Plan defines MLG to mean and include "all persons including individuals, corporations, partners and other interest owners represented by the law firm of Dolan & Domenici, PC as detailed in their letter of representation sent to GOCO dated February 6, 2004 attached,[24] both individually and in any and all other capacities . . . ."  Golden Oil Plan, ¶ 1.30, pp. 3 - 4.  The order confirming the Golden Oil Plan, entered on October 6, 2004, six months after Platinum was formed, simply refers to MLG without indicating what or who it is.

The first reference filed of record in the Golden Oil Bankruptcy Case to a transfer of the Operating Rights and Working Interests to Platinum is in a Motion to Enforce Compromise filed on February 3, 2005, nearly four months after the entry of the Golden Confirmation Order, and more than six months after the approval of the Settlement Agreement.  That motion recites that MLG formed Platinum to hold all of its interests.  The amended stipulated order resolving the Motion to Enforce Compromise states that certain operating rights and working interests are now owned by Platinum.  However, the amended stipulated order by its express terms is only binding as between the parties approving it: Golden Oil, Platinum and MLG.[25]  Because the findings contained in the order regarding the interests of Platinum in the Operating Rights and Working Interests are findings regarding the agreement of the parties approving the order, and the order binds only Golden Oil, Platinum, and MLG, the order cannot be relied upon by Platinum to establish MLG's and Platinum's actual interests.

Platinum's principal argument that Platinum is the transferee of the Operating Rights and Working Interests, and that no further approvals of the DOI or JAN are required, is that the DOI

---

[24]The referenced attachment is not in evidence before this Court.  The copies of the Golden Oil Plan proffered in evidence in connection with the cross motions for summary judgment do not have an attached letter.  Platinum had not been formed as of February 6, 2004.

[25] The amended stipulated order resolving Motion to Enforce Compromise provides: this order "affects only the relationship between the parties [to the order] and does not otherwise modify any previous order by the court." Amended Stipulated Order on MLG Motion to Enforce, p. 5.

and Nation are bound by the provisions of the Golden Oil Plan and the Golden Confirmation Order. Under the confirmed plan, Golden Oil would convey good title to the Operating Rights and Working Interests subject only to limited liabilities specified in the plan, all without any further consent on the part of the DOI or the Nation. The Court agrees with Platinum that the DOI and the Nation are bound by the terms of the Golden Oil Plan and the Golden Confirmation Order, and may not collaterally attack the confirmation order on the ground that it violates the Indian Mineral Leasing Act or the Nation's laws. However, the Court disagrees with Platinum that it can construe the plan and confirmation order as providing for the transfer of the Operating Rights and Working Interests to Platinum rather than to MLG. The Golden Oil Plan, the Settlement Agreement approved by confirmation of the plan, and the Golden Confirmation Order all provide for a transfer of the Operating Rights and Working Interests by Golden Oil to MLG. MLG is defined in those documents variously to mean certain named individuals, or certain named individuals and entities, which, for convenience, together were called MLG. The definition of MLG does not refer to Platinum or an entity to be formed by MLG, even though Platinum had been formed before the Golden Oil Plan was filed.

Without expressly invoking the parol evidence rule, Platinum essentially asks the Court to consider parol evidence to determine that by providing for a transfer of the Operating Rights and Working Interests to MLG, the Golden Oil plan necessarily contemplated that Platinum would be the transferee. Courts apply the parol evidence rule to interpret a confirmed chapter 11 plan when the plan contains an ambiguity. [26] Further, many courts recognize the doctrine of

---

[26] *See, e.g., In re Texas Gen. Petroleum Corp.*, 52 F3 1330, 1335-1336 (5th Cir. 1995)(stating that the rules of contract interpretation apply to the interpretation of a reorganization plan and affirming the bankruptcy court's use of parol evidence to determine the intent of the parties and resolve an ambiguity contained in the plan); *In re The Standard Beef Co.*, 2011 WL 2014331, *6 (Bankr.D. Conn. 2011); *In re Commercial Millwright Service Corp.*, 245 B.R. 585, 593 (Bankr. N.D. Iowa 1998)("Only when the language of the Plan is ambiguous may the court turn to other aids of construction and parol evidence.")(citation omitted); *Matter of Penrod*, 169 B.R. 910, 917 (Bankr N.D. Ind. 1994), *aff'd*, 50 F.3d 459 (7th Cir. 1995). *See also, In re Victory Markets, Inc.*, 221 B.R. 298, 303 (2nd Cir. BAP

latent ambiguity in connection with application of the parol evidence rule.[27]  "'An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.'"  *Moore v. Pennsylvania Castle Energy Corp.*, 89 F.3d 791, 796 (11th Cir. 1996)(citation to quoted case omitted).[28]  The classic example of a latent ambiguity is when a contract refers to an object by a particular name, but more than one object has the same name.[29]  A latent ambiguity may also exist when language used in a contract has a specialized meaning in a trade.[30]

This Court agrees that parol evidence is admissible to determine whether a latent ambiguity exists, but only if the party seeking to admit the evidence can provide a plausible

---

1998)(acknowledging that a confirmed plan has the status of a binding contract between the debtor and its creditors, and that unless the plan contains an ambiguity, the court is bound by the plain language of the plan and should not look beyond the text to interpret its meaning).

[27] *See, e.g., Coffin v. Bowater Inc.*, 501 F. 3d 80, 97 (1st Cir. 2007)(applying the latent ambiguity doctrine to a collective bargaining agreement); *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1310 (11th Cir.1998)(applying latent ambiguity doctrine under Florida law); *Pennsylvania Castle Energy Corp.*, 89 F. 3d at 795-96 (applying latent ambiguity doctrine under Alabama law); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1548 (10th Cir. 1993 (applying latent ambiguity under Illinois law); *Randles v. Hanson*, __ P.3d. __ , 2011 WL 2462302, *8 (N.M. Ct. App. 2011) (a court may consider extrinsic evidence to make a preliminary finding whether a contractual provision is ambiguous)(citing *Mark V,Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)).

[28] To the same effect, *see Coffin v. Bowater Inc.*, 501 F. 3d at 97.

[29] *See In re Inofin Inc.*, __ B.R. __, 2011 WL 3207368, *14 (Bankr D. Mass 2011)("'The classic case of latent ambiguity is *Raffles v. Wichelhaus,* 2 Hurlstone & Coltman 906, 159 Eng. Rep. 375 (Ex. 1864), in which a contract respecting a shipment of cotton to arrive from a certain port on the ship 'Peerless' was found ambiguous when the parties discovered that two ships named "Peerless" had departed from the same port . . .'" )(quoting *Coffin v. Bowater Inc.,* 501 F.3d at 97-98).

[30] *See Inofin*, 2011 WL 3207368 at *14 (explaining that "'the parties may use a term that, while signifying one thing in common parlance, designates something particular within the industry's jargon.'")(quoting *Coffin v. Bowater, Inc.,* 501 F.3d at 97-98)(internal citation omitted); *In re Cedar Chemical Corp*, 294 B.R. 224, 230 (Bankr. S.D.N.Y. 2003) ("[a]n agreement is ambiguous [and parol evidence is admissible] only if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business.")(citing *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2nd Cir. 1993)(remaining citation omitted).  *But cf. United States  v. Nat'l Steel Corp.*, 75 F.3d 1146, 1149 (7th Cir.1996)(distinguishing between an "intrinsic" ambiguity and an "extrinsic" ambiguity and explaining that an "extrinsic" ambiguity exists "when although the contract is clear at the semantic or literal level, anyone who knew something about the subject matter would realize that the contract probably did not mean what it said.")(citation omitted); *FDIC v. W.R. Grace & Co*., 877 F.2d 614, 620 (7th Cir.1989)(an "extrinsic" ambiguity "is present when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen")(citations omitted).

alternative meaning for the language in question.[31]   If parol evidence reveals that a latent ambiguity exists, parol evidence may also be admitted to explain or clarify the meaning of the language revealed to be ambiguous.   However, parol evidence is not admissible to contradict the writing[32] or to ascertain what the parties intended to be written independently of interpreting the meaning of the language actually used.[33]   In other words, parol evidence is appropriately admitted "'to declare the meaning of what is written in the instrument, not of what was intended to be written.'"[34]

In light of these rules governing the admission of parol evidence, this Court must consider what was actually written in the Golden Oil Plan in order interpret its meaning; the Court must not attempt to divine what was intended to be written.  The term "MLG" is defined in the Settlement Agreement and Golden Oil Plan variously to mean thirty-six named individuals, or thirty-six named individuals and entities.   That term cannot be interpreted to mean a corporation or limited liability company formed or to be formed by those thirty-six named individuals and entities even if that is what was actually intended.  No latent ambiguity therefore exists in the language of the Settlement Agreement, Golden Oil Plan, or Golden Confirmation

---

[31] *Coffin v. Bowater*, 501 F.3d at 99; *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 441 (7th Cir.1998)(observing that the party claiming that a term that appeared clear on its face was in reality an ambiguous term of art provided no clear and succinct explanation to definitively inform the court what the claimed "specialized meaning" might be).
[32] *Matthews v. Drew Chemical Corp.,* 475 F.2d 146, 149-150 (5th Cir. 1973)("The parol evidence rule . . . clearly prohibits the use of prior or contemporaneous agreements to alter the terms or ad inconsistent provisions to a written contract . . . . Even where parol evidence has been admitted to show some general or specific intent, that evidence may not be used to change the meaning of whatever unambiguous terms do appear in the writing.") *C.R. Anthony Co. v. Loretto,* 112 N.M. 504, 509, 817 P.2d 238, 243 (1991)("The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing . . . . [but] should not bar introduction of evidence to explain terms.")(citing *Bell v. Lammon,* 51 N.M. 113, 179 P.2d 757 (1947)).
[33] *Pennsylvania Castle Energy,* 89 F.3d at 796 ("Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed . . . ")(quoting *Gibson v. Anderson*, 265 Ala. 553, 92 So.2d 692, 695 (1957)(emphasis in original)(quotations omitted).
[34] *Id.*

Order with regard to whether "MLG" meant "Platinum" or an entity to be formed by MLG because that is not a plausible alternative meaning for the defined term "MLG."

It is quite possible that the parties in fact intended that the transferee under the Golden Oil Plan would be Platinum, or an entity to be formed by MLG. Platinum has proffered evidence of such intention. But evidence that a written contract did not conform to the parties' intent would be relevant to a claim of mistake;[35] it would not be admissible as parol evidence to clarify an ambiguity. A mistake does not constitute a latent ambiguity.[36] Thus, while it is appropriate to admit parol evidence when there is a latent ambiguity "for the purpose of explaining or clarifying language revealed to be ambiguous," such evidence cannot be used "for the purpose of uncovering the parties' alleged 'true intent.'" *Pennsylvania Castle Energy,* 89 F.3d at 796 (citation omitted).

E.   To Obtain Relief from the Designation of MLG as the Transferee of the Operating Rights and Working Interests under the Golden Oil Plan and Golden Confirmation Order, Platinum Must Obtain Relief from the Plan and Order under Rule 60 from the Court that Confirmed the Plan.

Platinum's assertion that the Settlement Agreement, Golden Oil Plan and the Golden Confirmation Order should be read to provide for the transfer of the Operating Rights and Working Interests to Platinum instead of MLG is, in reality, a claim of mistake. It is a claim that the written documents did not conform to the intent and true understanding of the parties – that, in fact, the parties meant for MLG to mean Platinum or an entity to be formed by MLG. Mistake can be relied upon to reform a contract.[37] A confirmed chapter 11 plan "has some indicia of a

---

[35]*Filipowicz v. Am. Stores Benefit Plans Comm.*, 56 F.3d 807, 814 n.3 (7th Cir. 1995)("Evidence that the written contract did not conform to the parties' intent would be relevant for a theory of mutual mistake and a request for reformation of the [contract].")(citation omitted).

[36] *Poole Engineering & Machine Co. v. United States,* 58 Ct.Cl. 9 (1923)("A mere mistake does not constitute a latent ambiguity.").

[37]*See* Restatement (Second) of Contracts § 155 (1981)("Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement . . ."). *See also, United*

contract ....Yet, it is also clear a confirmed plan is much more than a contract. For example, once confirmed, a plan is enforceable as a court order against parties who did not even agree to its terms." *United States Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1233, 1239 (10th Cir.1998).

A confirmation order is an order of the court with the binding effect of a final judgment.[38] Rule 9024, Fed.R.Bankr.P., makes Rule 60, Fed.R.Civ.P., applicable to cases under the Bankruptcy Code, including chapter 11 cases. Rule 60 provides the mechanism for seeking relief from an order, including an order confirming a plan.[39] In order to obtain relief from the designation of MLG as the transferee of the Operating Rights and Working Interests under the Golden Oil Plan and Golden Confirmation Order based on mistake, Platinum must proceed under Rule 60, Fed.R.Civ.P.

Both Rule 60(a) and Rule 60(b)(1) provide for relief from a judgment or order based on mistake. Rule 60(a), Fed.R.Civ.P., provides:

> The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

Rule 60(b), Fed.R.Civ.P., provides:

---

*States v. Golden*, 34 F.2d 367, 374 (10th Cir. 1929)(acknowledging "that contracts may be rescinded or reformed by reason of a mutual mistake as to a material fact.")(citations omitted); *In re Crowder*, 2008 WL 5157861, *4 (Bankr.D.N.M. 2008)(unreported)(acknowledging that, under New Mexico law, "[m]utual mistake can serve as the basis for reformation of a contract.")(citation omitted).

[38]*See United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367, 1376 (2010)(an order confirming a chapter 13 plan is a final judgment). *See also Standiferd v. United States Trustee*, 641 F.3d 1209, 1213 (10th Cir. 2011) (an order confirming a plan is a "lawful order of the court" as that phrase us used in 11 U.S.C. § 727(a)(6)(A)).

[39]*See Espinosa*, 130 S.Ct. at 1376 (finding that Rule 60(b) applies to chapter 13 confirmation orders because, under Bankruptcy Rule 9024, Rule 60(b) is applicable in chapter 13 cases). *See also In re Transtexas Gas Corp.*, 303 F.3d 571, 581 n.3 (5th Cir 2002)(noting that "a post-judgment motion calling into question the form of a judgment rather than its substantive correctness . . . is more properly considered as a Rule 60(a) motion.")(citation omitted); *Bowen v. United States (In re Bowen)*, 174 B.R. 840, 848 (Bankr.S.D.Ga. 1994)(acknowledging that the grounds under which a confirmed plan may be attacked, other than by a direct appeal, include Rule 60, Fed.R.Civ.P.).

(b) On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

A motion under Rule 60(b)(1) must be made within one year after the entry of the judgment or order or the date of the proceeding. Rule 60(c)(1), Fed.R.Civ.P. The Golden Confirmation Order was entered on October 6, 2004. Platinum filed its chapter 11 case well over a year later, on March 2, 2009. Consequently Rule 60(b), Fed.R.Civ.P. is no longer an option. Unless Platinum were to seek relief from the Golden Confirmation Order by an equitable action referenced in Rule 60(d)(1), Fed.R.Civ.P.,[40] Platinum must demonstrate the type of mistake for which relief is available under Rule 60(a).[41]

Ordinarily, a motion to correct a mistake under Rule 60(a) should be made to the court that rendered the order or judgment.[42] Some courts hold that a registration court (*i.e.* the court in which the judgment is registered) may not entertain a Rule 60(b) motion unless the motion alleges that the judgment is void for lack of personal jurisdiction or

---

[40] Recent cases discussing the independent action referenced in Rule 60(d)(1) include *Mitchell v. Rees*, __ F.3d __, 2011 WL 2566940, *3 (6th Cir. 2011); *United States v. Chapman*, 642 F.3d 1236, 1240 (9th Cir. 2011); *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010). *See also Winfield Associates, Inc. v. Stonecipher*, 429 F.2d 1087, 1090-91 (10th Cir. 1970)(decided prior to a 2007 amendment to Rule 60 that restyled parts of the rule to provide for independent actions in subsection (d)). Although it does not appear that the type of mistake Platinum is claiming may be asserted as an independent equitable action, because the parties have not addressed the issue the Court is not deciding whether an independent action may be asserted.

[41] As noted in *United States v. Kaye* 739 F.2d 488, 492-93 (9th Cir. 1984), the cases do not always provide a clear distinction between mistakes the may be corrected under Rule 60(a) and those that may be corrected under Rule 60(b)(1). Cases discussing when mistakes are correctable under Rule 60(a) or only under Rule 60(b)(1) include *Rivera v. PNS Stores, Inc.*, __ F.3d __, 2011 WL 2749627 (5th Cir. 2011)and *State Bank of Southern Utah v. Gledhill (In re Gledhill)*, 76 F.3d 1070, 1075 (10th Cir. 1996). *See also* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d,* § 2854, n. 13.

[42] *See, e.g., Budget Blinds, Inc. v. White*, 536 F.3d 244, 268 (3rd Cir. 2008)("Rule 60(b) relief must typically be made in the court rendering the judgment.)(citations omitted); *Harper Macleod Solicitors v. Keaty & Keaty,* 260 F.3d 389, 394 (5th Cir. 2001)("Typically, relief under Rule 60(b) is sought in the court that rendered the judgment at issue[;]" however, "registering courts may rely on Rule 60(b)(4) to void a default judgment if the rendering court was without jurisdiction over the defendant."); *Farmer v. Perrill*, 275 F.3d 958, 964 (10th Cir. 2001)(suggesting that a Rule 60(a) motion to alter a judgment based on clerical mistake made to a court that did not render the judgment was an impermissible collateral attack on the judgment; *Federal Practice and Procedure: Civil 2d,* § 2865 ("Relief under Rule 60(b) ordinarily is obtained by motion in the court that rendered the judgment").

-34-

alleges grounds that would support an independent equitable action.[43]    Other courts

require that all Rule 60(b) motions to be presented to the rendering court.[44]    This Court

has not found a reported decision in which a court that did not render the judgment or

order entertained a motion under Rule 60 for relief from the judgment or order that did

not involve an allegation of lack of jurisdiction or fraud on the court, and did not assert

the type of independent action referenced in Rule 60(d)(1).    The Golden Oil Plan and

Golden Confirmation Order, which both provide for a transfer of the Operating Rights

and Working Interests to MLG, cannot be interpreted to mean anything other than

providing for a transfer to MLG.    And because the alleged mistake is embodied in an

order issued by another court, it is not appropriate for this Court to entertain a motion for

relief from that order under Rule 60.    For these reasons, the Court concludes that

Platinum must return to the Texas bankruptcy court if it wishes to obtain relief from the

Golden Confirmation Order.


F.    Neither Platinum nor the Nation has established whether a valid transfer of the Operating
       Rights and Working Interests to Platinum Occurred Outside the Golden Confirmation
       Order and the Settlement Agreement entered in the Golden Oil Bankruptcy Case.

       Platinum argues, in the alternative, that even if the confirmed Golden Oil Plan did not

provide for a transfer of the Operating Rights and Working Interests to Platinum, the transfer of

those rights and interests by Golden Oil to Platinum nevertheless is effective because it was

made in accordance with applicable nonbankruptcy law.  Platinum asserts that the transfer did

not require the Nation's approval; that the only governmental approval Platinum needed for the

---

[43]*Indian Head Nat'l Bank of Nashua v. Brunelle*, 689 F.2d 245 (1st Cir. 1982).  *See also White*, 536 F.3d at 268
(stating that the holding in *Brunelle* "best vindicates the significant comity interests implicated in the registration
context while adequately preserving collateral avenues of relief for litigants.")
[44] *Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.* 212 F.3d 1031, 1034 (7th Cir.
2000) (Rule 60(b) motions must be presented to the rendering court)(citations omitted).

transfer was that of the DOI pursuant to 25 C.F.R. § 211.53; and that DOI approval was given. *See* Platinum's Reply to the DOI's Advisory Brief, pp. 3-6 (Docket No. 228). Platinum further asserts that even if the Nation's approval of a transfer were required, the Nation has recognized Platinum as the owner of the Operating Rights and Working Interests and is bound by its admissions.

The DOI asserts that its approval of a transfer of operating rights for leases on Indian lands is required under 25 C.F.R. § 211.53 and that it has not given its approval. The Nation asserts that DOI approval is not required under 25 C.F.R. § 211.53, but that the transfer required the Nation's approval, which it has not given. Platinum contends that under 25 C.F.R. § 211.53 the Nation has the right to approve a transfer of operating rights *only* if the oil and gas lease so provides; thus, because Jicarilla Lease Nos. 71 and 363 do not contain express provisions requiring the Nation's approval of any assignments or transfers, the Nation's approval of the transfer is not required. The Nation counters that its laws requiring approval of a transfer of operating rights is valid and enforceable regardless of whether 25 C.F.R. § 211.53 applies to a transfer of operating rights or whether the lease expressly requires such approval.

The record before the Court is insufficient to determine: 1) whether 25 C.F.R. § 211.53 applies to the transfer of operating rights or, if it does, whether the Indian mineral owner may by enactment of legislation require its consent to the transfer when the operative lease does not expressly require such consent; or 2) whether the Nation is bound by any admissions that Platinum is the owner of the Operating Rights and Working Interests. The Court does find, based on the record before it, that the DOI did not approve a transfer of the Operating Rights and Working Interests to Platinum and that that Platinum cannot take advantage of the limited liabilities to be assumed by the transferee of the Operating Rights and Working Interests set forth

in the Confirmed Golden Oil Plan unless the Golden Plan provided for a transfer to Platinum.

The Court will address each of these points in turn.

1) *The Court cannot on the record before it decide whether 25 C.F.R. § 225.53 applies to the transfer of operating rights or whether the Indian mineral owner may require that it consent to such a transfer when the operative oil and gas lease does not expressly provide for such consent.*

Whether a transfer of the Operating Rights to Platinum requires approval by the DOI, the

Nation, or both, centers on the meaning of 25 C.F.R. § 211.53. That section provides:

> Approved leases or any interest therein may be assigned or transferred only the approval of the Secretary. The Indian mineral owner must also consent if approval of the Indian mineral owner is required in the lease.

25 C.F.R. § 211.53.

Based on the language in the regulation, it is not entirely clear whether the transfer of operating

rights is governed by 25 C.F.R. § 211.53. *Compare Cross Creek Corp.*, 131 IBLA 32 (1994)

*with Golden Oil Company v. Chace Oil Company*, 128 N.M. 526, 994 P.2d 772 (Ct. App.

1999).[45] It is also not entirely clear whether, assuming 25 C.F.R. § 211.53 applies to operating

rights, the Nation's approval of a transfer of operating rights for properties on its lands is

required when the applicable lease does not contain a provision expressly requiring the Nation's

approval.[46] Courts give substantial deference to an agency's interpretation of its own regulations

---

[45] In *Cross Creek Corp.*, 131 IBLA 32, 37, n. 10, 1994 WL 687087 (I.B.L.A.)(1994), the Interior Board of Land Appeals observed:

> In particular, it appears that the assignment of operating rights does not require BIA approval. Appellant has provided a copy of a Sept. 30, 1988, letter from BIA, which states that, as of August 1987, it will no longer process assignments of operating rights. The assignment of record title does require BIA approval. See 25 U.S.C. §§ 1a, 2, 396a (1988); 25 CFR 211.26(a).

In *Golden v. Chace*, the New Mexico Court of Appeals observed in the Background and Procedural History section of the opinion that the Jicarilla Apache Tribe's Oil & Gas Administration requested the buyer of operating rights (Golden Oil Company) "to execute a form entitled 'Assignment of Oil and Gas Lease– Operating Rights' because in order to comply with federal law, any interest in oil and gas leases on Indian lands can be assigned or transferred only with the approval of the United States Secretary of the Interior." *Golden v. Chace*, 994 P.2d at 773. The Jicarilla Apache Nation was not a party to the *Golden v. Chace* case.

[46]The Nation, arguing its approval is required even if 25 C.F.R. § 211.53 applies, relies on principles of statutory construction under which statutes affecting Indian tribes are to be construed liberally in favor of Indian Tribes. The

unless its interpretation is unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.[47]  Apart from the DOI's position taken in this case and a footnote in *Cross Creek Corp*. regarding the Bureau of Indian Affairs' administration of 25 C.F.R. § 211.53 in 1994, there is no evidence before the Court regarding the practice and policy of the Bureau of Indian Affairs in administering 25 C.F.R. § 211.53.  Therefore, the record before the Court is insufficient for the Court to determine whether C.F.R. § 211.53 applies to the transfer of operating rights or whether the Indian mineral owner may require that it consent to such a transfer when the operative oil and gas lease does not provide for such consent.

Platinum further asserts that because the Leases did not expressly require the Nation's approval as a condition of assignment,[48] under 25 C.F.R. § 211.53 only the consent of DOI was required.  If 25 C.F.R. § 211.53 does not obviate the need for the Nation's approval, then the Nation's approval of the transfer is required by the Nation's Code enacted pursuant to 25 C.F.R. § 211.1(d).   That section provides:

> Nothing in the regulations in this part is intended to prevent Indian tribes from exercising their lawful governmental authority to regulate the conduct of persons, businesses, operations or mining within their territorial jurisdiction. Nothing in the regulations in this part is intended to prevent Indian tribes from exercising their lawful governmental authority to regulate the conduct of persons, businesses, operations or mining within their territorial jurisdiction.

> 25 C.F.R. §211.1(d).

---

Nation points to the language of 25 C.F.R. § 211..53 which uses the term "only" in relation to DOI approval but not in relation to approval of the Indian mineral owner, and on the Nation's rights under 25 C.F.R. § 211.1(d) to govern its affairs.  Nations' Brief, p. 21-23 (Docket No. 210).  Platinum argues that the language of 25 C..F.R. § 211.53 is clear that the Indian mineral owner's consent is required only if the lease so provides.

[47]*Midwest Crane and Rigging, Inc. v. Federal Motor Carrier Safety Admin.,* 603 F.3d 837, 840 (10th Cir. 2010)(stating that "we accord 'substantial deference to an agency's interpretation of its own regulations.'")(quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)(citations omitted). *See also Fed .Express Corp. v. Holowecki*, 552 U.S. 389, 397, 128 S.Ct. 1147, 1155, 170 L.Ed.2d 10 (2008)("an agency is entitled to further deference when it adopts a reasonable interpretation of its regulations it has put in force . . . . unless its position is 'plainly erroneous or inconsistent with the regulation.'")(citations and additional internal quotation marks omitted).

[48] Jicarilla Lease Nos. 71 and 363 contain no express provision requiring approval of the Nation of a transfer of the Leases or any interest in the Leases.

Case 09-10832-j11    Doc 258    Filed 08/12/11    Entered 08/12/11 17:00:52 Page 38 of 44

A law requiring the Nation's approval of the transfer of operating rights under leases within its territorial jurisdiction constitutes the regulation if the conduct of persons, businesses, operations or mining. Therefore, unless 25 C.F.R. § 211.53 both 1) applies to a transfer of operating rights, and 2) limits the Nation's right to approve a transfer *only* when the lease expressly provides for approval of the Indian mineral owner, the Nation's laws requiring the Nation's approval of a transfer of operating rights are valid and enforceable. Based on the foregoing uncertainties in the operation of 25 C.F.R. § 211.53, the Court cannot determine what approvals are required. And, as discussed in footnote 48 below, if the Nation's approval was required, the evidence is insufficient to establish that the Nation approved the transfer of the Operating Rights and Working Interests to Platinum.

2) *The record before the Court is insufficient to determine whether the Nation is bound by any admissions that Platinum is the owner of the Operating Rights.*

In support of it position that the Nation is bound by its admissions that Platinum is the owner of the Operating Rights and Working Interests, Platinum relies on: 1) tract notes in the Nation's Lease Data Sheets stating the Golden Oil bankruptcy court gave Platinum the right to operate and ownership of the oil and gas interests claimed by Golden Oil; 2) a draft memorandum of understanding and a title history prepared by Shenan Atcitty, then counsel for the Nation, in which the Nation acknowledges it is bound by the orders of the Golden Oil bankruptcy court including orders requiring the assignment of the Operating Rights and Working interests down the chain from Chace to Platinum; 3) verbal acknowledgments by Ms. Atcitty that Platinum owns the Operating Rights and Working Interests and Platinum's reliance on those statements; and 4) a Resolution of the Nation's Legislative Counsel acknowledging that the

Case 09-10832-j11    Doc 258    Filed 08/12/11    Entered 08/12/11 17:00:52 Page 39 of 44

Golden Oil bankruptcy court ordered the assignment of the Leases to Platinum.[49] The Nation objects to Platinum's assertions about the meaning of these statements on the ground that each of those communications was made in furtherance of settlement and are inadmissible under Federal Rule of Evidence 408(a)(2). The Nation further argues that the Legislative Council resolution was rescinded when settlement negotiations fell apart, and that the Lease Data sheets state that the assignment of operating rights has not been submitted or approved by the DOI or Nation.

The Court cannot based on the record before it rule on the Nation's objections under Federal Rule of Evidence 408(a)(2). There is insufficient evidence before the Court regarding what documents may have been prepared in connection with settlement negotiations. Further, the Court cannot, based on the record before it, determine whether the Nation, as a sovereign government, is bound by the alleged statements and representations upon which Platinum relies.[50]

3)  *The DOI did not approve a transfer of the Operating Rights and Working Interest to Platinum pursuant to 25 C.F.R. § 211.53.*

Platinum, relying on a decision of the Mining Minerals Service ("MMS"), which is part of the Department of Interior, argues that DOI did in fact grant its approval of the transfer of the Operating Rights and Working Interests to Platinum pursuant to 25 C.F.R. § 211.53 (assuming 25 C.F.R. § 211.53 applies to a transfer of operating rights. The Court disagrees.

On December 17, 2007, the MMS issued an Order to Report to Golden Oil ordering Golden Oil to submit certain Oil and Gas Operations Reports ("OGORs") for Lease Nos. 71 and

---

[49] Although the tract notes and communications in question provide evidence that the Nation understood and believed that the Settlement Agreement and confirmed Golden Oil Plan provided for a transfer of Operating Rights and Working Interests to Platinum, they do not show that the Nation actually approved the transfer. To the contrary, the Nation required as a condition to its approval of the transfer that Platinum execute assignment forms that expanded the liability Platinum would assume as transferee beyond the limited liabilities to be imposed on the transferee under the confirmed Golden Plan.
[50] *See Wade Pediatrics v. Dep't of Health and Human Services*, 567 F.3d 1202, 1206 (10th Cir. 2010)(regarding the requirements for establishing an estoppel claim against a government).

363.  Golden Oil filed an appeal of the MMS Order to Report.  The MMS issued a decision in the appeal that the "OGOR reporting requirement for the wells on Jicarilla 71 and 363 were the responsibly of Platinum Oil Properties, LLC for the production months [in question], and that "MMS agrees that Platinum Oil Properties, LLC is the responsible operator to report the OGORs."  See Docket No. 194-95, page 15 of 16.[51]  This decision on appeal does not constitute DOI approval of a transfer of operating rights to Platinum under 25 C.F.R. 225.53 for two reasons.

First, the regulations contained in 25 CFR Part 25, which include the requirement for DOI approval of assignments governed by 25 C.F.R. 225.53, are to be administered by the Bureau of Indian Affairs under the direction of the Secretary of Interior, not by MMS. 25 C.F.R. § 225.1.  Actions to be taken by the Secretary of Interior pursuant to 25 CFR Part 25 may be taken by an authorized representative of the Secretary.  *See* 25 C.F.R. § 225.3 (defining "Secretary" to include an authorized representative, with one limitation not applicable here).  Consistent with this requirement, the decision on an appeal of an order issued by MMS involving Indian leases is to be rendered by the Deputy Commissioner of the Bureau of Indian Affairs, not by MMS. 30 C.F.R. § 290.105(g). Notwithstanding this requirement, MMS instead of the Bureau

---

[51] In paragraph 3 of its notice of appeal, Golden Oil asserted, in part: "However, operating of these leases and all working interest ownership in them was transferred to Platinum Oil Properties, LLC ("Platinum") as of production month April 2005.  The Company is not privy to can not [sic] report on operations by a successor interest owner and operator."  Margaret Louise Williams and Suellen Williams, then employees of MMS, performed work on behalf of MMS in connection with the decision MMS issued in the appeal.  Suellen Williams called Manuel Myore, then a realty officer for the Bureau of Indian Affairs, to determine whether Platinum was the designated operator for the Leases.  Suellen Williams Deposition at pp. 16-18; Myore Deposition at p. 14.  Mr. Myore told her that "Golden Oil was court ordered to relinquish their wells to Platinum Oil and Star Acquisitions who are the lessees of record," and that Golden Oil was not the "operator of record."  *See* Suellen Williams Deposition, at p. 19 and Exhibit 6 to the deposition of Margaret Louise Williams.  Margaret Louise Williams understood that Suellen Williams had concluded that that paragraph 3 of Golden Oil's notice of appeal was correct.  Margaret Louise Williams Deposition at pp. 22-23.

of Indian Affairs rendered the decision in Golden Oil's appeal of the MMS Order to Report.[52]

Therefore, any approval of the transfer to Platinum of Operating Rights and Working Interests

stemming from the decision made in the Golden Oil appeal was given by MMS, not by the

Bureau of Indian Affairs.[53]

Second, the MMS decision on appeal did not address ownership of the Operating Rights

and Working Interests. MMS' decision on appeal was that the reporting requirements were the

responsibility of Platinum as the "responsible operator to report the OGORs," not that Platinum

was the owner of any operating rights or working interests. A designated operator need not be a

lessee or owner of operating rights.[54] Therefore, a finding that Platinum was the operator is not a

finding that Platinum owned any operating rights.

4) *If the confirmed Golden Plan did not provide for a transfer of the Operating Rights and Working Interests to Platinum, then Platinum cannot take advantage of the limited liabilities to be assumed by the transferee of the Operating Rights and Working Interests set forth in the confirmed Golden Oil Plan.*

The only limitation of assumed liabilities upon which Platinum relies is the limitation of

assumed liabilities in the Settlement Agreement and confirmed Golden Oil Plan. Thus, even if

the Court were to determine that 25 C.F.R. § 211.53 does not apply to a transfer of operating

rights (thereby rendering DOI approval of such transfer unnecessary), and even if Platinum were

able to show that the Nation is bound by an admission that Platinum is the owner of the

Operating Rights and Working Interests, unless the confirmed Golden Oil Plan were to provide

for a transfer of the Operating Rights and Working Interests to Platinum then Platinum could not

---

[52] The decision in Golden Oil's appeal of the MMS Order to Report was made by MMS, acting through Louise Williams, then a Manager or Production, Accounting and Verification for MMS. *See* the letter decision, Docket No. 194-95 at p 15 of 16.

[53] The fact that Mr. Myore, an employee of the Bureau Indian Affairs, told an MMS appeals officer that "Golden Oil was court ordered to relinquish their wells to Platinum Oil and Star Acquisitions who are the lessees of record" does not alter the fact that the decision on appeal was made by MMS, not the BIA.

[54] *See Fruge v. Parker Drilling Co.,* 337 F.3d 558, 563 (5th Cir. 2003)(describing MMS regulations describing the relationship between a lessee, operating rights owner, and designated operator where the operator is not the lessee or working rights owner).

take advantage of the provisions of the Settlement and Plan under which the assumed liabilities of the transferee are limited. Without the protection of the Settlement Agreement and confirmed Golden Oil Plan, Platinum would take the Operating Rights and Working Interests without any limitation on assumed liabilities.

## CONCLUSION

Based on the foregoing, the Court concludes that the cross-motions for summary judgment must be denied. This Memorandum Opinion is entered in accordance with Rule 7052, Fed.R.Bankr.P. An order consistent with this Memorandum Opinion will be entered.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  August 12, 2011

**Roger Jones**
**Austin McMullen**
Bradley Arant Boult Cummings LLP
Attorney for Platinum Oil Properties, LLC
1600 Division St, STE 700
Nashville, TN 37203

**Jennie D Behles**
Attorney for Platinum Oil Properties, LLC
PO Box 7070
Albuquerque, NM 87194-7070

**Robert J. Labate**
Holland & Knight LLP
Attorney for Jicarilla Apache Nation
131 S. Dearborn
Chicago, IL 60603

**Manuel Lucero**
Assistant US Attorney
PO Box 607
Albuquerque, NM 87103-0607

-43-

**Corby Davin Boldissar**
Locke Lord Bissell & Liddell
Attorney for BP America Production Company
601 Poydras St, Ste 2660
New Orleans, LA 70130

Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103