# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  PLATINUM OIL PROPERTIES, LLC,                              No. 11-09-10832 JA

Debtor.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court following a two-day evidentiary hearing on the issue

of whether Platinum Oil Properties, LLC ("Platinum") owns the operating rights relating to Oil

and Gas Lease Nos. 71 and 363 (together, the "Oil and Gas Leases") located on tribal land of the

Jicarilla Apache Nation ("JAN").   Central to the determination of the issue is the application of

25 C.F.R. § 211.53, promulgated by the Department of the Interior pursuant to the Indian

Mineral Leasing Act of 1938, 25 U.S.C. §§ 396(a)-396(g) ("IMLA"), and whether the purported

transfer to Platinum of operating rights under the Oil and Gas Leases is subject to approval of the

Secretary of the Department of the Interior (the "Secretary").   The Secretary has not approved

the transfer of operating rights under the Oil and Gas Leases to Platinum.   The JAN contends that

the Secretary's approval of a transfer or assignment of operating rights under an oil and gas lease

is required, both under the terms of the Oil and Gas Leases themselves, and pursuant to 25

C.F.R. §211.53.   The JAN also asserts that its approval of the transfer of operating rights under

the Oil and Gas Leases is required.   Platinum counters that the Secretary's approval of the

transfer of operating rights is not required for two reasons:  first, because operating rights are

non-record title interests relating to oil and gas leases; and second, because agreements

designating operators include the transfer of operating rights.   Platinum contends further that the

JAN's approval of a transfer of operating rights under the Oil and Gas Leases is not required.[1]

---

[1]Throughout the course of this bankruptcy case, the parties' positions have shifted considerably depending upon
their focus on the issues at any given time.  For example, early on in the bankruptcy case, Platinum appears to have

After considering counsel's arguments and the evidence presented at the final hearing, and the applicable law, and being otherwise sufficiently informed, the Court finds that, under 25 C.F.R. § 211.53, an assignment of operating rights in an oil and gas lease on Indian land requires the Secretary's approval. Because Platinum has not obtained the Secretary's approval of a transfer to Platinum of operating rights under the Oil and Gas Leases, the purported transfer is ineffective.

## PROCEDURAL HISTORY

Platinum filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 2, 2009. On March 6, 2009, Platinum filed a motion requesting "entry of an order authorizing the assumption of Jicarilla 'Oil and Gas Mining Lease – Tribal Indian Lands,' Contract No 71. Dated March 14, 1951 ("Lease 71") and Jicarilla 'Oil and Gas Mining Lease – Tribal Indian Lands,' Contract No. 363, dated April 18, 1966 ("Lease 363")." *See* Docket No. 10. Platinum bases its interest in the Oil and Gas Leases, in part, on a confirmation order entered in *In re Golden Oil Company,* Case No. 03-36974-82-11 (Bankr.S.D.Tex. 2003) (the "Golden Oil

conceded that the interests it contends it received as a result of the Golden Oil Company bankruptcy case were interests in leases, including operating rights, and that absent the confirmation of Golden Oil Company's plan, the assignment or transfer of such interests would require approval by the Secretary under 25 C.F.R. § 211.53. *See* Memorandum of Law in Support of Platinum Oil Properties, L.L.C.'s Cross-Motion for Summary Judgment on Threshold Issue and in Opposition to the Jicarilla Apache Nation's Motion for Summary Judgment on Threshold Issue – Docket No. 195, pp. 7, 10, and 11 (stating that the Settlement Agreement entered in the Golden Oil Company bankruptcy case "provided . . . for the assumption and assignment of the operating rights, leasehold interests and other ownership interests in the Jicarilla Lease Nos. 71 and 363 . . .[,]" reciting that the Department of Interior objected to the Golden Oil Plan because "it did not condition the assumption and assignment of the Lease Interests . . . on compliance with 25 C.F.R. § 211.53 . . .[,]" and acknowledging that "the Golden Oil Plan did not contemplate or require compliance with Section 211.53 or the execution of any JAN forms . . ."). Platinum now contends that the regulation does not require the Secretary's approval of a transfer or assignment of operating rights. Similarly, the JAN explained in an earlier brief that a transfer of operating rights does not require approval by the Secretary, citing *Cross Creek. Corp.,* 131 IBLA 32, 36 n. 10 (1994), 1994 WL 687087 (I.B.L.A. 1994). *See* Docket No. 210, p. 8 and n. 8 ("Because the holder of Operating Rights is not a party to the Lease, approval by the Secretary of the Interior is not required for assignments of Operating Rights."). The JAN now urges the Court to ignore the *Cross Creek* footnote as mere dicta. *See* Reply Memorandum of the Jicarilla Apache Nation, p. 10, n.1 (Docket No. 385). The Court has not relied upon or given weight to a prior inconsistent position of either party.

Bankruptcy"). JAN objected to Platinum's motion to assume. *See* Docket No. 18.[2] The JAN also filed a complaint for declaratory judgment initiating Adversary Proceeding No. 09-1087 J. Adversary Proceeding No. 09-1087 J includes a request for declaratory relief determining that Platinum does not hold any interest in the operating rights and working interests under the Oil and Gas Leases. The JAN also filed a motion to dismiss Platinum's bankruptcy case, asserting in part that Platinum holds no interest in the Oil and Gas Leases that could form the basis for reorganizing. *See* Docket Nos. 43 and 225.

The Department of the Interior ("DOI") filed a motion to withdraw the reference of the bankruptcy case, asserting that, because the question of whether Platinum owns the operating rights in question requires application of federal non-bankruptcy law, including the IMLA and the regulations promulgated under the IMLA, the matter should be heard by the United States District Court. *See* Docket No. 111. The JAN joined in the DOI's motion to withdraw the reference. *See* Docket No. 134. BP America and Platinum each objected to the motion to withdraw the reference. The United States District Court denied the DOI's motion to withdraw the reference. *See* United States District Court Case No. 09-CV-922 (Docket No. 18).

Platinum filed a plan and disclosure statement in this bankruptcy case on June 30, 2009. *See* Docket No. 56. The plan contemplated restarting the wells under the Oil and Gas Leases. *Id.* After a status conference held in the bankruptcy case on August 31, 2009, the Court determined it should first determine, as a threshold matter, the issues relating to what rights, if any, Platinum has in or under the Oil and Gas Leases. *See* Docket No. 115. Platinum and the JAN filed cross-motions for summary judgment with supporting briefs on these threshold issues. *See* Docket Nos. 193 and 195 (Platinum's motion and brief in support of summary judgment);

---

[2]BP America Production Company and Enervest Energy Ltd. each also filed objections to the motion to assume. *See* Docket Nos. 98 and 105.

Docket Nos. 103 and 104 (JAN brief in support of summary judgment).[3]  After hearing oral argument on the cross-motions for summary judgment, the Court directed the parties to file supplemental briefs.  *See* Docket No. 220.   The DOI filed an advisory brief regarding the interplay between the IMLA and the Bankruptcy Code.  *See* Docket No.  223.  Platinum asserted that it needed no approval by the Secretary of a transfer of operating rights in the Oil and Gas Leases, or had satisfied any approval requirement, by virtue of the confirmed plan in the Golden Oil Bankruptcy.  The JAN countered that a confirmed chapter 11 plan cannot supersede the requirements under the IMLA or its own laws, and argued that a transfer of any interest in the Oil and Gas Leases to Platinum requires the approval of the Secretary and of the JAN, and that neither had given such approval.

On August 12, 2011 the Court entered a Memorandum Opinion and order denying the cross-motions for summary judgment.  *See* Docket Nos. 258 and 259.  As part of its Memorandum Opinion, the Court made fifty-two findings of fact.  *See* Docket No. 258.  The Court determined that the confirmed plan in the Golden Oil Bankruptcy bound the JAN and the DOI to its terms, but that because the plan provided for a transfer of the operating rights in question to McKay-Lotspeich-Group ("MLG"), not Platinum, the confirmed plan did not obviate the need for Platinum to obtain approval by the Secretary or JAN to a transfer of the operating rights if such approvals are required.  *See* Memorandum Opinion, Docket No. 258, pp. 15 – 19, 29 and 35.  In reaching this determination, the Court did not decide whether the Secretary's approval of a transfer of operating rights is required; rather, the Court determined that, if a transfer of operating rights requires the Secretary's approval, the confirmed plan in the Golden Oil Bankruptcy satisfied that requirement with respect to a transfer to MLG, but not as to

---

[3] The JAN had also filed a motion for summary judgment in the Adversary Proceeding, which the Court directed the JAN to re-file in the bankruptcy case.  *See* Docket No. 115.

4

Platinum.  The Court also did not consider whether a transfer of operating rights requires approval by the JAN.

The Court found in its Memorandum Opinion that the record then before it was insufficient to determine the following issues:   1) whether 25 C.F.R. § 211.53 requires the Secretary's approval of a transfer of operating rights, or, if it does, whether the Indian mineral owner, by enactment of legislation after a lease becomes effective, may require its consent to the transfer when the operative lease does not expressly require such consent; or 2) whether the JAN is bound by any admission that Platinum is the owner of the operating rights and working interests under the Oil and Gas Leases.  Memorandum Opinion - Docket No. 258, p. 36.  Thus, the threshold issues remained unresolved.[4]  On request of the JAN, the Court entered an order pursuant to Fed.R.Civ.P. 56(g), and Fed.R.Bankr.P. 9014 establishing the fifty-two facts contained in the Court's Memorandum Opinion for purposes of the Court's final adjudication of the threshold issues.  *See* Docket No. 292.  The JAN filed a second motion to dismiss on December 30, 2011.  *See* Docket No. 275.  Following the preliminary hearing on the motion to dismiss, the Court set a final hearing on April 10, 2012 on the "threshold issues" as set forth in its Memorandum Opinion entered August 12, 2011.  *See* Docket No.  281.

The parties then attempted to settle their dispute.   At the parties' request, the Court continued the final hearing on the threshold issues for over a year.  After the parties' settlement efforts failed, the Court held a final evidentiary hearing on May 22 and 23, 2013 on the threshold

---

[4]Platinum filed a motion to reconsider the Court's Memorandum Opinion and Order (Docket No. 262), which the Court denied for the reasons set forth in an Order Denying Platinum Oil Properties, LLC's Motion to Reconsider Order and Memorandum Opinion entered December 12, 2013.  *See* Docket No. 274.

5

issue of whether Platinum owns the operating rights relating to the Oil and Gas Leases (the "Threshold Issue").[5]

## FACTS

The fifty-two findings of fact contained in the Court's Memorandum Opinion entered August 12, 2011 have been deemed established for purposes of adjudicating whether Platinum owns the operating rights relating to the Oil and Gas Leases. The fifty-two findings are attached hereto as Appendix A and are incorporated herein by reference.  In addition to those fifty-two findings of fact, the Court makes the following findings of fact:

1.  The Oil and Gas Leases each include the following provisions:

    > [T]he lessee . . . agrees:
    >> To abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases:[6] *Provided,* That no regulation hereafter approved shall affect a change in rate of royalty or annual rental herein specified without the written consent of the parties to this lease.
    >>
    >> Not to assign this lease or any interest therein by an operating agreement or otherwise nor to sublet any portion of the leased premises before restrictions are removed, except with the approval of the Secretary of the Interior.  If this lease is divided by the assignment of an entire interest in any part of it, each part shall be considered a separate lease under all the terms and conditions of the original lease.

    > *See* Lease 363, paragraphs (g) and (h) – Platinum Exhibit 25; and Lease 71, paragraphs (g) and (h) -  Platinum Exhibit 26.

2.  The Oil and Gas Administration of the Jicarilla Apache Tribe ("JOGA") oversees oil and gas activity on the JAN's tribal land.

---

[5]In connection with the final hearing on the Threshold Issue, the parties filed several motions in limine seeking to exclude certain evidence from the Court's consideration.  With the exception of the Motion to Exclude Testimony of Ross Swimmer, which the Court has addressed by separate order, the Court has either expressly ruled on the motions at the close of the hearing, or, by virtue of having conducted the final, evidentiary hearing on the merits, the Court has implicitly denied the motions as moot.
[6]Lease 363 includes the following additional language after the word, "leases":   "including 30 CFR 221."  Platinum Exhibit 25.

3. The JAN's Tribal Code contains provisions concerning oil and gas activity on the

   JAN's tribal land, including the following, adopted after execution of the Oil and Gas

   Leases:

   Under the BIA Regulations 25 C.F.R. § 211.26, no lease assignment (record title or
   operating rights) of any oil and gas lease within the Jicarilla Apache Nation shall be
   effective until approval of the Legislative Council of the Jicarilla Apache Nation is
   obtained. The BIA is requested to submit all lease assignments (record title or
   operating rights) to the Nation for consideration and obtain Council approval prior to
   BIA approval. The Council will operate in a reasonable and businesslike manner and
   handle all approvals or disapprovals of assignments (record title or operating rights)
   timely.

   No sublease or designation of operator of any oil and gas lease within the Jicarilla
   Apache Nation shall be effective until approval of the Council is obtained. All
   lessees and/or operators will submit subleases and designations of operators to the
   BIA. The BIA is requested to submit all subleases and designations of operator to the
   Nation for its consideration and obtain Council approval.

   The Council shall consider approval of assignments, subleases, assignment of
   operating rights and designation of operator of oil and gas leases within the Nation
   upon certification by the Oil and Gas Administrator as to compliance with the terms
   of this Chapter. The Council may waive compliance with any provisions hereof for
   good cause.

   This Chapter is enacted pursuant to 25 C.F.R. § 211.29 to supersede any conflicting
   provision of 25 C.F.R. Part 211. The provisions of this Chapter shall supersede any
   conflicting provision of 43 C.F.R. §3160, as amended. Therefore, publication in the
   Federal Register by the Secretary of the Interior is hereby requested.

   Jicarilla Apache Tribal Code - Assignments, Subleases, Designations of Operator and
   Operating Rights on Oil and Gas Leases on the Jicarilla Apache Nation § 18-11-1, 2,
   6, and 8 – JAN Exhibit 3.

4. In 2010, the Bureau of Indian Affairs Jicarilla Agency prepared a pamphlet titled

   Regulatory Guidelines for Oil & Gas Industry Officials Operating on the Jicarilla

   Apache Reservation (the "BIA/JAN Guidelines"). JAN Exhibit 31.

5. The JAN and the Bureau of Indian Affairs ("BIA") created the BIA/JAN Guidelines

   as part of a collaborative effort. *Id.* Though not prepared until 2010, the BIA/JAN

7

Guidelines were intended to document the practices then existing. *Testimony of Kurt Sandoval.*

6. The BIA/JAN Guidelines describe the responsibilities of the BIA, the Bureau of Land Management, the Office of Natural Resource Revenue, and the JOGA. *See* JAN Exhibit 31.

7. The BIA/JAN Guidelines include a flowchart for the assignment process that includes the following:

> 1) BIA receives request to assign a lease
>    - Provide instructions on filing an assignment
> 2) BIA receives a proposed assignment for approval (Record Title or Operating Rights)
>    - The assignee submits 6 copies of each assignment form
>    - A designation of Operator (DO) should be submitted because operators are not permitted to conduct any operations until approval of the assignment.
> 3) Forward the proposed package to BLM and ONRR for appropriate clearance
> 4) Forward the package to Jicarilla Apache Nation (JAN)
> 5) All parties review the assignment package
> 6) JAN approves or disapproves the assignment and returns approved signed copies to BIA
> 7) BIA approves assignment and sends copies of the approved assignment to the assignee(s), BLM, ONRR and JAN. *Id.*

8. The BIA/JAN Guidelines include a separate flowchart for the Designation of Operator Process:

> 1) BLM or BIA receives a Designation of Operator (DO) request
> 2) Distribute DO to other parties (BIA, BLM, and JAN)
> 3) Review the Designation of Operator (DO) request
> 4) After acceptance send copies of the designation to BLM, ONRR & the Designated Operator
>
> *Notice to Industry: When an assignment comes into BIA and the operators on lease are in process of change, a Notice of Designation of Operator needs to be filed by the assignor to allow operations to continue under the new operator until the assignments are approved. Id.*

8

9. In 2008, the JOGA prepared an Industry Handbook regarding oil and gas leases on the JAN's tribal land (the "JOGA Industry Handbook"). *See* JAN Exhibit 29.

10. The JOGA Industry Handbook includes the following statement regarding assignments, subleases, designations of operator and operating rights on oil and gas leases on the Jicarilla Apache Nation:

> ➢ Under the BIA Regulations 25 C.F.R. 211.26, no lease assignment (record title or operating rights) of any oil and gas lease within the Jicarilla Apache Nation shall be effective until approval of the Legislative council of the Jicarilla Apache Nation is obtained.

    JAN Exhibit 29.

11. A document prepared by the Revenue and Taxation Department of the JAN on February 1, 2008 following a meeting held at the Nordhaus Law Firm includes the following statement:

> The [Jicarilla] Oil and gas Administration now does not have a committee or commissioner to process the Lease Assignments as outlined in the [JAN's] Ordinances.

    Platinum Exhibit 45.

12. Kurt Sandoval is the acting realty officer for the BIA in Dulce, New Mexico. He has been the acting realty officer since May of 2010. He first became employed with the BIA in 2009 as a petroleum engineer and technician. Before he was employed by the BIA, Mr. Sandoval worked for the JOGA from December 2005 through December 2009 as the supervisor for compliance and enforcement.

13. Kurt Sandoval testified that record title determines ownership under a lease, that a party who holds operating rights can explore, drill and develop an oil and gas well, and that the operating agreement between the lessee and the operator will determine what rights the operator has. He believes that operating rights are an interest in an oil

9

and gas lease and that operating rights are not the equivalent of a designation of operator. He testified further that it is his understanding that a transfer of operating rights requires approval by the BIA/Secretary but a designation of operator does not require any approvals. As acting realty officer, Kurt Sandoval is not involved with the disapproval or approval process for transfers and assignments of interests in oil and gas leases on the JAN's tribal land. Based on his experience in enforcement and compliance, he believes that a company claiming operating rights must obtain the JAN's approval under its Code. He is not aware of whether companies are operating on the JAN's tribal land without obtaining approval of a transfer of operating rights. While he worked as supervisor of compliance and enforcement for JOGA, he never issued a compliance order for lack of approval of transfer of record title or of operating rights.

14. Ross Swimmer served as assistant Secretary of Indian Affairs from 1985 to approximately January of 1989. To him, an operating agreement is the agreement between the lessee under an oil and gas lease and the operator that contains the terms under which the operator will operate the well, and that a party's right to explore for oil and gas under an oil and gas lease could be termed as "the right to operate, operating rights, the role of operator." *See* Platinum Exhibit 56, Deposition of Ross Swimmer dated March 17, 2012 ("Swimmer Deposition"), p. 47, lines 13 – 14. In his view, the terms operating rights, operators, and operating agreements are

interchangeable and are not interests in an oil and gas lease. Swimmer Deposition, p. 82, lines 7 – 11.[7]

15. Johnna Blackhair is the superintendent for the BIA in the Unitah and Ouray Agency. Her understanding is that there is no distinction between the operator and the holder of operating rights, but that a designation of operator is not the same as operating rights. *See* JAN Exhibit 36, Deposition of Johnna Marie Denny Blackhair ("Blackhair Deposition), pp. 69, 70, and 124.

16. If the BIA receives a transfer or assignment of an interest in an oil and gas lease, the BIA first forwards the transfer or assignment to JOGA. BIA then approves the requests after the JAN has given its approval. *Testimony of Kurt Sandoval and Marlena Reval.*

17. The BIA reviews a transfer or assignment of an interest in oil and gas lease against a checklist to make sure all required information has been provided. If so, the BIA generally approves the requested transfer or assignment. *Testimony of Marlena Reval.*

18. All companies that operate on the JAN's tribal land must obtain an oil and gas operating permit regardless of whether the company has holds an interest in a lease.

19. An operator need not hold operating rights in order to obtain an operating permit.

20. The record title holder of an oil and gas lease is the lessee, or a lessee.

21. The record title holder may choose to hire an operator to develop and operate certain wells on property leased to the record title holder.

---

[7]By separate order, the Court denied the JAN's motion to exclude this testimony. *See* Order Denying the Nation's Motion *In Limine* to Exclude Expert Testimony of Ross Swimmer (Docket No. 355). The Court admitted this testimony as lay testimony, not expert testimony.

22. The operating agreement between the lessee and an operator defines the operator's rights, which may include the right to drill, the right to develop or explore an area of the leased property, or the right to drill and develop the oil and gas interest for its own benefit.

23. A designation of operator informs the JAN and the BIA that a record title owner has designated an operator to go out onto the leased property and drill or operate wells under its lease.

24. Marlena Reval has been employed with the BIA, Jicarilla Agency since 2002. She is the current realty specialist in the energy and minerals department. In 2008, she created a log to track assignments of operating rights and record title. *See* JAN Exhibit 32. Before that time no spreadsheet existed, but the BIA tracked assignments. From at least 2008 forward, the BIA was acting to approve assignments of operating rights. *Testimony of Marlena Reval.*

25. Currently, the BIA has separate forms for the assignment or transfer of record title, for assignments of operating rights, and for designations of operators.

DISCUSSION

The Threshold Issue presently before the Court is whether Platinum holds operating rights relating to the Oil and Gas Leases. The JAN asserts that Platinum does not own the operating rights because Platinum did not obtain required approvals of a transfer of the operating rights from the Secretary and from the JAN pursuant to federal regulations and tribal ordinances. Platinum counters that under applicable federal regulations, a transfer of operating rights does not require the Secretary's or the Indian mineral owner's approval, and that, with respect to the operating rights at issue here, the JAN's approval is not required because a) the Oil and Gas

12

Leases do not contain an express provision requiring the Indian mineral owner's approval; and b) the Oil and Gas Leases pre-date the JAN ordinance.[8]

The Court will first consider whether the Secretary's approval of a transfer of operating rights is required under 25 C.F.R. § 211.53, promulgated by the Department of the Interior pursuant to the IMLA. Platinum contends that a transfer of operating rights to it *does not* require the Secretary's approval under 25 C.F.R. § 211.53. The JAN disagrees. Resolution of this issue requires the Court to construe the regulation. The regulation contains specialized terminology commonly used in the oil and gas industry, including the terms lease, sublet, agreements designating operators, overriding royalties or payments out of production, and drilling contract. *See* 25 C.F.R. § 211.53. When a statute or regulation contains specialized, technical terms, it is appropriate to interpret the meaning of those terms by reference to the industry usage of those terms. *See Louisiana Public Service Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 371, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)("technical terms of art should be interpreted by reference to the trade or industry to which they apply.")(citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)); *United States v. Lachman,* 387 F.3d 42, 53 (1st Cir. 2004)(acknowledging that "there are instances where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by usual tools of statutory construction.")(citing *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 342, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)(remaining citations omitted)). Thus, as part of its task to construe the regulation, the Court will begin by examining the common understanding of various terms and other concepts commonly used in the oil and gas industry, as well as the way in which the BIA uses those terms to the extent the Court can ascertain it.

[8]Platinum also disagrees with the Court's prior ruling that only MLG, not Platinum, benefitted from the approval of the transfer of operating rights in the Golden Oil Bankruptcy.

13

A.  *Industry Terminology and Common Understanding of Oil and Gas Terms*

The oil and gas industry uses specialized terminology to refer to different interests relating to oil and gas leases, but the precise meaning of a particular term in any given context may not be exact.  *See Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.,* 116 Cal.App.4th 1375, 1378, 11 Cal.Rptr.3d 412 (Ct.App. 2004)(observing that "the terminology used in oil and gas cases is inexact and can vary in meaning depending on context").

### *Lease and Leasehold Interest*

An oil and gas lease is generally defined as "[a] lease granting the right to extract oil and gas from a specified piece of land." Black's Law Dictionary 899 (7th ed. 1999).  "A traditional oil and gas lease is an actual conveyance of a real property interest, and the lessee typically obtains the exclusive right to develop the resource."  *State of Utah v. Babbitt,* 830 F.Supp. 586, 594, n. 14 (D. Utah 1993), *aff'd,* 53 F.3d 1145 (10th Cir. 1995)(citation omitted).  A leasehold interest is "[t]he interest of one holding as a grantee or lessee under an oil and gas lease or lease of oil, gas and other minerals." 8-L Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms L (2012).  It "includes the right on the part of the lessee to drill and produce, and is subject to the payment to the lessor of a royalty . . . free of operating expense, either in kind or at the prevailing price at the time of production."  *Id.*  Under federal oil and gas leases, the lessee under an oil and gas lease holds record title to the lease.  *See* 43 C.F.R.  § 3100.0-5(c) and (i) (relating to the Mineral Leasing Act of 1920 ("MLA"), and defining "[r]ecord title [as] . . . a lessee's interest in a lease which includes the obligation to pay rent, and the rights to assign and relinquish the lease." "Lessee means a person or entity holding record title in a lease issued by the United States.").  Under the MLA, an assignee of record title has a direct contractual relationship with the lessor, and is substituted for the lessor as to the interest that is assigned.  1

Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, § 10.02[3], at 10-6 to 10-7 (2012). A lessee typically has several obligations to the lessor, including the obligation to pay royalties and rental, reclamation, and whatever other obligations are set forth in the lease. *See, e.g.,* 25 C.F.R. § 211.41 (rentals and production royalty on oil and gas leases); 25 C.F.R. § 211.42 (development expenditure obligations); 25 C.F.R. § 211.5 (reclamation regulations apply to reclamation on leases of tribal land for mineral development); 25 C.F.R. § 211.47 (duty of lessee to protect from drainage and pay compensatory royalty for drainage as may be required).

### Operating Interests, Operating Rights and Working Interests

"Operating Interest" is generally defined as an interest created by an oil and gas lease that is burdened with the cost of development and operation of the property. 8-O Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms O (2012). Similarly, a "working interest" is understood to mean "[t]he operating interest under an oil and gas lease." 8-W Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms W (2012). "The owner of the working interest has the exclusive right to exploit the minerals on the land." *Id. See also, Armstrong Petroleum,* 116 Cal.App.4[th] at 1379, 11 Cal.Rptr.3d at 415 (stating that "'[w]orking interest' means the exclusive right to enter the land to explore, drill, and produce oil and gas from the land and to take title to the oil and gas produced."). These definitions are consistent with the definition of "operating right" applicable to federal oil and gas leases on non-Indian lands. *See* 43 C.F.R. § 3100.0-5(d)(Under the MLA, "[o]perating right (working interest) means the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including production of oil or gas from such lands in accordance with the terms of the lease."). The Tenth Circuit has observed in the context

of applying a federal treasury regulation that the terms "operating rights," "operating interest," and "working interest" appear to be synonymous. *Marathon Oil Co. v. Comm'r,* 838 F.2d 1114, 1123 (10th Cir. 1987)("As used in Treas.Reg. §1.612-4(a), the terms 'operating rights,' 'operating interest,' and 'working interest' appear to be synonymous.")(citation omitted). At common law, an assignee of operating rights is akin to a sublessee who is not in privity of contract with the lessor. *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, § 10.06[1][c][2], at 10-77 (2012)("An assignment of operating rights in a federal lease is in the nature of a common law sublease, leaving intact the relationship between the government as lessor and the assignor, who retains record title, as lessee."). An assignment of operating rights does not affect record title. *Id.*

### Operator

An operator is "[a] person, natural or artificial (e.g. corporate), engaged in the business of drilling wells for oil and gas." 8-O Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms O (2012). The precise meaning of the term "operator" may differ depending on the context in which it is used. Generally an operator is the person who is responsible for the operations conducted on the leased lands or a portion thereof. *See* 30 C.F.R. § 250.105 (applicable to oil, gas, and sulphur exploration, development, and production operations on the Outer Continental Shelf); 43 C.F.R. § 3100.0-5 (applicable to onshore oil and gas development and production on public domain lands subject to MLA). A lessee or operating rights owner may also serve as the operator on the ground, but under the MLA the party who conducts the actual operations may not be the lessee or operating rights owner. *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, § 10.02[4], at 10-8 to 10-9 (2012)(describing the difference between an operating rights owner and operator under the

16

MLA).  On the other hand, in some contexts the term "operator" is used to refer to one who

holds operating rights. *See below* at pp. 25-26.

<u>*Operating Agreements and Drilling Contracts*</u>

"An operating agreement is a contract in which the record holder of a lease grants the

right to another to drill for oil and gas and produce same upon discovery, under terms and

conditions set out in the agreement." *Harry L. Bigbee,* 2 IBLA 23, 25, 1971 WL 12369 (I.B.L.A.

1971).  It is generally understood to be:

> [a]n agreement between or among interested parties for the testing and development of a
> tract of land.  Typically one of the parties is designated as the operator and the agreement
> contains detailed provisions concerning the drilling of a test well . . . the sharing of
> expenses, and accounting methods.  The authority of the operator, and restrictions
> thereon, are spelled out in detail in the typical agreement.

8-O Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms O (2012).

A drilling contract is "[a]n agreement to drill and complete a well, setting forth the obligations of

each party, compensation, indemnification, method of drilling, depth to be drilled, etc."  8-D

Williams & Meyers, *Oil and Gas Law,* Manual of Oil and Gas Terms D (2012).   An operating

agreement may include an assignment of operating rights, or operating rights may be assigned by

a separate transfer document.  *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal*

*Oil and Gas Leases*, §10.02[4], at 10-7 (2012)(observing that operating rights may be transferred

pursuant to an operating agreement.).

<u>*Sublease*</u>

A lessee's transfer of less than the entire leasehold estate for less than the remainder of

the lease term is a sublease. *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil*

*and Gas Leases*, §10.02[2], at 10-5 (2012)(explaining that under common law, "[w]here less

than the entire estate was transferred or for less than the remaining balance of the term or under

17

conditions materially different than those set forth in the lease, the transfer was denominated a sublease."). At common law, there typically is no privity of estate or privity of contract between a lessor and a sublessee; thus, the sublessee has no direct contractual obligation to the lessor to perform the lessee's obligations under the lease. *See,* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, §10.02[2], at 10-5 (2012)(explaining that, at common law, a sublease creates "a relationship purely between the sublessor and the sublessee, with the sublessor remaining bound to the lessor both by privity of estate and by privity of contract.").

These definitions indicate that one of the major components of a lessee's interest in an oil and gas lease is the right to explore for, develop, and produce oil and gas from the leased premises, *i.e.*, operating rights. And a lessee under a federal oil and gas lease on non-Indian lands can choose to exercise the operating rights incident to the lease, or may sever the operating rights from the record title pursuant to an operating agreement. *See Continental Oil Co.,* 74 I.D. 229, 234 (1967)("In the case of an operating agreement, the lessee transfers rights in the lease, such as the right to drill and produce, to another, but he does not purport to divest himself of any record title to any interest in the lease . . .."). A party holding an interest relating to an oil and gas lease may function in multiple capacities: as the lessee, as the holder of the operating rights, and/or as the operator under an oil and gas lease. *See* 1 Rocky Mountain mineral Law Foundation, *Law of Federal Oil and Gas Leases*, §10.02[4], at 10-8 (2012)(observing that a lessee or operating rights owner can also be the operator on the ground).

B. *Terminology Used by the BIA in Dealing with Oil and Gas Leases On Indian Land*

Several representatives of the BIA gave deposition testimony about lease assignments on the JAN's tribal land. These representatives explained generally that a designation of operator is

simply the designation by a lessee of an operator to go out onto the leased property to operate the lease. *See, e.g.,* Blackhair Deposition, page 70, lines 14-15 ("There's a designation of operator that designates that operator to operate the lease."); Swimmer Deposition, page 75, lines 6-10 ("The lessee can name the operator, you know, whoever that might be or operate the well him or herself. So by designating an operator or hiring an operator that doesn't come to the status of a transfer of a leasehold interest . . .").

However, the BIA representatives also appeared to use the terms "operating agreement," "operating rights," and "operators" in a somewhat inconsistent manner. For example, Ms. Johnna Blackhair, the superintendent for the BIA in the Uintah and Ouray Agency, believes there is no distinction between the operator and the holder of the operating rights. *See* Blackhair Deposition, p. 124, lines 11 – 14. However, she also testified that "operating rights of the lease gives the right of the operator to perform that lease," but that "[d]esignation of operator isn't the same as operating rights." *Id.* at p. 69, lines 8-9 and p. 70, lines 11-12. Ross Swimmer, who served as assistant Secretary of Indian Affairs from 1985 to approximately January of 1989, testified that an operating agreement is "the agreement between the lessee and the operator to go out and operate the well and the way in which it's going to be done. . ." Swimmer Deposition, page 49, lines 5-8. He also stated that the right to explore for oil and gas on the leased premises could be called "the right to operate, operating rights, the role of the operator." Swimmer Deposition, page 47, lines 13-14. With this generalized understanding of these specialized terms and their use, or inconsistent use, by BIA representatives in connection with oil and gas leases on Indian land, the Court will next examine the language of the regulation itself.

19

C. *The IMLA and the Regulations Carrying out its Provisions*

The Oil and Gas Leases at issue in this matter, located on tribal lands, are subject to the IMLA.[9]  The IMLA authorizes the Secretary to promulgate regulations to carry out its provisions.  *See* 25 U.S.C. § 396(d)("All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396(a) to 396(g) of this title . . . shall be subject to the rules and regulations promulgated by the Secretary of the Interior.").[10]  The regulations promulgated pursuant to the IMLA are found in section 211 of Part 25 of the Code of Federal Regulations.  The purpose and scope of the regulations is set forth in 25 C.F.R. § 211.1, which provides, in part:

> (a)  The regulations in this part govern leases and permits for the development of Indian tribal oil and gas . . . . These regulations are intended to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development.

> 25 C.F.R. § 211.1

The primary regulation at issue in this case, governing assignments and transfers of interests in oil and gas leases, is set forth in 25 C.F.R. § 211.53, which provides:

> Assignments, overriding royalties, and operating agreements.

> (a) Approved leases or any interest therein may be assigned or transferred only with the approval of the Secretary.  The Indian mineral owner must also consent if approval of the Indian mineral owner is required in the lease.  If consent is not required, then the Secretary shall notify the Indian mineral owner of the proposed assignment.  To obtain the approval of the Secretary, the assignee must be qualified to hold the lease under existing rules and regulations and shall furnish a satisfactory bond conditioned for the faithful performance of the covenants and conditions of the lease.

---

[9]Federal oil and gas leases on Indian land can also be granted pursuant to the Indian Mineral Development Act of 1982 ("IMDA"), 25 U.S.C. §§ 2101-2108.  The IMDA is inapplicable to the Oil and Gas Leases at issue in this matter.

[10]*See also, Ute Mountain Tribe v. Rodriguez,* 660 F.3d 1177, 1180 n.7 (10th Cir. 2011)(noting that "[t]he IMLA has been implemented through comprehensive regulations promulgated by the Secretary of the Interior.")

(b) No lease or interest therein or the use of such lease shall be assigned, sublet, or transferred, directly or indirectly by working or drilling contract, or otherwise, without the consent of the Secretary.

(c) Assignments of leases, and stipulations modifying the provisions of existing leases, which stipulations are also subject to the approval of the Secretary, shall be filed with the superintendent within five (5) working days after the date of execution. Upon execution of satisfactory bonds by the assignee the Secretary may permit the release of any bonds executed by the assignor. Upon execution of satisfactory bonds the assignee accepts all the assignor's responsibilities and prior obligations and liabilities of the assignor (including but not limited to any underpaid royalties and rentals) under the lease.

(d) Agreements creating overriding royalties or payments out of production shall not be considered as interests in the leases as such provision is used in this section. Agreements creating overriding royalties or payments out of production or agreements designating operators are hereby authorized and the approval of the Secretary shall not be required with respect thereto, but such agreements shall be subject to the condition that nothing in such agreements shall be construed as modifying any of the obligations of the lessee, including but not limited to, obligations imposed by requirements of the MMS for reporting, accounting, and auditing; obligations for diligent development and operation, protection against drainage and mining in trespass, compliance with oil and gas, geothermal, and mining regulations (25 CFR part 216; 43 CFR parts 3160, 3260, 3480, and 3590; and those applicable rules found in 30 CFR chapter II, subchapters A and C) and the requirements for Secretarial approval before abandonment of any oil and gas or geothermal well or mining operation. All such obligations are to remain in full force and effect, the same as if free of any such overriding royalties or payments. The existence of agreements creating overriding royalties or payments out of production, whether or not actually paid, shall not be considered as justification for the approval of abandonment of any oil and gas or geothermal well or mining operation. Nothing in this paragraph revokes the requirement for approval of assignments and other instruments which is required in this section, but any overriding royalties or payments out of production created by the provisions of such assignments or instruments shall be subject to the condition stated in this section. Agreements creating overriding royalties or payments out of production, or agreements designating operators shall be filed with the superintendent unless incorporated in assignments or instruments required to be filed pursuant to this section.

25 C.F.R. § 211.53.

D. *Whether the Regulation Requires the Secretary's Approval of a Transfer of Operating Rights*

Platinum makes two arguments in support of its position that a transfer of operating rights does not require the Secretary's approval under 25 C.F.R. § 211.53:  1) only transfers of record title interests in an oil and gas lease require the Secretary's approval, and because an operating right does not affect record title, the Secretary's approval is not required; and 2) the terms, "operating right," "operator," "operating agreement," and "designation of operator" are all used to reference the same thing, such that the exclusion of "agreements designating operators" from the requirement for Secretary's approval found in subsection (d) of 25 C.F.R. § 211.53 means that a transfer of operating rights is not subject to approval by the Secretary.   The JAN asserts that operating rights are interests in a lease such that subsections (a) and (b) of 25 C.F.R. § 211.53 require the Secretary's approval of a transfer of operating rights, and that the exclusion in subsection (d) of agreements designating operators does not encompass an assignment of operating rights.

The starting place for discerning the meaning of a regulation, just like a statute, is the language of the regulation itself. *See First Nat'l Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 476 (7th Cir. 1999)("Administrative rules are subject to the same well-known maxims of construction as legislative statutes.")(citation omitted).  If the language is clear, the Court's inquiry generally ends.  *Id.*  A close review of the language in 25 C.F.R. § 211.53 reveals that the regulation is not entirely clear because it was not drafted with technical clarity.

Subsection (a) requires the Secretary's approval of any assignment or transfer of a lease or "any interest therein." 25 C.F.R. § 211.53(a).   Subsection (b) requires the Secretary's

consent[11] to alienation of a lease or any interest therein, or the use of the lease by assignment, sublease, or transfer, "directly or indirectly by working or drilling contract, or otherwise." 25 C.F.R. § 211.53(b). If a transfer falls within either subsection (a) or (b) of the regulation, the Secretary's approval is required. *See* 25 C.F.R. § 211.53(a)("any interest therein may be assigned or transferred only with the approval of the Secretary."); 25 C.F.R. § 211.53(b)("No lease or interest therein or the use of such lease shall be assigned, sublet or transferred, directly or indirectly . . . without the consent of the Secretary."). Subsections (a) and (b) both reference transfers of leases and interests in leases, but the language in subsection (b) is substantially broader. In fact, the language in subsection (b) is so broad that it would appear to encompass any and all manner of transfer, assignment, or use of any lease or interest in a lease, however denominated, including such transfers and assignments already covered under subsection (a).

The first sentence in subsection (d) provides that "[a]greements creating overriding royalties or payments out of production shall not be considered as interests in the leases" as used in 25 C.F.R. § 211.53. Consequently, agreements creating overriding royalties or payments out of production are not subject to the Secretary's approval under subsection (a) because such interests are expressly excluded from what is considered an interest in a lease. *See* 25 C.F.R. § 211.53(a)(requiring the Secretary's approval of any transfer of an interest in a lease). The second sentence in subsection (d) begins by using the same terms, "[a]greements creating overriding royalties or payments out of production" but then includes an additional term, "agreements designating operators" as the items that do not require the Secretary's approval

---

[11]Although subsection (b) uses the word, "consent" rather than "approval," subsection (a) uses both words in such a manner as to suggest that "consent" and "approval" are used interchangeably. Specifically, subsection (a) provides that "[a]pproved leases or any interest therein may be assigned or transferred only with the *approval* of the Secretary." 25 C.F.R. § 211.53(a). The next sentence states that "[t]he Indian mineral owner must also *consent* if *approval* of the Indian mineral owner is required in the lease." *Id.* The third sentence in subsection (a) switches back to the term "consent" rather than "approval": "[i]f *consent* is not required . . ." *Id.* The structure of these sentences suggests that "consent" and "approval" mean the same thing.

under either subsection (a) or (b).  25 C.F.R. § 211.53(d).  Subsection (d) does not expressly

exclude "agreements designating operators" from what is considered an interest in a lease. 25

C.F.R. §211.53(d).  Nowhere in the applicable regulations is the term "operating right" used or

defined.  Nor do the regulations define "operator" or "designation of operator."

Platinum points out that the assignment of operating rights relating to the Oil and Gas

Leases did not affect record title to the leasehold interests.  Consequently, Platinum reasons that

the relationship between the JAN as mineral owner/lessor and the lessee is not affected by such

assignments because an assignee of operating rights is not in privity of contract or estate with the

lessor.  The Court agrees that an assignee of operating rights relating to an oil and gas lease

subject to the IMLA holds non-record title and is not in  privity of contract or estate with the

lessor.[12]   Because an assignment of operating rights leaves intact the relationship between the

Indian mineral owner and the lessee and does not affect record title to the lease, Platinum

concludes that such assignments do not create interests in leases subject to the Secretary's

approval under 25 C.F.R. § 211.53(a) or (b).  Yet, the language of 25 C.F.R. §211.53(b) suggests

otherwise.

---

[12] A lessee under a federal oil and gas lease holds record title to the lease.  1 Rocky Mountain Mineral Law
Foundation, *Law of Federal Oil and Gas Leases*, § 10.02[3], at 10-6 (2012).  Non-record title interests include
operating rights.  *Pitch Energy Corp.,* 169 IBLA 267, 274, 2006 WL 2810980 (I.B.L.A. 2006)(noting that "[t]he
assignment of operating rights under a Federal oil and gas lease has long been distinguished from the assignment of
record title to the lease.")(citations omitted).  "An assignment of operating rights in a federal lease is in the nature of
a common law sublease, leaving intact the relationship between the government as lessor and the assignor, who
retains record title, as lessee."  1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, §
10.06[2], at  10-77 (2012).  The assignee/transferee of operating rights from a lessee is not in privity with and
generally has no direct obligation to the lessor.  *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil
and Gas Leases*, § 10.02[4], at 10-7, n. 16 (2012)(noting that assignments of operating rights leave the assignee with
no contractual relationship with the lessor)(citing BLM Instruction Memorandum No. 86-177 (Dec. 31, 1985)).

Unlike the regulations under the IMLA, the regulations under the MLA, applicable to federal oil and gas leases on
non-Indian lands, "make both an approved assignee of record title and a transferee of operating rights directly
responsible to the Department for various lease obligations." 1 Rocky Mountain Mineral Law Foundation, *Law of
Federal Oil and Gas Leases*, § 10.02[4], at  10-8 (2012)(citing 43 C.F.R. § 3106.7-6 (elec. 2010)).  The Oil and Gas
Leases at issue are not governed by the MLA.

Unlike subsection (a) of 25 C.F.R. §211.53, subsection (b) subjects the indirect assignment, sublease or transfer of an interest in a lease or use of a lease by working or drilling contact, or otherwise, to consent by the Secretary. 25 C.F.R. § 211.53(b). This language expressly includes indirect transfers of an interest in, or use of, a lease by sublease. Because subleases of oil and gas leases are non-record title interests, it is clear that the types of transfers requiring Secretary approval under subsection (b) are not limited to record title interests. Subsection (b) also requires the Secretary's approval of the transfer of the use of a lease, indirectly, by drilling contract. Because subsection (b) is not limited to transfers of record title, and because even the indirect transfer of the use of a lease by drilling contact requires the Secretary's approval, subsection (b) is surely broad enough to encompass transfers of non-record title interests by an assignment of operating rights. In fact, subsection (b) appears broad enough to cover agreements creating royalty interests and agreements under which the lessee or operating rights owner retains a third party to conduct the oil and gas operations. Thus, regardless of whether an operating right is considered an interest in a lease under the regulation, the language in subsection (b) is broad enough to encompass a transfer or assignment of an operating right.

Subsection (d) excepts agreements creating overriding royalties and payments out of production, as well as agreements designating operators, from the types of agreements otherwise requiring approval of the Secretary under subsection (a) or (b). 25 C.F.R. § 211.53(d). If those interests were not covered by subsections (a) or (b), subsection (d) would be unnecessary. Thus, exclusion in subsection (d) of certain interests from the operation of subsections (a) and (b) is consistent with a broad reading of subsections (a) and (b).

Platinum argues further that even if an assignment of operating rights is otherwise covered by subsection (a) or (b), the Secretary's approval of such a transfer is not required because of subsection (d).  Subsection (d) excepts "agreements designating operators" from the requirement to obtain the Secretary's approval, but does not use the phrase, "assignments of operating rights."  25 C.F.R. § 211.53(d).  Platinum maintains that "agreements designating operators," which subsection (d) carves out from the requirement to obtain the Secretary's approval (but not from the definition of interests in leases), includes assignments of operating rights.

The IMLA regulations do not define the terms "operating interest," "operator," or "designation of operator."  The term "operator" as used within the oil and gas industry has a specialized meaning that differs depending on the context or on the parties' agreement.  For example, under the Texas Natural Resources Code, an operator may be a person other than the mineral owner or working interest owner.  Under that statute, "operator" is defined as "a person who assumes responsibility for the physical operation and control of a well as shown by a form the person files with the commission and the commission approves."  Tex.Nat.Res.Code Ann. § 89.002(2) (2011).  "'Nonoperator' means a person who owns a working interest in a well at the time the well is required to be plugged pursuant to commission rules and is not an operator as defined in Subdivision (2) of this subsection."  Tex.Nat.Res.Code Ann. §89.002(3).  On the other hand, Treas.Reg. § 1.612-4(a) relating to intangible drilling and development costs associated with oil and gas wells that may be deducted by an "operator," defines the term "operator" as "one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights."  Treas. Reg. § 1.612-4(a)(1965).  *See also Marathon Oil Co. v. Comm'r*, 838 F.2d at

26

1125 (noting that Treas.Reg. § 1.612-4(a) defines "operator" as "'one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease *or any other form of contract granting working or operating rights.*'")(emphasis added by *Marathon*). The Oklahoma Surface Damage Act defines "operator" to mean "a mineral owner or lessee who is engaged in drilling or preparing to drill for oil or gas."  Okla.St.Ann. tit. 52 § 318.2(1)(1982). Parties by private agreement may designate an "operator" and decide whether the operator acquires an interest in a lease.  For example, in in *Coosewoon v. Meridian Oil Co.,* 25 F.3d 920 (10th Cir. 1994), the parties entered into a contract designating an operator that expressly provided that such designation did not  constitute an assignment of any interest in the lease itself. *Coosewoon v. Meridian,* 25 F.3d at  931 (the contract "unambiguously stated that 'this designation of operator does not constitute an assignment of any interest in the lease.'"). *See generally,* 8-O Williams & Myers, *Oil and Gas Law,* Manual of Oil and Gas Terms O (2012) for a discussion of how the term "operator" is used differently in different contexts.  Because IMLA regulations do not define the meaning of "agreements designating operators" or "operator," and because even the term "operator" can have different meanings in different contexts, the Court must resort to other extrinsic aids in an effort to shed light the meaning of "agreements designating operators" as used in 25 C.F.R. § 211.53(d).

E.   *Neighboring Regulations Applicable to Oil and Gas Leases on non-Indian Federal Lands*

To construe the meaning of language used in a particular regulation, the Court may look to regulations promulgated under other federal statutes dealing with the same subject matter. *See United States v. Quarrell,* 310 F.3d 664, 674 (10th Cir 2002)(acknowledging that the court may look to related statutes to interpret a statute in order to ascertain Congressional intent)(citation omitted); *Planned Parenthood of the Rocky Mountains Services, Corp. v. Owens*, 287 F.3d 910,

923 n. 13 (10th Cir.2002)(a court may interpret a statute by examining other statutes dealing with the same subject as the statute being construed)(citation omitted). "[D]ifferent acts which address the same subject matter . . . should be read together such that the ambiguities in one may be resolved by reference to the other." *Firstar Bank, N.A. v. Faul,* 253 F.3d 982, 990 (7th Cir. 2001)(citations omitted).[13] The MLA and the IMLA both address oil and gas leases on government lands and were enacted for the purpose of regulating the development of natural resources by private parties on public lands.[14] The MLA governs the development of oil and gas leases on onshore federal lands with certain exceptions, while the IMLA governs development of oil and gas leases on Indian lands held in trust by the federal government. The Court will, therefore, look to the regulations under the MLA to assist with its interpretation of 25 C.F.R. § 211.53.

The regulations under the MLA in effect from 1983 to 1987 defined "designated operator" as "the party designated by the lessee or holder of operating rights to conduct operations on the lease or a portion thereof." 43 C.F.R. 3100.0-5 (1983). This definition suggests that a designation of operator does *not* confer operating rights. The current form of the regulation does not define "designated operator," but defines "operating right" as:

---

[13]*See also, Impact Energy Resources, LLC v. Salazar,* 693 F.3d 1239, 1254 n.1 (10th Cir. 2012)(J. Seymour, concurring)("Statutes that are *in pari materia*—dealing with the same subject matter—should be construed consistently with each other.")(citing *Planned Parenthood v. Owens,* 287 F.3d at 923 n. 13 (remaining citation omitted)).

[14]*See California Co. v. Udall,* 296 F.2d 384, 388 (D.C.Cir. 1961)(stating that the MLA "was intended to promote wise development of . . . natural resources and to obtain . . . a reasonable financial return on assets that 'belong' to the public."); *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 767 n.5, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)(one of Congress's three primary goals in enacting the IMLA was to "ensure that the Indians receive 'the greatest return from their property.'")(quoting H.R.Rep. No. 1872, 75th Cong., 3d Sess. 2 (1938)), ; 25 C.F.R. § 211.1 (regulation enacted pursuant to the IMLA regarding "leases and permits for the development of Indian tribal oil and gas . . . resources.").

the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including the production of oil or gas from such lands in accordance with the terms of the lease.

43 C.F.R. § 3100.0-5(d).

"Operator" is defined as

any person or entity, including, but not limited to, the lessee or operating rights owner, who has stated in writing to the authorized officer that it is responsible under the terms and conditions of the lease for the operations conducted on the leased lands or a portion thereof.

43 C.F.R. 3100.0-5(a).

Finally, "transfer" is defined in the MLA regulations as:

any conveyance of an interest in a lease by assignment, sublease or otherwise. This definition includes the terms: Assignment which means a transfer of all or a portion of the lessee's record title interest in a lease; and sublease which means a transfer of a non-record title in a lease, i.e., a transfer of operating rights is normally a sublease and a sublease also is a subsidiary arrangement between the lessee (sublessor) and the sublessee, but a sublease does not include a transfer of a purely financial interest, such as overriding royalty interest or payment out of production, nor does it affect the relationship imposed by a lease between the lessee(s) and the United States.

43 C.F.R. § 3100.0-5(e).

These regulations expressly recognize the distinction between a record title interest in a lease and a non-record title interest in a lease, and address the concept of a sublease. The MLA regulations further establish that "operating "rights" and "operator" are distinct concepts. A transfer of operating rights is a transfer of a non-record title interest in a lease, while the transfer of a purely financial interest, such as an overriding royalty interest or payment out of production, does not transfer either a record title or non-record title interest in a lease. *See* 43 C.F.R. § 3100.0-5(e). Section 211.53(d) of the IMLA regulation similarly provides that overriding royalty interests and payments out of production are not interests in a lease.

On the other hand, the IMLA regulations do not use the terms "operating rights," "record title," or "non-record title." The IMLA regulations refer to operators and subleases, but do not

define either term. Under both the IMLA and the MLA, designations of operators, and agreements creating an overriding royalty interest or payments out of production, do not require the Secretary's approval. *See* 1 Rocky Mountain Mineral Law Foundation, *Law of Federal Oil and Gas Leases*, § 10.02[4] and § 10.06[3], at 10-9 and 10-77 (2012)(stating that under the MLA, "[u]nlike a transfer of operating rights, the designation of a new lease operator does not require BLM approval" and that "approval is not required for an assignment of overriding royalty interest or production payments" though such assignments must be filed with the BLM); 25 C.F.R. § 211.53 (excluding agreements designating operators from the types of agreements requiring the Secretary's approval). Yet the MLA regulations expressly require the Secretary's approval of an assignment of operating rights, whereas the IMLA regulations are unclear.[15] Given that the IMLA and the MLA both 1) concern oil and gas leases; 2) govern when the Secretary's approval of a transfer is required; 3) use the same or similar terminology; and 4) have the same general purpose of permitting and regulating the development by private parties of oil and gas natural resources on onshore federal lands or federal trust lands, the Court finds that it is appropriate to construe the meaning of basic terms such as operating rights and operator as used in or governed by 25 C.F.R. § 211.53 by reference to the MLA regulations.

Under the MLA regulations a lessee owns a record title interest in the lease whereas an owner of operating rights owns a non-record title interest in the lease. An operator, on the other hand, owns neither a record title interest nor a non-record title interest in a lease simply by virtue of being the operator. If an operator owns a record or non-record title interest in a lease it is not based on its status as operator; rather, it is because the operator also happens to be the lessee or has otherwise obtained a non-record title interest in the lease, such as operating rights.

---

[15]*See* 43 C.F.R. § 3106.7-2 ("You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights.").

Construing the term "operator," as used in the IMLA regulations *in para materia* with the definition of "operator" in the MLA, the exception in subsection (d) of 25 C.F.R. § 211.53 in the IMLA regulation for "agreements designating operators" from the Secretarial approval requirements of subsections (a) and (b) only excepts agreements regarding the interest of an operator *qua* operator, which is neither a record title interest nor a non-record title interest in a lease. An owner of operating rights, on the other hand, holds a non-record title interest in a lease which remains subject to the Secretarial approval requirement of subsection (b), and possibly subsection (a). Therefore, subsection (d) of 25 C.F.R. § 211.53 does not except a transfer of operating rights from the requirement that the Secretary approve a transfer of operating rights whether such transfer is accomplished by an operating agreement or otherwise.

F.  *The Oil and Gas Leases*

The Oil and Gas Leases themselves also support the conclusion that a transfer of operating rights is subject to the Secretary's approval. Paragraph 3(h) of the Leases requires the Secretary's approval of any assignment of any interest in a lease by an operating agreement.[16] On the one hand, the phrase "interest in lease" contained in the Leases simply tracks the language of 25 C.F.R. § 211.53, which the Court has already determined is inconclusive to determine whether operating rights require the Secretary's approval.   On the other hand, the language in the Oil and Gas Leases broadly refers to assignments of any interest in a lease "by an operating agreement or otherwise," and prohibits such assignments "except with the approval of the Secretary of the Interior." As explained above, the extent of a party's operating rights is often

---

[16] Subsection (h) provides:

> Assignment of lease – Not to assign this lease or any interest therein by an operating agreement or otherwise nor to sublet any portion of the leased premises before restrictions are removed, except with the approval of the Secretary of the Interior. If this lease is divided by assignment of an entire interest in any part of it, each part shall be considered a separate lease under all the terms and conditions of the original lease.
> Lease 71 and 363.

determined by the terms of the operating agreement between the lessee and the assignee. And the Oil and Gas Leases clearly require the Secretary's approval for assignments by operating agreement. Record title interests are not generally assigned by operating agreements, whereas an operating agreement may include the non-record title assignment of operating rights. Thus, the requirement for the Secretary's approval of a transfer of an interest under an operating agreement contained in the Oil and Gas Leases suggests that the parties contemplated that Secretary's approval of a transfer of operating rights is required. Construing 25 C.F.R. § 211.53 to require the Secretary's approval of a transfer or assignment of operating rights is, therefore, consistent with the restrictions contained in the Oil and Gas Leases themselves.

G. *Agency Interpretation*

When faced with an ambiguous regulation, a court may look to an agency's interpretation of the regulation to discern its intended meaning. *See In re BDT Farms, Inc.,* 21 F.3d 1019, 1021 (10th Cir. 1994)("We first determine whether the statute is unambiguous, and if we decide that it is ambiguous, we determine whether the agency's construction of it is permissible.")(citation omitted). An agency's interpretation of its own regulation is entitled to substantial deference. *Midwest Crane and Rigging, Inc. v. Federal Motor Carrier Safety Admin,* 603 F.3d 837, 840 (10th Cir. 2010)(stating that "we accord 'substantial deference to an agency's interpretation of its own regulations.'")(quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405(1994)(citations omitted)); *Newton v. Federal Aviation Admin.,* 457 F.3d 1133, 1137 (10th Cir. 2006)(finding that an agency handbook interpreting a federal statute "is entitled to deference to the extent it is persuasive, and it is entitled to great deference insofar as it

32

is interpreting the agency's own regulations.")(citations omitted).[17]   In *Shalala*, the Supreme

Court explained why a court must give substantial deference to an agency's interpretation of its

own regulations:

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.

> *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)(citations and internal quotation marks omitted).

With these principles in mind, the Court will review the commentary accompanying the

regulations, the testimony of representatives who administer the regulations, and other

documentary evidence of the agency's interpretation of the regulation at issue.

      i)      *Commentary Offered in Connection with the Promulgation of the Regulation*

Platinum cites commentary relating to proposed revisions to 25 C.F.R. § 211.45 which

was published for comment in October of 1987.[18]   The commentary provided:

---

[17]*See also Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)(Secretary of Labor's interpretation of his own regulations is controlling, unless such interpretation is "plainly erroneous or inconsistent with the regulation.")(quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)(additional internal quotation marks and citation omitted).

[18]Proposed regulation 211.45 provides in full:

    (a)   *Assignments.* An assignment or sublease of any interest in a contract entered into pursuant to this part shall not be valid without the approval of the Secretary and the Indian mineral owner, if approval by the Indian mineral owner is required in the contract.  The assignee must be qualified to hold such contract and shall furnish a satisfactory bond conditioned on the faithful performance of the terms and conditions thereof.  Approval shall not relieve the assignor of obligations under the original contract, unless the Secretary, with the consent of the Indian mineral owner when required, releases the assignor of obligations under said contract.  The Secretary may permit the release of any bonds executed by the assignor upon executions of satisfactory bonds by the assignee.

    (b)   *Overriding royalties and operating agreements.* Agreements creating overriding royalties or payments out of production and agreements designating operators shall not be considered assignments, and the approval of the Department of the Interior  or any agency thereof is not required. Such agreements

The BIA has concluded that paragraph (b) should be amended to require that a copy of any agreement creating overriding royalties or payments out of production be filed with the Secretary except in instances where the agreement is incorporated in an assignment which is required to be approved under paragraph (a), as provided in existing regulations in 25 CFR 211.26(d).

The BIA has also concluded that assignments of operating rights need not and will not be approved by the Secretary. However, in order to keep the Secretary apprised of the identity of the operator, the rule requires that such designations be filed with the Secretary.

52 Fed. Reg. 39341.

Platinum also relies on the following commentary relating to the proposed regulations that were not adopted:

The comments and BIA response state:

A number of industry commentators noted that it is unclear from the language of paragraph (a) whether the BIA intends to prohibit the **assignment of operating rights**, or merely that approval of such assignments by the Secretary is not required. They contend that **assignments of operating rights** serve an essential purpose in getting wells drilled, and that industry would strongly object to any prohibition of such assignments.

Indian commentators contend that the regulations should provide that the assignment of any interest in Indian oil and gas resources, including an **assignment of operating rights**, should be deemed invalid unless it has been approved by the Secretary with the consent of the Indian mineral owner.

After considering the issue, the BIA has concluded that **designation of operators** should be filed with the Secretary, but approval by the Secretary will not be required because there is no transfer of any leasehold interest.

52 Fed. Reg. 39343. (emphasis added).

---

shall be construed as not modifying any of the obligations of the operator with the Indian mineral owner under the contract, the regulations in this part, and part 216 of this Title, including requirements for Departmental approval before abandonment. All such obligations are to remain in full force and effect, the same as if free of any such overriding royalties or payments. Such agreements shall be filed with the Secretary unless incorporated in assignments or instruments required to be field pursuant to paragraph (a) of this section.

52 Fed.Reg. 39351-39352.

34

The statement in the BIA commentary to proposed regulation 25 C.F.R. § 211.45 that "assignments of operating rights need not and will not be approved by the Secretary" is clear. However, it is insufficient to establish that the Secretary intended that the current regulation at issue, 25 C.F.R. § 211.53, excludes assignments of operating rights from the requirement to obtain the Secretary's approval.

Before the final regulations were published as a final rule in 1996, the regulations went through several revisions. The regulations that were first published as final regulations on August 24,1987 did not become effective. *See* 52 Fed.Reg. 39332[19] Instead, the BIA amended and republished the rules as proposed rules on October 24, 1987 with an opportunity for further comment in response to concerns raised by the public. *Id.*[20] Commentators found the October 24, 1987 proposed regulations "confusing and ambiguous." 61 Fed.Reg. 35635. As a result, the regulations were "entirely reformatted and revised" and published as proposed rules on November 21, 1991 with a 90-day public comment period ending February 19, 1992. *Id.* The public comment period for the November 21, 1991 proposed regulations was reopened on September 2, 1992 for an additional 60 day comment period. *Id.* In 1996, when the current regulations were published as final, the BIA stated that

> [t]he regulations are rewritten and restructured in response to the comments received during the comment periods of 1991 and 1992. Because of previous extensive reformatting and restructuring in response to comments received in 1987 (56 FR 58735) as well as to comments received in 1991 and 1992, the Department is of the opinion that a detailed review of comments received during a time interval of more than five years would be more confusing than helpful.

> 61 Fed.Reg. 35635-35636.

The 1996 commentary accompanying the regulation at issue, §211.53, states:

---

[19]"In response to concerns expressed by the public, the Bureau of Indian Affairs has decided to republish as a proposed rule, the rule published as final on August 24, 2987 (52 FR 31916). The rule will not become effective on October 24, 1987 as scheduled." 52 Fed.Reg. 39332.

[20]The commentary that Platinum relies upon relates to the October 24, 1987 republication of the proposed regulations.

Changes are made in this section to clarify that: (1) the Indian mineral owner must consent to assignment or transfer of approved leases or any interest therein if such approval of the Indian mineral owner is required in the lease; (2) even if such consent is not required the Secretary shall notify the Indian mineral owner of a proposed assignment; (3) agreements creating overriding royalties or payments out of production or agreements designating operators, although not requiring the approval of the Secretary, are required to be filed with the superintendent and do not relieve the lessee from obligations imposed by the MMS for reporting, accounting, and auditing; and (4) in response to comments, the proposed restrictions concerning assignment of partial interests and assignment of stratigraphic intervals are removed from the regulations.

61 Fed.Reg. 35637.

The BIA's 1996 responses to the public comments on the regulation state that

"[p]roposed § 211.53 is rewritten to be more nearly compatible with § 211.26 formerly in place

and retain the existing and widely understood concept of an assignment in current use with

respect to Indian mineral leases," and simply confirmed that the final regulations "provide for a

broad right of assignment of an approved lease for Indian owned minerals, so long as there is no

change in the material provisions of the lease." 61 Fed. Reg. 35649. Like § 211.53, former §

211.26 is divided into subparts (a), (b), (c) and (d).[21] Former § 211.26 specifies the types of

---

[21] Former 211.26 provided:

(a) Approved leases or any interest therein may be assigned or transferred only with the approval of the Secretary of the Interior, and to procure such approval the assignee must be qualified to hold such lease under existing rules and regulations and shall furnish a satisfactory bond conditioned for the faithful performance of the covenants and conditions thereof: *Provided*, That in order for such assignment to receive favorable consideration the lessee shall assign either his whole interest or an undivided interest in the whole lease.

(b) No lease or interest therein or the use of such lease shall be assigned, sublet, or transferred, directly or indirectly, by working or drilling contract, or otherwise, without the consent of the Secretary of the Interior.

(c) Assignments of leases, and stipulations modifying the terms of existing leases, which stipulations are also subject to the approval of the Secretary of the Interior, shall be filed with the superintendent within 30 days after the date of execution.

(d) Agreements creating overriding royalties or payments out of production on oil and gas leases shall not be considered as interests in the leases as such term is used in this section. Agreements creating overriding royalties or payments out of production are hereby authorized and the approval of the Department of the Interior or any agency thereof shall not be required with respect thereto, but such agreements shall be subject to the condition that nothing in any such agreement shall be construed as modifying any of the obligations of the lessee, including, but not limited to, obligations for diligent development and operation, protection against drainage, compliance with oil and gas operating regulations (30 CFR Part 221), and the requirement for departmental approval before abandonment of

36

transfers in subparts (a) and (b) that require the Secretary's approval using language similar to that in § 211.53. Proposed § 211.45, which was not adopted, was structured differently, used narrower language than that found in subpart (b) of § 211.53 regarding the types of transfers requiring the Secretary's approval, and did not apply to oil and gas leases. Like subpart (d) of §211.53, subpart (d) of former § 211.26 specifies that agreements creating overriding royalties or payments out of production are not considered interest in leases and do not require the Secretary's approval. However, former § 211.26, unlike §211.53, does not exclude "agreements designating operators" from the types of transfers for which the Secretary's approval is not required. Proposed § 211.45 contained no provisions similar to subpart (d) of either former § 211.26 or § 211.53.

The BIA's comments in 1996 regarding the restructuring and revisions of the proposed 1987 regulations generally, coupled with the language and structural differences between proposed § 211.45 (unadopted) and § 211.53 and the BIA comment that § 211.53 was rewritten to be more compatible with former § 211.26, cast substantial doubt on the efficacy of the BIA's comment in 1987 to proposed § 211.45 as applied to 25 C.F.R. § 211.53 (adopted in 1996). Nothing in the BIA's 1996 commentary regarding § 211.53 provides any clear guidance as to whether an assignment of operating rights requires the Secretary's approval, or whether the phrase, "agreements designating operators," ultimately used in the regulation, is intended to

_____

any well. All such obligations are to remain in full force and effect, the same as if free of any such royalties or payments. The existence of agreements creating overriding royalties or payments out of production, whether or not actually paid, shall not be considered as justification for the approval of abandonment of any well. Nothing in this paragraph revokes the requirement for approval of assignments and other instruments which is required in this section, but any overriding royalties or payments out of production created by the terms of such assignments or instruments shall be subject to the condition stated above. Agreements creating overriding royalties or payments out of production need not be filed with the Superintendent unless incorporated in assignments or instruments required to be filed pursuant to this section.
25 C.F.R. § 211.26 (1982).

include assignments of operating rights. The only BIA commentary that expressly references

assignments of operating rights relates to a regulation that was not adopted. In these

circumstances, the BIA's commentary to the unadopted regulation is insufficient to establish the

agency's interpretation of current regulation § 211.53 for purposes of discerning the current

regulation's meaning. *See Clay v. Johnson,* 264 F.3d 744, 750 (7th Cir. 2001)("'a proposed

regulation does not represent an agency's considered interpretation of its statute' and therefore is

not entitled to deference.")(quoting *Commodity Futures Trading Comm'n v. Schor,* 478 U.S.

833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)). Thus, the Court is not persuaded that the

commentary accompanying proposed regulation § 211.45 establishes the intended meaning of 25

C.F.R. § 211.53 applicable to oil and gas leases on Indian lands.

ii)    *Other evidence of agency interpretation*

When a regulation is silent or ambiguous, the Court may also look an agency's own

handbook interpreting the regulation in an effort to understand its meaning. *See Newton v.*

*Federal Aviation Admin.,* 457 F.3d at 1137 (finding that the court should give deference to an

agency's handbook interpreting a federal statute). However, the agency's interpretation must be

consistent with a permissible construction of the statute or regulation at issue. *Chevron, U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d

694 (1984)("[I]f the statute is silent or ambiguous with respect to the specific issue, the question

for the court is whether the agency's answer is based on a permissible construction of the

statute."). The Court may even consider an agency's position expressed in connection with

litigation as some evidence of the agency's interpretation of its own regulations. *See Talk*

*America, Inc. v. Michigan Bell Telephone Co.,* __ U.S. __, 131 S.Ct. 2254, 2261, 180 L.Ed.2d 96

(2011)(when a regulation is ambiguous, "we defer to an agency's interpretation of its

38

regulations, even in a legal brief, unless the interpretation is 'plainly erroneous or inconsistent with the regulation[s]' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'")(quoting *Auer v. Robbins,* 519 U.S. at 461, 462 (additional internal quotation marks and citation omitted). Here, the BIA/JAN Guidelines and the position of the DOI evidenced in an earlier brief provide some indication that the Secretary's approval of assignments of operating rights is required. *See* BIA/JAN Guidelines, p. 7 (outlining approval process for assignments of operating rights)[22]; DOI's Advisory Brief Regarding the Interaction of the Indian Mineral Leasing Act and the Bankruptcy Code, p. 8 (Docket No. 223)("Without the affirmative and written consent of the Secretary, the proposed transfer or assignment of operating rights ins ineffective . . .")(citation omitted). These positions are consistent with a permissible construction of the regulation. In addition, given that the DOI is not a party to the instant dispute, the Court need not heavily discount the DOI's litigation position as not reflecting the DOI's fair and considered judgment regarding what the regulation requires.

Conflicting evidence was offered with respect to whether the BIA's practice is to approve transfers of operating rights. Kurt Sandoval, the acting realty officer for the BIA in Dulce, New Mexico, testified that it is his understanding that a transfer of operating rights requires approval of the Secretary, though he is not involved in the disapproval or approval process for transfers and assignments of interest in oil and gas leases on the JAN's tribal land. The BIA currently uses separate forms for the assignment or transfer of record title, for assignments of operating rights, and for the designation of operators, but there is no evidence that the BIA used these forms during the relevant time period. Ross Swimmer, who served as assistant Secretary of

_____

[22]Platinum points out that the BIA Guidelines were not created until 2010. However, the BIA/JAN Guidelines documented existing procedures. *Testimony of Kurt Sandoval.*

Indian Affairs from 1985 to approximately January of 1989, suggested that, in his opinion, "operating rights, operators, and operating agreements, are generally used interchangeably in the Bureau, and that they're not an interest in the lease . . ." Swimmer Deposition, p. 82, lines 7 – 11. Such testimony could indicate that assignments of operating rights do not require the Secretary's approval. But because Mr. Swimmer was not responsible for administering 25 C.F.R. §211.53 during the relevant time period, and because he was not serving as assistant Secretary of Indian Affairs when the regulation was promulgated, his opinion testimony regarding the agency's interpretation and application of the regulation to the transfer at issue here must be discounted.

H. *The Cross Creek Decision*

Platinum also relies on a footnote in the *Cross Creek* decision indicating that BIA approval for transfers of operating rights is not required. In *Cross Creek,* Cross Creek Corporation ("Cross Creek"), the record title owner under an oil and gas lease, attempted to assign its record title interest in the lease to Dry Mesa Corporation ("Dry Mesa"), its designated operator. *Cross Creek,* 131 IBLA at 33. At that time, an assignment of record title required approval by the BIA under 25 C.F.R. § 211.26, the predecessor to 25 C.F.R. § 211.53. The BIA never approved the assignment to Dry Mesa, yet Dry Mesa operated the lease. The Interior Board of Land Appeals ("IBLA") determined that Cross Creek was responsible to plug and abandon the wells located on an Indian oil and gas lease because it was the record title owner under the lease notwithstanding its purported assignment of its record title interest to its designated operator. *Cross Creek,* 131 IBLA at 35 ("Absent BIA's approval of the assignment of record title . . . [Cross Creek] remained ultimately liable for compliance with the terms of the lease."). In reaching its conclusion, the IBLA noted that an "assignment of operating rights under a lease has long been distinguished from the assignment of record title to the lease," that

an assignment of record title, "unlike the assignment of operating rights, gives rise to a contractual relationship between the lessor and the lessee's assignee," and that, consequently, "the agency must affirmatively approve an assignment of record title." *Cross Creek*, 131 IBLA at 36 – 37 (citation omitted). *Cross Creek* noted in passing that the BIA and the BLM may recognize an assignment of operating rights, "even going so far as to 'approve' the assignment of operating rights," but observed further in a footnote, that "it appears that an assignment of operating rights does not require BIA approval." *Id.* at 36 and n. 10 (referencing a letter from BIA dated Sept. 30, 1988 stating that "as of August 1987, it will no longer process assignments of operating rights.").

The guidance offered by *Cross Creek* is insufficient to establish whether 25 C.F.R. § 211.53 requires the Secretary's approval of a transfer of operating rights. *Cross Creek* was concerned with the continuing liability of the record title holder to the Indian mineral owner— not the liability of the holder of operating rights. The IBLA's observation that it "appears" that an assignment of operating rights does not require the Secretary's approval was, therefore, not essential to its decision. Further, in concluding that Cross Creek remained liable because of its status as record title holder, it cited 43 C.F.R. § 3106.7-2, applicable to leases under the Mineral Leasing Act, not the IMLA. That regulation recognizes that both a record title holder *and* a holder of operating rights are responsible until the BLM approves an assignment. *See* 43 C.F.R. § 3106.7-2 ("You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights."). *Cross Creek* confirms what the parties here do not dispute: a transfer of record title requires approval by the Secretary. It does not establish whether an operating right constitutes an interest in a lease which would require the Secretary's approval under 25 U.S.C. §211.53.

CONCLUSION

The language of 25 C.F.R. § 211.53, though not a model of clarity, provides that a transfer of operating rights requires the Secretary's approval, either because operating rights constitute an interest in an oil and gas lease subject to the Secretary's approval under subsection (a) of 25 C.F.R. § 211.53, or because a transfer of operating rights constitutes a direct or indirect assignment or sublease of an interest in or the use of a lease, by working or drilling contract or otherwise, subject to the Secretary's approval under subsection (b) of the regulation. The exception in subsection (d), which provides that agreements designating operators do not require the Secretary's approval, does not except the transfer of operating rights from the approval requirement. Neither the extrinsic evidence in the form of agency commentary during the rulemaking process, nor the inconsistent testimony from BIA representatives, nor the *Cross Creek* decision offered by Platinum in support of its position, are sufficient to overcome the Court's construction of the regulation consistent with the definitions and requirements under the neighboring regulations promulgated under the MLA applicable to oil and gas leases on non-Indian federal lands as well as the conditions contained in the Oil and Gas Leases themselves. Based on the foregoing, the Court concludes that the transfer of an operating right, as opposed to a designation of operator, requires the Secretary's approval under 25 C.F.R. § 211.53. Platinum did not obtain the Secretary's approval of the transfer of operating rights; consequently, Platinum holds no interest in the Oil and Gas Leases. Because the Court concludes that the Secretary's approval of a transfer of operating rights is required under 25 C.F.R. § 211.53, the Court does not reach the question of whether the JAN's approval is also required.

The Court will enter a separate judgment on the threshold issue consistent with this

Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  November 26, 2013

COPY TO:

Roger Jones
Austin L. McMullen
Bradley Arant Boult Cummings LLP
Attorneys for Platinum Oil Properties, LLC
1600 Division St, STE 700
Nashville, TN 37203

Robert J. Labate
Malcolm H. Brooks
Richard Bixter
Holland & Knight LLP
Attorneys for Jicarilla Apache Nation
131 S Dearborn 30th Floor
Chicago, IL 60603

APPENDIX A

1.      On March 2, 2009, Platinum filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Court for the District of New Mexico. *See* Docket No. 1.

2.      The Nation is a federally recognized Indian Tribe organized under the Indian Reorganization Act of 1934 located on a reservation in northwestern New Mexico.

3.      On March 19, 1992, Chace Oil Company, Inc. ("Chace") and Golden Oil Company, a Delaware corporation ("Golden Oil"), among others, executed an Assignment, Bill of Sale and Conveyance under which Chace purported to assign and convey to Golden Oil, all of Chace's operating rights, leasehold interests and other ownership interests in certain leases under which the Nation was the lessor (the "Jicarilla Leases"), including but not limited to leases commonly known as Jicarilla Lease No. 71 and Jicarilla Lease No. 363 (individually, Jicarilla Lease No. 71 and Jicarilla Lease No. 363; and together Jicarilla Lease Nos. 71 and 363). *See* Myore Deposition at pp. 42-44; Sandoval Deposition at pp. 130 and Exhibit 24 thereto); *see also* The Nation's Objection to Motion to Assume (Platinum Oil Docket No. 18), ¶¶ 4 and 5.

4.      A defect in the transfer of title by Chace to Golden Oil of Chace's interest in Jicarilla Lease Nos. 71 and 363 resulted in a failure to complete and perfect the transfer. *See* Settlement Agreement between Golden Oil Company and McKay-Lotspeich Group, ¶ 16; Third Amended and Restated Joint Plan, ¶7.2.

5.      Jicarilla Lease Nos. 71 and 363 contain no express provision requiring approval by the Nation of a transfer of Jicarilla Lease Nos. 71 and 363 or any interest in those leases. *See* Jicarilla Lease No. 71, including ¶ 3(h) of the Lease – Deposition of Kurt Sandoval ("Sandoval Deposition"), Exhibit 20; and Jicarilla Lease No. 363, including ¶ 3(h) thereto - Sandoval Deposition, Exhibit 19. Jicarilla Lease Nos. 71 and 363 do not by their express terms incorporate existing and future regulations of the DOI and do not incorporate existing or future laws or regulations of the Nation. *See* Jicarilla Lease No. 71, including ¶ 3(g) of the Lease - Sandoval Deposition, Exhibit 20; and Jicarilla Lease No. 363, including ¶ 3(g) thereto - Sandoval Deposition, Exhibit 19.

7.      On May 12, 2003, Golden Oil filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Case No. 03-36974 (the "Golden Bankruptcy Case"). *See* Golden Oil Bankruptcy Docket (Notice of Filing, Exhibit 1); Sandoval Deposition, Exhibit 31.

8.      On October 22, 2003, the DOI, through the Bureau of Indian Affairs, filed a Proof of Claim in the Golden Bankruptcy Case (the "DOI Proof of Claim"). *See* Notice of Filing, Exhibit 22. The DOI Proof of Claim stated, in part, that to the extent it is determined that plugging and abandonment liabilities of Golden Oil under Jicarilla Lease Nos. 71 and 363 are "claims" in the Golden Bankruptcy Case, claims for such plugging and abandonment liabilities were made. *See* Golden Oil Bankruptcy Case, Claim No. 62 (Notice of Filing, Exhibit 22). The DOI Proof of Claim further stated, in part, that "[t]he Debtor [referring to Golden Oil] is a lessee and the Jicarilla Apache Nation (Nation) is the lessor of the oil and gas leases listed about [which include Jicarilla Lease Nos. 71 and 363] which were all approved by the BIA pursuant to 25 U.S.C. § 396a, *et seq.* (the Indian Mineral Leasing Act)." *Id.*

-5-

9. A Second Amended and Restated Joint Disclosure Statement was filed in the Golden Oil Bankruptcy on March 22, 2004. *See* Golden Oil Bankruptcy, Docket No. 203 (Notice of Filing, Exhibits 1 and 3).

10. The DOI filed an objection in the Golden Oil Bankruptcy Case to the Second Amended and Restated Joint Disclosure Statement (the "DOI Disclosure Statement Objection"). *See* Golden Oil Bankruptcy, Docket No. 216 (Notice of Filing, Exhibit 4). In the DOI Disclosure Statement Objection, the DOI stated:

> Debtor [referring to Golden Oil] is the owner of operating rights and is the operator of oil and gas wells on eight oil and gas leases issued by the Secretary of Interior for the Jicarilla Apache Nation ("Nation") in the 1950s. See Exhibit 1 (Original Lease Tract No. 95); Disclosure Statement at § 3.2.1.

> *Id.* at p. 1. The eight leases in question include Jicarilla Lease Nos. 71 and 363. See Golden Oil Bankruptcy, Docket No. 203, § 3.2.1 and Exhibit 3.4.3.2 (Notice of Filing, Exhibit 3).

11. Golden Oil entered into a Settlement Agreement dated March 17, 2004 (the "Settlement Agreement"), with a group of thirty-six (36) individuals or entities referred to in the Settlement Agreement as the "McKay-Lotspeich-Group" (herein, "MLG"). *See* Golden Oil Bankruptcy, Docket No. 311; Exhibit B (Notice of Filing, Exhibit 11); Sandoval Deposition, Exhibit 30; Nation's Memorandum of Law (Platinum Oil Docket No. 104), Exhibit C; Exhibit A to Debtor's Motion to Approve Compromise filed in the Golden Oil Case, Exhibit 11.

12. The Settlement Agreement describes the members of MLG as a "group of limited partners and working interest owners." *See* Settlement Agreement, second recital. The Settlement Agreement also describes the members of MLG as "including individuals, corporations, partners and other interest owners represented by the law firm of Dolan & Domenici, PC ...", both individually and in any other capacities, including as former or current officers, directors, joint venturers, shareholders or control person ... of Chace Oil Company, Ltd., Golden Oil Company ...." *See* Settlement Agreement, ¶ 1.

13. The Settlement Agreement provided the liabilities MLG would assume as transferee of assets that included the Operating Rights and Working Interests would be limited to royalties and taxes in specified dollar amounts and plug and abandonment liabilities. Settlement Agreement ¶¶ 3a and 11.

14. The Settlement Agreement provided, among other things, for the assignment of the operating rights and other interests Jicarilla Lease Nos. 71 and 363 by Golden Oil to MLG. *See* attachment to Motion to Approve Compromise, Exhibit 11. The Settlement Agreement further provided for the termination of certain unspecified partnerships "to fully effectuate the separation and divorce of ownership interest and operations as intended under this Agreement ...." Settlement Agreement, ¶ 7(b).

15. The Nation and certain agencies of the United States were given notice of the motion to approve the Settlement Agreement in the Golden Bankruptcy Case. See Certificate of Service attached to Debtor's Motion to Approve Compromise, Exhibit 11.

16. On July 10, 2004, the Bankruptcy Court entered an order approving the Settlement Agreement in the Golden Oil Bankruptcy Case (the "Order Approving Settlement Agreement"). See Exhibit 13 and Exhibit 1, Docket No. 361.

17. Notice of the Order Approving Settlement Agreement was given to the Nation and to the United States of America/Bureau of Indian Affairs. See Exhibit 14, Certificate of Service.

18. On March 30, 2004, Platinum was organized as a New Mexico limited liability company. See Nation's Statement of Uncontested Fact (Platinum Oil Docket No. 104) at ¶ 9.

19. MLG formed Platinum to own and operate certain rights under certain Jicarilla Leases, including Jicarilla Lease Nos. 71 and 363. See Motion to Enforce Compromise and Amended Stipulated Order on MLG's Motion to Enforce Compromise filed in the Golden Bankruptcy Case (Notice of Filing, Exhibits 17 and 20); Letter from Pete V. Domenici Jr. (then counsel for MLG and Platinum) to Naomi Barnes (then counsel for the Nation), dated August 24, 2004; Golden Oil Bankruptcy Docket Nos. 466, 501, and 543 (Notice of Filing, Exhibits 17, 18 and 20); Sandoval Deposition, Exhibit 34; Deposition of David Lionette ("Lionette Deposition") at p. 23.

20. Sagebrush Holdings/O&G, LLC ("Sagebrush") now owns one hundred percent of Platinum's capital stock. See the Nation's Statement of Uncontested Facts (Platinum Oil Docket No. 104) ¶ 11.

21. Sagebrush is owned by FRI Holding, which is a collection of investment funds solely managed by Madison Capital Company, LLC. See Lionette Deposition at p. 131 (Notice of Filing, Exhibit 25).

22. A Third Amended and Restated Joint Disclosure Statement (the "Golden Oil Disclosure Statement") was filed in the Golden Bankruptcy case on April 22, 2004. (Notice of Filing, Exhibit 1, Golden Oil Docket No. 223 and Exhibit 5). On April 23, 2004 an order was entered approving the Golden Oil Disclosure Statement. (Notice of Filing, Exhibit 1, Golden Oil Docket No. 226). A copy of the order approving the Golden Oil Disclosure Statement was served on the Nation on April 26, 2004. See Certificate of Service attached to Exhibit 8.

23. In the Golden Oil Disclosure Statement, there is a disclosure that Golden Oil and the other plan proponents, on the one hand, and the Bureau of Indian Affairs and the Nation, on the other, dispute whether the transfers contemplated by the plan require the approval of the Bureau of Indian Affairs and the Nation. See Golden Oil Disclosure Statement, ¶ 10.5.2, Exhibit 3.

24. The Golden Oil Disclosure Statement further provides, in part:

-7-

The Debtor or Reorganized Debtor may sign the documents necessary to effectuate the transfer of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist. This was a contentious issue that had been the subject of significant litigation. The Debtor and Reorganized Debtor shall incur no liability for signing these required forms, or actions taken in reliance thereof. The forms are required by the Jicarilla Apache Nation, the Bureau of Indian Affairs, and have little or no effect, other than to change the official status of the lessee on the leases formerly operated by Chace. The United States of America, Department of the Interior, Bureau of Indian Affairs has objected to this procedure because they believe that the Jicarilla Apache Nation may require a specific individual to make representations notwithstanding the decree of a Federal Court. The Jicarilla Apache Nation has not specifically appeared in this case. The Debtor's position is that the lease transfer document is a mere formality and does not create substantive rights not otherwise existing under applicable law (including tribal law).

Golden Oil Disclosure Statement § 10.5.3.

25. The Third Amended Plan ("Golden Oil Plan") was filed in the Golden Bankruptcy Case on April 23, 2004. *See* Golden Oil Bankruptcy Case Docket No. 224, Exhibit 1.

26. The Golden Oil Plan provides, in part:

(a) "MLG is defined to mean and include certain persons, including individuals, corporations, partners and other interest owners, represented by the law firm of Doan & Domenici PC as detailed in a certain letter." *See* ¶¶ 1.30., 5.5.1.[3]

(b) "Settlement Agreement refers to the Settlement Agreement described n paragraph 11 [of the plan]." ¶ 1.43.

(c) "MLG shall receive the benefit of the Settlement Agreement, the respective interest in the 71 and 363 leases described therein, and the liabilities associated therewith." ¶ 5.5.1.

(d) "**Compromise Terms**. The Debtor's compromise with MLG is approved upon entry of the final order confirming the Plan. The compromise h MLG is complex, however its general terms are that the Debtor will convey both the assets and the limited liabilities (set

---

[3] Exhibit A to the Debtor's Motion to Approve Compromise with MLG filed in the Golden Bankruptcy is a list of the members of MLG. Exhibit B to Exhibit 11. The members of MLG on the list consist of 35 individuals and one trust. Id. Platinum asserts that the individuals included in MLG were limited partners of limited partnerships of which Golden Oil was the general partner and individuals that owned working interest in Jicarilla leases, including Lease Nos. 71 and 363. Platinum Brief at 7, Docket No. 195.

forth below) relating to working interests in all wells on the 71 and 363 leases (except for five wells on the 71 lease being worked-over).... MLG shall obtain the Section 71 Lease subject only to prepetition royalty payments of $95,958, prepetition state taxes of $27,815, and plug and abandonment liabilities.... MLG shall obtain the Section 363 Lease subject only to prepetition royalty payments of $-0-, prepetition state taxes of $-0-, and plug and abandonment liabilities...." Golden Oil Plan, ¶7.1.

(e)　"**Authority to Sign Title Transfer Documents on Behalf of Chace**. On the date the Confirmation Order is entered, the Debtor or Reorganized Debtor may sign the documents necessary to effectuate the transfer of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, even though Chace Oil Company may no longer exist. The Debtor and Reorganized Debtor shall incur no liability for signing these required forms, or actions taken in reliance thereof." Golden Oil Plan, ¶ 7.2

(f)　"**Additional Releases**. On the Effective Date, McElvenny, the Debtor and MLG shall be forever released and discharged from [certain described liabilities], except for obligations maintained between the Debtor and MLG by the Settlement. Any liability to MLG from GOCO [referring to Golden Oil] or any third party is limited to prepetition royalty payments and prepetition state taxes as set further above. These claims shall be non-recourse to MLG except as against right, title and interest to post June 30, 2004 revenues associated with the operation of rights, title and interest in Section 71 and Section 363 Leases...." Golden Oil Plan, ¶ 7.3.

(g)　"**Relation to other Creditors**. MLG and GOCO shall cooperate to obtain a lease assignment and approval of MLG as operator of the Section 71 and 363 Leases for the Jicarilla's, and to reduce any and all claims on behalf of MMS, Jicarilla and other governmental agencies against GOCO. NO [sic] claims of MMS, Jicarilla and other governmental agencies shall survive against MLG or the MLG interests described in Section 10.5 except as set forth herein." Golden Oil Plan, ¶ 7.4.

(h)　"**MMS; New Mexico Energy, Minerals, and Natural Resources, and BIA Claims**. The Debtor does not intend to pay the protective claims filed by the New Mexico Oil Conservation Division (#65, 66), the MMS (Claim #22m 63) and the BIA. These claims are mostly for estimated future plugging costs and will specifically except them from discharge if needed. Likewise the MMS claim is based upon alleged royalties owed in 1984-1995, not assessed on the amounts actually paid for hydrocarbons, but by some other formula. The MMS claim is also barred by limitations...." Golden Oil Plan, ¶ 10.5.

(i)　"**Jicarilla Release**. The Jicarilla Indian Nation has previously assessed clean-up costs for non-hazardous waste removal to clean up waste buried by Chace Oil, the previous lessee. The Debtor does not own the wells, it merely operates them or has a farmout agreement. Accordingly, the Debtor and its affiliates do not believe they have an obligation for similar cleanups. Accordingly, the Debtor and its Affiliates and Insiders are released and discharged for any liability to the Jicarilla Indian Nation remove buried waste at the wells operated by the Debtor, unless placed there by the Debtor." Golden Oil Plan, ¶ 14.3.

-9-

27.     The DOI filed an objection in the Golden Oil Bankruptcy Case to the Golden Oil Plan (the "DOI Original Plan Objection"). Exhibit 9. In the objection, the DOI asserted, among other things:

(a)     "Under 25 C.F.R. § 211.53(a), (b) (2003) a lease or any interest in Indian land may be assigned or transferred only with the approval of the Secretary of the Interior, that the consent of the Indian mineral owner is required prior to the assignment or transfer of a lease or any lease interest, and that the Secretary cannot compel the Nation to approve the assignments contemplated by the settlement and plan." DOI Original Plan Objection, ¶ 2.

(b)     "The assignee of lease interests from Chace to Golden oil, and the subsequent assignment of Golden Oil's interests to MLG, are rendered ineffectual by the failure to obtain the approval of the Secretary of the Interior." *Id.* at ¶ 4.

(c)     "The completed discharge in the plan of Golden Oil's and MLG's liability for clean-up costs for non-hazardous waste removal buried by previous lessees violates the provisions of 25 C.F.R. § 211.53(c)." Id at ¶ 5.

28.     The DOI subsequently filed an Amended Objection to the Golden Oil Plan (the "DOI Amended Plan Objection"). Exhibit 10. The DOI Amended Plan Objection states, in part: "The United States (BIA) previously filed an objection to confirmation. After discussions with the plan proponents, the United States has resolved all issues regarding approval of the Indian mineral owner, bonding and submission documents required by federal regulations." DOI Amended Plan Objection, ¶ 1. "The United States only remaining objection is to the Release of unknown liabilities of the Debtor for removal of non-hazardous waste buried by the previous lessee on the lands of the Jicarilla Apache Nation." *Id.* at ¶ 2.

29.     A proposed order confirming the Golden Oil Plan was submitted to the Bankruptcy Court in the Golden Oil Case approved by, among others, counsel for the Bureau of Indian Affairs (the "Proposed Golden Confirmation Order"). Exhibit 12.

30.     An order confirming the Golden Oil Plan ("Golden Confirmation Order") was entered in the Golden Bankruptcy Case on October 6, 2004. *See* Golden Oil Bankruptcy Case Docket No. 399, Exhibit 1.

31.     The Proposed Confirmation Order was substantially similar to the Golden Confirmation Order entered October 6, 2004 in the Golden Oil Case confirming the Golden Oil Plan. Compare Exhibits 12 and 15. Both the Proposed Golden Confirmation Order and the entered Golden Confirmation Order contained the following provisions, among others:

(a)     "Doc. #250 filed by the United States of America on behalf of the Bureau of Indian Affairs ("BIA") The objection has been resolved and the claim for plugging and abandonment filed by the BIA will be withdrawn in view of the following: (i) the Debtor has a bond; (ii) the Debtor agrees to comply with the provisions of 25 C.F.R. § 211.23; (iii) the Debtor's agreement to escrow funds for plugging and abandonment costs as provided for in the

-10-

Plan Modifications; (iv) the Debtor's acknowledgement as set forth in paragraph 40 of this Order that environmental liabilities are being excluded from discharge; and (v) the Debtor does not seek discharge of liabilities for plugging and abandonment of wells it operates." ¶ 13.b

(b)    "The Court finds that the Debtor is the owner and operator of the wells contained on the lands of the Jicarilla Apache Nation located in the State of New Mexico which are the subject of agreements being assumed pursuant to the terms of the Plan." ¶ 15.

(c)    "Any liability to MLG from GOCO or any third party is limited to prepetition royalty payments and prepetition state taxes as set forth above as well as in the Plan and the settlement. These claims shall be non-recourse to MLG except as against right, title and interest to post June 30, 2004 revenues associated with the operation of rights, title and interest in Section 71 and Section 363 Leases." ¶ 30.

(d)    "MLG shall be allowed to request assistance of this Court to finalize, effectuate or obtain approval of any assignments or transfers required by the Plan or settlement. Approval of assignment or transfer shall not be unreasonably withheld by any Creditor or third party.  On the later of the Effective Date or June 30, 2004, all rights, title and interest in the Section 71 and Section 363 leases (except for five wells on the 71 lease being worked-over, which will be transferred after collection of allowable charges for work over), shall be transferred to MLG. If the transfer cannot legally take place on the later of the Effective Date or June 30, 2004, then MLG shall be entitled to a transfer of all equitable interest in  and to the Section 71 and Section 363 Leases (except for five wells … ). This equitable transfer shall mean that MLG shall have the rights to all income produced form said Leases net of any current royalties and taxes and the proportionate share of past due royalties payable under this Plan as well as Lease operating expense, equal to direct will expenses paid to third parties and a $300 per operating well operational fee." ¶ 30.

(e)    "The Debtor is authorized to execute all documents under the confirmed Plan as may be necessary, required or appropriate to carry out the provisions of the confirmed Plan including the documents necessary to effectuate the transfer of legal title of assets under the 1991 asset purchase agreement between Chace and the Debtor, specifically including forms required by the Jicarilla Apache Nation, and the costs necessary to transfer assets to the MLG group in accordance with Article 7 of the plan." ¶ 34

32.    Notice of the entered Golden Confirmation Order was given to the Nation and to the United States of America/Bureau of Indian Affairs. *See* the Certificate of Service that is part of Exhibit 16.

33.    MLG informed the Nation by a letter from Pete V. Domenici Jr. (then counsel for MLG and Platinum) to Naomi Barnes (then counsel for the Nation), dated August 24, 2004, that MLG and Platinum contemplated a transfer of the rights under Jicarilla Lease Nos. 71 and 363 to Platinum pursuant to the Settlement Agreement and Golden Oil Plan.  Sandoval Deposition, Exhibit 34.

-11-

34.    Neither the Settlement Agreement, Golden Oil Disclosure Statement, Golden Oil Plan, nor the Golden Confirmation Order mentions or refers to Platinum, expressly approves the transfer of any assets to MLG's designee, or indicates that MLG intends to form an entity to take title to any assets. *See* Exhibits 5, 6, 11 and 15.

35.    On January 4, 2005, the Nation granted Platinum an Oil & Gas Operating Permit on the Jicarilla Apache Reservation for a term of one year. Sandoval Deposition, Exhibit 18. Platinum provided the Nation with a certificate of liability insurance. *Id.*

36.    Golden Oil, Platinum and MLG executed and recorded a Quitclaim Assignment and Bill of Sale, effective April 1, 2005, that included the conveyance of the Operating Rights and Working Interests from Golden Oil to Platinum. Sandoval Deposition Exhibit 22.

37.    On February 3, 2005, MLG filed a motion in the Golden Oil Bankruptcy Case to compel compliance with the terms of the Settlement Agreement (the "Motion to Enforce"). *See* Golden Oil Bankruptcy Docket No. 466, Exhibit 1; and Exhibit 17). The Motion to Enforce recites that MLG formed Platinum to hold all of its interests. *Id.*

38.    Neither the DOI nor the Nation filed an objection to the Motion to Enforce. *See* Golden Oil Docket, Exhibit 1.

39.    The Court in the Golden Bankruptcy Case entered an amended stipulated order resulting from the Motion to Enforce, approved by Golden Oil and by MLG and Platinum, by their respective counsel. Exhibit 20. The findings contained in the order regarding the interests of Platinum in the Jicarilla Lease Nos. 71 and 363 are findings regarding the agreement of the parties approving the order and not findings regarding MLG's and Platinum's actual interests in the Jicarilla Lease Nos. 71 and 363. *Id.* The order further provides, in part: "This order affects only the relationship between the parties [to the stipulated order] and does not otherwise modify any previous order by the court." *Id.*

40.    By a letter dated August 13, 2007 from counsel for the Nation to counsel for Golden Oil, with a copy to counsel for Platinum and MLG, the Nation required Golden Oil to execute certain assignment documents to complete the earlier purported assignment from Chace to Golden Oil, and required Golden Oil and Platinum to execute certain documents to effectuate the assignments from Golden Oil to Platinum of, among other things, interests in Jicarilla Lease Nos. 71 and 363. See Sandoval Deposition, Exhibit 36. The letter states that the transfers will be made pursuant to the Settlement Agreement between the MLG Group and Golden Oil, and refers to the Golden Oil Bankruptcy Case. *Id.*

41.    The documents included with the August 13, 2007 letter from counsel for the Nation, prepared for execution by Platinum, designated Platinum as assignee of certain working interests in Jicarilla Lease Nos. 71 and 363, among other interests. The documents contained an Acceptance and Assumption by Assignee that included the following language:

-12-

Assignee hereby assumes full liability under the lease from its inception as to the assigned interest and assumes all obligations of Assignor related to the assigned interest in such lease, rules and regulations and agrees to pay to the Jicarilla apache Nation all rental, royalty, other lease payments and/or taxes due the nation for any oil or gas produced under said lease from the interest assigned herein, accruing prior to or subsequent to the date of approval of this assignment.

Sandoval Deposition, Exhibit 36.

42.     MLG and Platinum, as seller, and Star Acquisition VII LLC ("Star"), as buyer, entered into a Purchase and Sale Agreement (the "Purchase and Sale Agreement") dated June 20, 2005. In connection with the Purchase and Sale Agreement, MLG and Platinum, as assignor, and Star, as assignee, executed an Assignment and Bill of Sale dated June 23, 2005, and a Corrective Assignment and Bill of Sale dated July 7, 2005. *See* Exhibits A, B, and C to Lionette Affidavit – Exhibit 32;  Lionette Deposition, Exhibit 67;  Nation's Statement of Uncontested Facts, ¶ 38, Docket No. 104-1.

43.     The assets to be transferred by Platinum and MLG to Star under the Purchase and Sale Agreement included "the oil and gas leasehold interests and working interests in the oil and gas leases described on <u>Exhibit A</u> [to the Purchase and Sale Agreement]" which included all oil and leasehold interests and working interests in Jicarilla Lease Nos. 71 and 363. *See* Purchase and Sale Agreement, Article I, Definition of Properties and ¶ 2.1.

44.     The Corrective Bill of Sale incorporated by reference the terms of the Purchase and Sale Agreement, and provided that if there is conflict between the terms of the Purchase and Sale Agreement and the Corrective Bill of Sale, the provisions of the Purchase and Sale Agreement would control.  Corrective Bill of Sale, ¶4.

45.     The Purchase and Sale Agreement includes the following provisions:

(a)     "Seller is not required to make any filing with or obtain any authorization, consent or approval of any government or governmental agency or Third Party in order for the parties to consummate the transactions contemplated by this Agreement." ¶9.5.

(b)     "Unless waived by the buyer, it is a condition of the obligation of the buyer to close that all representations of seller contained in the Agreement "shall be true and correct in all material respects at and as of Closing…." ¶ 12.2a.

(c)     "Unless waived, it is a condition to the obligation of either party to close that "all material consents and approvals, if any, whether required contractually or by applicable federal, state, local or tribal Law, or otherwise necessary for the execution, delivery and performance of this agreement by a party … shall have been obtained and delivered to the other party by the Closing and shall not been withdrawn or revoked." ¶ 12.3b.

(d)     "It is understood that at Closing, Seller may not have record title to all of the Properties, and may not have all necessary approvals (including tribal approvals and

-13-

approvals of the Bureau of Indian Affairs (BIA) for its title in and to the Properties. Seller covenants with buyer that upon Closing, Seller will use its best efforts and diligence, at Seller's expense, to cause title to the Properties to be fully vested in Buyer, with all necessary tribal and BIA approvals, together with any approvals required by the Bankruptcy Court in connection with the Bankruptcy Case. From time to time, Seller shall execute and deliver all instruments necessary or desirable to vest Buyer in complete title to the Properties." ¶ 14.4a.

(e) "Until Seller has caused complete title to the Properties to be vested in Buyer, with all necessary approvals, the parties agree that Seller shall remain the designated "operator" of the Properties, and Buyer will cause the actual operations thereof as a subcontractor operator to Seller. From and after Closing, as between Sellers and Buyer, Buyer shall have the exclusive authority and control of all operations of the Properties." ¶ 14.4b.

(f) "Concurrently with the delivery by Seller to Buyer of all executed instruments necessary or desirable to vest Buyer in complete title to the Properties . . .

46. The Nation did not approve the assignment of property or interests in Jicarilla Lease Nos. 71 and 363 by Platinum and MLG to Star under the Purchase and Sale Agreement. Sandoval Deposition at pp. 86-88; Nation's Statement of Uncontested Facts, ¶ 42, Docket No. 104-1; Deposition of Manuel Myore ("Myore Deposition") at p. 16.

47. The DOI did not approve the assignment of property or interests in Jicarilla Lease Nos. 71 and 363 by Platinum and MLG to Star under the Purchase and Sale Agreement Nation's Statement of Uncontested Facts, ¶ 42, Docket No. 104-1.

48. Mr. Sandoval, the Nation's Rule 30(b)(6) witness, testified at his deposition that it was his understanding that since the Nation and BIA did not approve the assignment from Platinum to Star the assignment was ineffective to transfer ownership. Sandoval Deposition at pp. 86-87.

49. Mr. Myore, a realty officer for the Bureau of Indian Affairs, testified that if the BIA does not approve an assignment of operating rights under an oil and gas lease the assignment is not effective. Myore Deposition at p. 16.

50. Tract Notes on the Nation's Lease Data Sheets for Jicarilla Lease Nos. 71 and 363 state in part:

Star Acquisition was assigned the Operating Rights held by MLG and Platinum. This Assignment has not been presented or approved by the JAN and the BIA.

Unapproved Assignment of 100% Operating Rights from Chace into Golden Oil Company. Subsequently Golden Oil Company and McKay, Lotspeich (successor to Chace Oil Company) entered into a Settlement Agreement 3/17/2005, affirmed by the Bankruptcy Court that "from and after the effective date" gives MLG and their SUCCESSOR Platinum Oil LLC the right to Operate and the ownership of any interests that were obtained by Golden Oil Company (including the wells on

-14-

these leases). There has never been an approval of the interest from Chace to Golden.... Chace Oil Company, Inc. remains that last entity approved as having Operating Rights on this lease. An assignment of interest in this lease is unnecessary and no such Assignment from Golden to Chace or a successor entity since the time of the Agreement providing for the ownership and operation on this lease. Under the terms of the bankruptcy Platinum's interest was also confirmed by the Bankruptcy Court. This Assignment of Operating Rights has not been submitted or approved by the JAN or BIA.

Sandoval Deposition Exhibit 5.

51.     On June 24, 2008, the Nation's Legislative Council passed a resolution reflecting the transfer as a result of the Golden Oil Bankruptcy Case of the Leasehold Interests from Chace Oil Company to Golden Oil, From Golden Oil to MLG and from MLG to Platinum. Sandoval Deposition, Exhibit 40; Jones Affidavit, Exhibit A.

52.     On December 17, 2007, the Mining Minerals Service issued an Order to Report to Golden Oil ordering Golden Oil to submit certain Oil and Gas Operations Reports ("OGORs") for Lease Nos. 71 and 363. Margaret Louise Williams Deposition Exhibit 1. Golden Oil filed an appeal of the MMS Order to Report. Margaret Louise Williams Deposition Exhibit 2. The MMS issued a decision in the appeal that the "OGOR reporting requirement for the wells on Jicarilla 71 and 363 were the responsibly of Platinum Oil Properties, LLC for the production months [in question], and that "MMS agrees that Platinum Oil Properties, LLC is the responsible operator to report the OGORs." Docket No. 194-95, page 15 of 16.